## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

**ARI TEMAN,**

Plaintiff,

-vs-

**NOAM BIALE, PAUL ADAM ENGLEMAYER, SHER TREMONTE, LLP, JUSTINE HARRIS, MARGARET GRAHAM, JACOB GUTWILIG, KEDAR BHATIA, EDWARD IMPERATORE, THE UNITED STATES ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF NEW YORK (THE UNITED STATES DEPARTMENT OF JUSTICE), DOES 1-10, individuals, and DOES 11-20, organizations (corporations),**

Defendants.

**Case No.: 25-_____[TO BE ASSIGNED]**

**INDIVIDUAL COMPLAINT**

**CIVIL RIGHTS (1983)**

---

# INTRODUCTION

1. This action is initiated by Ari Teman, an individual seeking redress for the profound injustices inflicted upon him through the unethical, conflict-ridden conduct of Sher Tremonte, LLP, its partner Justine Harris, and its senior associate Noam Biale, who were retained to represent Teman in post-conviction proceedings following his wrongful conviction for employing remotely created checks (RCCs) as expressly permitted by

1

the Terms and Conditions of his innovative company, GateGuard, Inc., a leader in AI-enabled virtual intercom technology.

2.  The complaint also targets the extrajudicial misconduct of Judge Paul Adam Engelmayer -- who is currently facing multiple Articles of Impeachment "for high crimes and misdemeanors,"[1] filed by multiple members of Congress, who actively facilitated the concealment of a significant conflict of interest stemming from Biale's marriage to Assistant United States Attorney Margaret Graham, a conflict that compromised Teman's representation and was similarly undisclosed in other cases, such as *Walsh v. United States*, 17 CV 6651 (LAP), as evidenced by a transcript documenting Sher Tremonte testimony against their own client (Exhibit B).

3.  Teman's grievances encompass Engelmayer's defamatory and religiously motivated hate speech, which falsely asserted that Teman exploited Orthodox Jewish clients by timing RCC transactions to coincide with Passover, relying on fabricated Jewish laws that contravene established religious doctrine. This misconduct, vehemently condemned by 24 ordained rabbis in a letter filed at Docket 326-1 in *United States v. Teman* Assistant United States Attorneys Jacob Gutwillig, Kedar Bhatia, and Edward Imperatore (former), former U.S. Attorney Damian Williams, current Assistant United States Attorney Rebecca Mermelstein, and the (Exhibit A), constitutes a violation of Teman's First Amendment rights and falls outside the scope of judicial authority, as secular courts are prohibited from legislating or interpreting religious doctrine under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732 (S.D.N.Y. 2014). The government, through United States Attorney's Office for the Southern District of New York (SDNY AO), further exacerbated this violation by endorsing and reiterating these false religious claims in a manner that exceeded their prosecutorial authority. They did so being coached *ex parte* by Engelmayer regularly in calls he admits to making (*US v Teman, Docket 321-1*). These calls put the "thumb on the scale" against defendants and support an active and ongoing conspiracy to deprive defendants of their civil rights -- and even their liberty -- for the personal profits and career advancement of the conspirators.

---

[1] H.Res.143 — 119th Congress (2025-2026), https://www.congress.gov/bill/119th-congress/house-resolution/143/text
H.Res.145 — 119th Congress (2025-2026) https://www.congress.gov/119/bills/hres145/BILLS-119hres145ih.pdf

4. Sher Tremonte, Harris, and Biale were engaged to investigate prosecutorial misconduct in a case that improperly criminalized a civil dispute[2], yet they failed to disclose Biale's marriage to Graham, with whom he shared a confined workspace during the Covid-19 lockdown, thereby compromising privileged communications. Engelmayer, who maintained a close personal relationship with Biale—his mentee—and Graham, delayed disclosure of this conflict until a sentencing hearing on December 1, 2020, as captured in the transcript of that proceeding (Exhibit F). This delay violated Teman's Sixth Amendment right to conflict-free counsel, as mandated by *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), and caused irreparable harm to his defense.

5. Engelmayer's refusal to hold hearings on exculpatory evidence, which Biale falsely claimed to have pursued, further compounded Teman's injury. Attorney Ronald D. Coleman, who provided pro bono assistance to Teman in seeking dismissal or a pardon, affirmed that Biale misrepresented his efforts to obtain exculpatory evidence from 18 Mercer LLC shareholders (Exhibit D). Shelly Jenkins Pecot, a shareholder at 18 Mercer, confirmed that witnesses concealed emails and documents evidencing their awareness of GateGuard's fees, committing perjury at Teman's trial (Exhibit E). Engelmayer's refusal to consider this evidence, which has not yet been reviewed by the Second Circuit, appears motivated by his desire to protect Biale, his close friend and mentee, from liability for contributing to Teman's wrongful conviction.

6. Engelmayer's admitted practice of making ex parte calls to SDNY AO colleagues to ensure prosecutorial staffing sufficient to secure convictions, as revealed in a sealed hearing transcript (Exhibit G, Dkt. 321-1), constitutes impermissible collusion and a direct violation of Teman's Fifth Amendment due process rights. This pattern of misconduct, coupled with the government's failure to address the Biale/Graham conflict, as evidenced by a FOIA email obtained from *Butowsky v. US Dep't of Justice*, 21-cv-774 (Exhibit C), reflects a systemic disregard for constitutional protections that has caused Teman severe harm.

7. Any statute of limitations applicable to Teman's claims is tolled under both the discovery rule and equitable tolling principles. The full extent of the harm caused by Engelmayer's refusal to hold hearings on the

---

[2] It is worth noting that the current US Pardon Attorney Edward Martin Jr has publicly and repeatedly called for Mr. Teman to be pardoned, agreeing with Harvard Law Professor Lawrence Lessig that what Mr. Teman stands accused of cannot be a crime and evidences no intent.

exculpatory evidence that Biale failed to pursue, as well as the religiously motivated violations detailed by the 24 rabbis, is only now being uncovered through ongoing appellate proceedings and Teman's § 2255 petition.

8. Additionally, Teman's reasonable fear for his life and safety while under Engelmayer's jurisdiction, stemming from credible threats posed by Engelmayer's biased conduct—including his religiously motivated defamation and ex parte communications with prosecutors—prevented him from pursuing these claims earlier, further justifying tolling.

9. It is not only Teman who believes his life is at risk under Engelmayer and that Engelmayer intends to kill Teman or let him die through deprivation of medical treatment, but multiple board-certified physicians who have put such comments into the public docket, while Engelmayer continues to completely disregard every single board certified doctor -- without a single medical expert ever once contradicting them. Three board-certified specialists who relied upon MRI imaging and other medical records having treated Teman recommended Teman needed urgent treatment for a spinal and testicular conditions, Englemayer ignored them despite having zero evidence to the contrary, no medical images or experts who said otherwise. Once Teman was released from prison, new MRIs and ultrasounds confirmed Teman was truthful about his conditions and treatments were given. Following this, Teman experienced a severe ear condition, confirmed by two board certified physicians and an objective ETF (Eustachian Tube Function) test, and Engelmayer completely disregarded their opinion, *despite the Government's* own expert stating clearly he could not contradict their opinion, and then ordered Teman to return from Israel during a multi-front war via a boat that does not exist and then violated Teman for not taking this non-existent boat.

10. The personal animosity Engelmayer holds against Teman has been noted by Harvard Law Professors, Rabbis, Pundits, and community leaders, and even AI like Grok and ChatGPT, who all note it exuded in Engelmayer's writings and his acerbic comments. Engelmayer has consistently acted more a prosecutor than a judge in US v Teman, and it is clear that this is to protect Engelmayer's personal friends Noam Biale and AUSA Graham.

## PARTIES

7. Plaintiff Ari Teman is the founder and owner of GateGuard, Inc., a trailblazing company in AI-enabled security solutions, and JCorps, a Jewish volunteer organization inspired by the Peace Corps. He resides primarily in Miami-Dade County, Florida, and GateGuard is currently engaged in litigation with MVI Industries, a competitor in the security technology sector.

8. Defendant Sher Tremonte, LLP, is a New York Limited Liability Partnership with its principal offices located in New York County, New York. The firm provides legal services to clients, including Teman, in complex litigation matters within the Southern District of New York.

9. Defendant Justine Harris is a partner at Sher Tremonte, operating from its New York County office. She was directly involved in Teman's post-conviction representation, overseeing the firm's efforts to investigate prosecutorial misconduct in his case.

10. Defendant Noam Biale is a senior associate at Sher Tremonte, also operating from its New York County office. Biale served as counsel in Teman's case, during which he concealed a significant conflict of interest arising from his marriage to an SDNY prosecutor.

11. Defendants Harris and Biale were retained as post-conviction counsel to investigate prosecutorial misconduct in *United States v. Teman*, Case No. 19-cr-696, a criminal case currently pending on appeal before the Second Circuit Court of Appeals, docketed as 21-1920 (the "Teman Case").

12. Defendant Paul Adam Engelmayer is a judge in the Southern District of New York who presided over the Teman Case. During the proceedings, he engaged in extrajudicial actions and exhibited bias against Teman, including through defamatory statements and improper communications with prosecutors.

13. Defendant Edward Imperatore was an Assistant United States Attorney in the Southern District of New York and a member of the prosecutorial team in the Teman Case until his departure from the SDNY, the exact date of which is unspecified in available records.

14. Defendant Kedar Bhatia was an Assistant United States Attorney in the Southern District of New York and served as the lead prosecutor in the Teman Case until his departure from the SDNY. He continues to serve as a U.S. Attorney in another jurisdiction, upon information and belief.

15. Defendant Margaret Graham is the wife of Noam Biale and an Assistant United States Attorney in the Southern District of New York. Her employment with the SDNY AO created a conflict of interest that compromised and continues to compromise Teman's representation.

16. Defendant Jacob Gutwillig is an Assistant United States Attorney in the Southern District of New York and served as initial trial counsel in the Teman Case, participating in the prosecution that Teman alleges was marred by misconduct.

17. Defendant United States Attorney's Office for the Southern District of New York (SDNY AO) is the federal prosecutorial office responsible for Teman's case. Following Williams' resignation, it is currently led by Acting U.S. Attorney Edward Y. Kim, pending the confirmation of a new appointee, such as Jay Clayton.

18. Plaintiff references *Walsh v. United States*, 17 CV 6651 (LAP) (the "Walsh Case"), as an example of another instance where Sher Tremonte, representing defendant John Walsh, testified as a government witness against their own client after pushing their client to take an unjustified and ultimately reversed plea deal and 20- year sentence without disclosing their conflict of interest with Graham, as documented in a transcript from that case (Exhibit B). Specifically, Sher Tremonte as in Teman's case, did little to no work, and pushed their client into sentencing that was unwarranted by the facts. In Walsh's case they had him plea to a $400,000,000 loss, when the loss was less than $0. When interrogated on the stand by attorney Susan Kellman, it was proven that the Sher Tremonte firm had volunteered itself into the case as Biale did with Teman (Teman did not know Biale even existed), took a substantial sum of money, and then did not pursue a defense or counter the government in any way, and effectively acted as an arm of the government.

---

# JURISDICTION AND VENUE

21. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between Plaintiff Teman, a citizen of the State of Florida, and all Defendants, who are citizens of the State of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs, satisfying the requirements for diversity jurisdiction. Additionally, federal question jurisdiction exists under 28 U.S.C. § 1331 for claims arising under 42 U.S.C. § 1983, which address violations of Teman's constitutional rights under the First, Fifth, and Sixth Amendments.

22. Personal jurisdiction over all Defendants is established, as each is involved in criminal and civil proceedings within the Southern District of New York, where their actions giving rise to this complaint occurred. The Defendants' conduct, including their roles in Teman's prosecution and representation, is directly tied to this judicial district.

23. Venue is proper in the Southern District of New York, as this is the judicial district where the causes of action accrued. The events underlying Teman's claims, including his prosecution, the misconduct of his counsel, and Engelmayer's judicial and extrajudicial actions, all took place within this district.

24. Any statute of limitations applicable to Teman's claims is tolled under both the discovery rule and equitable tolling principles. The full extent of the harm caused by Engelmayer's refusal to hold hearings on exculpatory evidence that Biale falsely claimed to have pursued, as documented in the affirmations of Ronald D. Coleman (Exhibit D) and Shelly Jenkins Pecot (Exhibit E), is only now being uncovered through ongoing appellate proceedings and Teman's § 2255 petition. Furthermore, Teman's reasonable fear for his life and safety while under Engelmayer's jurisdiction, stemming from credible threats posed by Engelmayer's biased conduct—such as his religiously motivated defamation (Exhibit A) and ex parte communications with prosecutors (Exhibit G)—prevented him from pursuing these claims earlier. These circumstances warrant tolling under New York law, as articulated in *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006), which applies the discovery rule when harm is not immediately apparent, and under federal equitable tolling principles, as established in *Holland v. Florida*, 560 U.S. 631, 649 (2010), which permits tolling in extraordinary circumstances that prevent timely filing.

# THE SHER TREMONTE SPOUSAL CONFLICT AND THE FIRM'S BETRAYAL OF ITS CLIENT

25. On July 29, 2020, Teman executed a retainer agreement with Justine Harris for professional legal services to be rendered by Sher Tremonte in connection with the Teman Case. The operative indictment in the Teman Case alleged fraud arising from Teman's use of RCCs to collect debts from real estate customers, a practice explicitly authorized by GateGuard's Terms and Conditions.

26. Sher Tremonte and Harris were specifically engaged to explore the feasibility of filing additional post-trial motions in the district court, with a particular emphasis on identifying potential violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and other instances of prosecutorial misconduct that could justify relief from Teman's conviction.

27. Teman paid Sher Tremonte a retainer of $50,000 for its services, with billing rates set at $850 per hour for partners such as Harris and up to $650 per hour for associates, including Biale, as detailed in the engagement letter (Exhibit C). Upon termination of the representation, Sher Tremonte issued a final bill for legal services totaling $59,827.55, reflecting the work performed during their engagement.

28. The engagement letter, signed by Harris on behalf of Sher Tremonte, guaranteed a 15% discount on fees for the first two months of representation, further inducing Teman's reliance on the firm's competence, integrity, and freedom from conflicts of interest.

29. In the engagement letter, Sher Tremonte explicitly represented that "we are not aware of any other representation that would preclude the Firm from undertaking this engagement or adversely affect the Firm's ability to complete it" (Exhibit C). Teman relied on this representation, reasonably believing that Sher Tremonte, Harris, and Biale were free of any conflicts that could impair their ability to provide zealous and undivided representation in the Teman Case.

30. Over the course of two months, Sher Tremonte, through Harris and Biale, obtained sensitive documents, strategic guidance, and privileged communications from Teman. Teman directed their attention to Joseph Soleimani, the managing director of ABJ Properties, one of the entities against which Teman had drawn RCCs at issue in the case. Teman believed that Soleimani had perjured himself at trial by denying knowledge of GateGuard's Terms and Conditions, which clearly authorized the use of RCCs to collect overdue fees.

31. Teman further instructed Sher Tremonte to investigate potential undisclosed communications between Soleimani and Samuel Taub, the owner of MVI Industries, Inc., a competitor of GateGuard and a former client. Teman believed these communications could provide exculpatory evidence, as Taub and MVI had acknowledged the binding nature of GateGuard's Terms and Conditions in related litigation, even moving to compel arbitration based on those terms.

32. At no point during this two-month period, during which Teman shared confidential files, strategic objectives, and privileged communications with Harris and Biale, did Sher Tremonte, Harris, or Biale disclose that Biale was married to Margaret Graham, an Assistant United States Attorney in the SDNY AO. Biale worked from home with Graham in close proximity during the Covid-19 lockdown, creating an environment where client confidences could not be preserved, as Graham was within earshot of Teman's communications with Biale.

33. Engelmayer's close personal relationship with Biale and Graham enabled him to engage in extrajudicial actions that facilitated the concealment of this conflict. For years before the start of US v Teman, Engelmayer coached, recommended for positions, and mentored Biale and Graham in restaurants, Chambers, and other locations, all before any of these parties knew of Teman's existence. These actions cannot be protected by judicial or prosecutorial immunity because Engelmayer was not a judge to Teman and Graham was not a prosecutor -- their actions were not under the role of judge or prosecutor, neither as relates to Teman or any other similarly situated party (It is worth noting that Teman intends to retain counsel and move for this case to become a class action against the defendants deprived of conflict-free counsel and defrauded by Sher Tremonte with the ongoing assistance of defendants Englmayer et al.). Furthermore, in or about September 2020, Engelmayer visited Biale at his Brooklyn residence for a social occasion, during which he advised Biale on strategies to avoid disclosing his marriage to Graham to Teman and other clients, including those

involved in the Walsh Case. In October 2020, Engelmayer further communicated with Biale and Graham, providing guidance on how to frame their representation to the court to minimize scrutiny of the conflict, as part of a broader effort to protect the SDNY AO's prosecutorial interests. Upon information and belief, evidence including GPS data and other documents will show multiple times Graham, Biale, and Engelmayer met outside of the courthouse, during these times.

34. These actions by Engelmayer were not performed in his judicial capacity but were private interventions designed to shield Biale and Graham from ethical accountability, thereby defrauding Teman of his constitutional right to conflict-free counsel. The FOIA email obtained from *Butowsky v. US Dep't of Justice*, 21-cv-774 (Exhibit C), reveals communications among Harris, Bhatia, and other AUSAs discussing the Biale/Graham conflict, suggesting Engelmayer's awareness and complicity in its concealment.

35. On October 15, 2020, Biale and Harris contacted Kedar Bhatia at the Department of Justice, requesting production of any communications between Soleimani and Taub, as well as any DOJ interview notes reflecting Soleimani's knowledge of GateGuard's Terms and Conditions. The DOJ provided no responsive information, effectively stonewalling Teman's defense.

36. On October 23, 2020, Biale and Harris reiterated their request to Bhatia and Imperatore, seeking documents related to Soleimani's housing court litigation and any communications between Soleimani and Taub, including those involving MVI. Again, the DOJ failed to produce any responsive documents, further hindering Teman's ability to challenge the prosecution's case.

37. On November 2, 2020, Harris and Biale entered appearances for Teman and filed a Letter Motion with Engelmayer, seeking disclosure of notes related to Soleimani's housing court litigation and any statements by Soleimani that were inconsistent with his trial testimony. Notably, the motion omitted any request for the Soleimani-Taub communications, which were central to Teman's defense strategy and potentially exculpatory, reflecting a critical failure in their representation.

38. On November 10, 2020, the Government filed a three-page response, asserting that it had produced all available information regarding the housing court matter and was unaware of any inconsistencies in Soleimani's statements. This was false. The Government failed to address whether it had complied with a

prior court order to discuss the housing court matter with Soleimani, leaving critical questions unanswered and further undermining Teman's defense. Defendants Biale , Harris, and Sher Tremonte had a responsibility to act on this but did not to protect his wifes team. Defendant Engelmayer had a responsibility to order a hearing into Biale's alleged sabotage (as alleged by attorney Ronald Coleman) but did not to protect his friends Biale and Graham.

39. On November 19, 2020, Defendant Engelmayer issued a ruling, stating that he had reviewed the papers filed by Teman's counsel, including the Letter Motion signed by Harris and Biale, and found the Government's response satisfactory. Consequently, he ruled against Teman, denying the requested relief and perpetuating the harm caused by the prosecution's withholding of potentially exculpatory evidence. Engelmayer had a responsibility to front his conflict with Biale and Graham at this time, but failed to do so, while Biale pushed Teman into sentencing despite every Harvard Law Professor and other legal expert who reviewed the case and all available evidence saying there was no crime and no intent.

## THE VIOLATION OF CURCIO BY DEFENSE COUNSEL, THE PROSECUTION, AND ENGLEMAYER

40. On December 1, 2020, during a sentencing hearing, Engelmayer abruptly suspended proceedings, announcing that a significant issue had arisen concerning the propriety of continuing with Biale as Teman's counsel due to Biale's marriage to Graham, an Assistant United States Attorney in the SDNY AO. Engelmayer claimed, implausibly given his close relationship and frequent intimate meetings with Biale and Graham, that he had only become aware of this conflict the previous day, as documented in the transcript of the hearing (Exhibit F).

41. Engelmayer provided a detailed account of his extensive ties to Biale, noting that he had spent an hour discussing Biale's professional future, considered himself Biale's mentor and friend, appointed Biale to represent an indigent defendant (whom he praised as "superb"), attended shiva at Biale's Brooklyn apartment

in 2019, and received a group email announcing the birth of Biale's son shortly before ruling on the Letter Motion. He also acknowledged a prior professional relationship with Graham from their time in private practice, underscoring his familiarity with both attorneys (Exhibit F).

42. Engelmayer explicitly stated on the record, "Mr. Biale's wife's status as an employee of the United States Attorney's Office for the Southern District of New York – Mr. Teman's adversary in this case – presents a potential conflict" (Exhibit F). This acknowledgment highlighted the gravity of the conflict and its implications for Teman's constitutional rights.

43. Engelmayer outlined the mandatory procedures under *United States v. Curcio*, 680 F.2d 881, 888-890 (2d Cir. 1982), requiring the court to: (1) advise the defendant of the dangers arising from the conflict, (2) determine through narrative questioning whether the defendant understands and freely accepts those risks, and (3) provide time for the defendant to consult independent counsel. He emphasized that these steps are essential to ensure a knowing and intelligent waiver of the right to conflict-free counsel, without which a case cannot proceed.

44. Engelmayer referenced a prior case where a similar spousal conflict was disclosed and waived, underscoring the necessity of a *Curcio* hearing to protect defendants' rights. He concluded, "Absent a properly conducted Curcio proceeding resulting in a knowing waiver by Mr. Teman of the potential conflict here – and it needs to be a waiver that I find knowing and intelligent – we simply cannot proceed further with Mr. Biale representing Mr. Teman" (Exhibit F).

45. Engelmayer acknowledged that such conflicts are typically brought to the court's attention by counsel in advance, and he berated Bhatia for failing to raise the issue earlier. Bhatia admitted that he was unaware that the spousal relationship triggered a *Curcio* hearing, a failure Engelmayer deemed a breach of candor to the court (Exhibit F). This exchange revealed a systemic failure by both defense and prosecution to uphold Teman's rights.

46. Despite the gravity of the conflict, Engelmayer had not raised it before ruling on the Letter Motion on November 19, 2020, nor when he previously appointed Biale to represent an indigent defendant. This delay

suggests either negligence or deliberate inaction, given Engelmayer's close relationship with Biale and his awareness of Graham's role in the SDNY AO.

47. Neither Sher Tremonte, Harris, Biale, nor the prosecution alerted Teman to the conflict, depriving him of the opportunity to participate in a *Curcio* hearing and thereby violating his Sixth Amendment right to conflict-free counsel. This failure had profound consequences for Teman's defense and the fairness of the proceedings.

## SHER TREMONTE'S BREACH OF ITS FIDUCIARY DUTY

48. During the relevant period, Margaret Graham, like Biale, worked from home due to the Covid-19 pandemic and her maternity leave, sharing a small confined two-bedroom apartment in Kings County, New York (Brooklyn). This close proximity made it impossible for Biale to preserve client confidences, as Graham was privy to Teman's privileged communications with Biale, creating an unacceptable risk of disclosure to the prosecution. Graham could be seen clearly in the background of video calls, but Teman did not know and had no reason to assume she was a prosecutor with the team prosecuting him -- and even more, that her team had pursued cases with the investigators who relied upon GateGuard technology and had even entered into these same online terms with GateGuard repeatedly.

49. The Covid-19 pandemic and New York's 'Stay At Home' executive order, issued by Governor Andrew Cuomo, compelled both Biale and Graham to work from their shared residence, exacerbating the risk of inadvertent disclosure of sensitive information. The confined workspace heightened the potential for Graham to overhear or access Teman's confidential discussions with Biale.

50. Biale conducted discussions with Teman via speakerphone and video conferencing, further compromising the confidentiality of attorney-client communications, as Graham could overhear or access these exchanges in their shared apartment. This environment was wholly unsuitable for maintaining the sanctity of privileged communications.

51. Sher Tremonte, Harris, and Biale failed to disclose Biale's marriage to Graham or the resultant conflict, nor did they initiate a *Curcio* hearing to ensure that Teman could make an informed decision about whether to continue with conflicted counsel. This nondisclosure was a direct breach of their ethical and fiduciary duties to Teman.

52. The failure to disclose the conflict denied Teman the opportunity to consult independent counsel regarding the risks of continued representation by conflicted counsel, further violating his right to make informed decisions about his legal representation.

53. The conflict permeated Teman's representation, causing irreversible damage by potentially leaking privileged information and defense strategies to the prosecution through Graham's proximity and access. This breach undermined the integrity of Teman's case and prejudiced his ability to mount an effective defense.

54. By the time Engelmayer addressed the conflict on December 1, 2020, as documented in the sentencing hearing transcript (Exhibit F), the damage to Teman's representation was irreparable. Sher Tremonte's subsequent withdrawal on December 11, 2020, could not retroactively cure the constitutional violation caused by the conflict's impact on earlier proceedings.

55. Biale's failure to pursue exculpatory evidence, such as testimony from 18 Mercer LLC shareholders, significantly delayed the discovery of critical information that could have challenged the prosecution's case. These shareholders, as confirmed by Shelly Jenkins Pecot in her sworn statement, were fully aware of GateGuard's fees and terms, directly contradicting their trial testimony (Exhibit E).

56. Sher Tremonte, Harris, and Biale falsely represented to Teman, his corporate counsel, and others, including attorney Ronald D. Coleman, that they had pursued or intended to pursue this exculpatory evidence, when in fact they had not contacted the 18 Mercer shareholders, as Coleman affirmed (Exhibit D). This misrepresentation further delayed Teman's ability to uncover evidence that could have altered the outcome of his case.

57. The delays caused by these misrepresentations and inaction resulted in Teman enduring over eight months of near-solitary confinement, during which he suffered severe emotional, psychological, and physical harm, as

well as significant financial losses to GateGuard. Sher Tremonte's breaches of duty are directly responsible for these injuries.

# BIALE'S MISREPRESENTATIONS TO RONALD COLEMAN AND ENGLEMAYER'S REFUSAL TO CONSIDER EXCULPATORY EVIDENCE

58. Ronald D. Coleman, an experienced attorney who previously represented GateGuard, Inc. in civil litigation, provided pro bono assistance to Teman in his efforts to secure dismissal or a pardon for his wrongful conviction. In an affirmation dated November 22, 2021, Coleman detailed a telephone call in November 2020 with Teman and Sher Tremonte lawyers, during which Biale and others misrepresented their efforts to obtain exculpatory evidence from 18 Mercer shareholders (Exhibit D).

59. Coleman recalled that during the call, Sher Tremonte attorneys, including Biale, claimed they had contacted or intended to contact 18 Mercer shareholders to obtain documents regarding a board member's improper conduct in connection with GateGuard. This board member was a key government witness at Teman's trial, and the documents were potentially exculpatory, as they could have demonstrated the witness's bias or knowledge of GateGuard's terms (Exhibit D).

60. Biale's misrepresentations misled both Teman and Coleman, delaying the discovery of critical exculpatory evidence. Shelly Jenkins Pecot's sworn statement later confirmed that 18 Mercer shareholders were fully aware of GateGuard's fees and had been properly notified by Teman, directly contradicting their trial testimony and exposing their perjury (Exhibit E).

61. Engelmayer has steadfastly refused to hold hearings on this exculpatory evidence, which has not yet been reviewed by the Second Circuit. This refusal appears motivated by Engelmayer's desire to protect Biale, his close friend and mentee, from liability for contributing to Teman's wrongful conviction through his failure to pursue this evidence and his false representations about doing so.

62. Engelmayer's refusal to consider this evidence compounds the harm to Teman, as Pecot's statement and related documents demonstrate that 18 Mercer witnesses perjured themselves, undermining the validity of Teman's conviction (Exhibit E). This evidence could have significantly altered the outcome of Teman's case, potentially leading to a dismissal or acquittal.

63. The ongoing discovery of the harm caused by Biale's misrepresentations and Engelmayer's refusal to address this evidence tolls any applicable statute of limitations. Additionally, Teman's fear for his life and safety under Engelmayer's jurisdiction, due to the judge's biased conduct and the psychological toll of his wrongful conviction, further justifies tolling, as it prevented Teman from pursuing these claims earlier.


## WIDESPREAD DISREGARD OF CURCIO AT THE SDNY

64. A FOIA email obtained from *Butowsky v. US Dep't of Justice*, 21-cv-774 (Exhibit C), reveals collusion between Harris and SDNY prosecutors, including Bhatia, Mermelstein, and others, to minimize, justify, or conceal the Biale/Graham conflict, demonstrating a deliberate effort to undermine Teman's constitutional right to conflict-free counsel.

65. Damian Williams, during his tenure as U.S. Attorney, failed to acknowledge or address the issue when Teman brought it to his attention, perpetuating the constitutional violations affecting Teman's case.

66. Kedar Bhatia overtly admitted that he was aware of the Biale/Graham conflict but chose not to raise it with the court or the defense, a failure implicitly shared by Imperatore and Gutwillig. Rebecca Mermelstein, as Co-Chief of the SDNY General Crimes Unit at the time, was informed of the issue but took no corrective action to rectify the deprivation of Teman's constitutional rights.

67. The Walsh Case, where Biale testified as a government witness against his own client, John Walsh, without disclosing his conflict with Graham, as documented in a transcript (Exhibit B), evidences a troubling pattern of nondisclosure of the Biale/Graham conflict across multiple SDNY cases, further highlighting the systemic nature of the misconduct.

16

## JUDICIAL AND PROSECUTORIAL COLLUSION

68. In a sealed hearing transcript (Exhibit G, Dkt. 321-1), Engelmayer admitted to regularly making ex parte calls to former colleagues at the SDNY AO to ensure that the prosecution was adequately staffed to secure convictions. This practice constitutes impermissible collusion, as it places Engelmayer in the dual role of judge and de facto prosecutor, undermining the impartiality of the judicial process.

69. Engelmayer's extrajudicial communications with Biale and Graham, including his September 2020 meeting at Biale's residence and October 2020 emails (¶ 33), further biased the judicial process by facilitating the concealment of the Biale/Graham conflict, violating Teman's due process rights under the Fifth Amendment.

70. The SDNY AO actively colluded with Engelmayer by responding to his staffing requests, reassigning prosecutors deemed insufficiently skilled or experienced and replacing them with more capable attorneys to ensure the convictions Engelmayer sought. This collaboration prejudiced Teman's case and compromised the fairness of the proceedings.

## ENGLEMAYER'S DEFAMATION AND RELIGIOUSLY MOTIVATED HATE SPEECH

71. Engelmayer engaged in defamatory conduct by fabricating statements that Teman's emails contained threats to cash RCCs on Passover to exploit Orthodox Jewish clients, falsely asserting that this timing demonstrated fraudulent intent (Exhibit A). These statements were not only baseless but relied on invented Jewish laws that misrepresent religious doctrine.

72. Engelmayer broadcast these false statements during Teman's sentencing hearing on December 1, 2020, as captured in the transcript (Exhibit F), and repeated them in subsequent proceedings, even after correction by

24 ordained rabbis in their letter filed at Docket 326-1 (Exhibit A). The rabbis unequivocally stated that "there is not a shred of evidence in the record" for Engelmayer's claims and that his assertion "constitutes an abuse of the Jewish faith for dishonest, misleading purposes" (Exhibit A).

73. Under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014), secular courts lack jurisdiction to adjudicate or legislate religious doctrine, as such actions violate the First Amendment's Establishment Clause. Engelmayer's fabrication of Passover laws, claiming they prohibit financial transactions in a manner not recognized by Jewish law, constitutes a non-judicial act, rendering his conduct unprotected by judicial immunity, as immunity does not extend to acts taken in the "clear absence of all jurisdiction" (*Mireles v. Waco*, 502 U.S. 9, 11 (1991)).

74. Engelmayer's persistence in republishing these defamatory statements, despite authoritative correction by the rabbis, who described his comments as having an "anti-Jewish – even, alas, anti-semitic – tenor" (Exhibit A), demonstrates personal animus rather than judicial function. This further supports the argument that his actions are outside the scope of immunity and actionable as defamation and a First Amendment violation.

75. Engelmayer's defamatory statements caused profound reputational harm to Teman, a recognized leader in the Jewish community who was falsely portrayed as anti-Semitic. The rabbis noted, "As Rabbis, we cannot countenance your dishonest abuse of Jewish practices and your calumnious attacks on Mr. Teman" (Exhibit A), highlighting the severity of the injury to Teman's standing and his ability to operate JCorps and other community initiatives.

76. The ongoing discovery of the harm caused by Engelmayer's religiously motivated defamation, coupled with Teman's fear for his safety under Engelmayer's jurisdiction, tolls any applicable statute of limitations, as Teman could not reasonably pursue this action earlier due to these extraordinary circumstances.

77. Engelmayer continues to issue orders to Teman to outright violate his religious faith, Englemayer called the Jewish legal rulings of the Chief Rabbi of Israel and the Chief Rabbi of Modiin "bogus", and ordered Teman to travel by boat from Israel to the USA (after a board-certified ENT ordered Teman not to fly due to an ear injury until it was resolved with steroids or surgery) despite knowing full well that no such boat exists so as to force Teman into an unavoidable violation -- as an aide to Biale and Graham and Sher Tremonte.

Engelmayer has consistently ignored the urging of Board-Certified medical experts to deny Teman urgently needed medical care. It is the believe of these experts, as expressed by Dr. Jonathan Harrison and Dr. Georgiy Brusovanik, that Engelmayer intends to cause Teman significant harm and possibly death. Given the desire to protect Biale, it is clear Englemayer is aiming to disable Teman from being able to file and pursue this litigation -- a draft of which was sent together with Teman's appellate counsel to the defendants previously.


## GOVERNMENT'S VIOLATION OF TEMAN'S RELIGIOUS RIGHTS

77. The government, through Gutwillig, Bhatia, Imperatore, Williams, and the SDNY AO, violated Teman's First Amendment religious rights by fabricating and endorsing false Jewish laws regarding Passover to argue that Teman's timing of RCC transactions demonstrated fraudulent intent (Exhibit A). This argument was advanced during trial and sentencing, falsely claiming that the Friday before Passover was a restricted period that Teman exploited to defraud Jewish clients.

78. The rabbis' letter confirms that the government was aware that these claims were baseless, as evidenced by their knowledge that Soleimani had communicated with Teman via WhatsApp during the Intermediary Days of Passover the previous year, a period when Jewish law permits work, travel, and electronic use (Exhibit A). The government's persistence in this false narrative, even after correction by the 24 rabbis, constitutes an intentional abuse of Teman's religious identity and exceeds the scope of prosecutorial authority.

79. Under *Klagsbrun*, 53 F. Supp. 3d at 740, secular authorities, including prosecutors, lack jurisdiction to interpret or enforce religious doctrine, as such actions entangle the government in religious matters in violation of the First Amendment. The government's fabrication of Passover laws to bolster its case against Teman was an administrative or investigative act, not advocative, and is therefore unprotected by prosecutorial immunity, as established in *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009).

80. The government's actions caused Teman severe reputational and emotional harm, compounding the defamation by Engelmayer. The ongoing discovery of these violations, as revealed through the rabbis' letter and subsequent proceedings, tolls any applicable statute of limitations, ensuring that Teman's claims remain actionable.

# COUNT I – FRAUDULENT MISREPRESENTATION

**(Against Sher Tremonte, Harris, and Biale)**

81. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

82. Defendants Sher Tremonte, Harris, and Biale explicitly represented in the engagement letter that "we are not aware of any other representation that would preclude the Firm from undertaking this engagement or adversely affect the Firm's ability to complete it" (Exhibit C). This representation was knowingly or recklessly false, as Biale's marriage to Graham, an SDNY prosecutor, created a clear conflict of interest that required disclosure and a knowing waiver under *Curcio*.

83. Teman justifiably relied on these representations when retaining Sher Tremonte, believing that the firm was free of conflicts that could impair its representation. But for these false representations, Teman would not have engaged Sher Tremonte, Harris, and Biale, and would instead have hired competent, conflict-free counsel who could have effectively pursued the investigation of prosecutorial abuses.

84. As a direct result of Sher Tremonte's fraudulent misrepresentations, Teman suffered significant damages, including prolonged confinement, financial losses to GateGuard, and severe emotional and psychological distress. The delays caused by Sher Tremonte's inaction, compounded by Biale's misrepresentations about pursuing exculpatory evidence (Exhibit D), prevented Teman from accessing capital markets during a favorable period in 2021, when a competitor, Latch, went public at a $1.56 billion valuation.

85. The ongoing discovery of the harm caused by Sher Tremonte's misrepresentations, particularly through Coleman's affirmation (Exhibit D) and Pecot's statement (Exhibit E), tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction further justifies tolling, as it prevented timely pursuit of these claims.

86. As a result of the foregoing, Teman is entitled to compensatory damages in an amount to be determined at trial, together with punitive damages for Sher Tremonte's malicious and intentional misconduct, as well as attorneys' fees and costs.

## COUNT II – BREACH OF FIDUCIARY DUTY

**(Against Sher Tremonte, Harris, and Biale)**

87. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

88. Sher Tremonte, Harris, and Biale owed Teman a fiduciary duty to act with undivided loyalty, to disclose any conflicts of interest promptly, and to pursue his defense with diligence and competence. This duty required them to inform Teman of Biale's marriage to Graham and to seek a knowing waiver before proceeding with representation.

89. Sher Tremonte, Harris, and Biale breached this fiduciary duty by failing to disclose the Biale/Graham conflict, compromising privileged communications by working in close proximity to Graham, and lying to Teman and others, including Coleman, about their efforts to pursue exculpatory evidence from 18 Mercer shareholders (Exhibit D). These breaches undermined Teman's defense and delayed the discovery of critical evidence (Exhibit E).

90. As a result of these breaches, Teman suffered substantial financial losses, including the diminished value of GateGuard, as well as severe emotional and psychological harm from prolonged confinement and the

betrayal by his counsel. The ongoing discovery of these harms, coupled with Teman's fear for his safety, tolls any applicable statute of limitations.

91. Teman is entitled to compensatory damages in an amount to be determined at trial, together with attorneys' fees and costs, for Sher Tremonte's egregious breach of its fiduciary obligations.

# COUNT III – DEFAMATION AND FIRST AMENDMENT VIOLATION

**(Against Engelmayer)**

92. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

93. Engelmayer knowingly made false and injurious statements, asserting that Teman's emails contained threats to cash RCCs on Passover to exploit Orthodox Jewish clients, claiming this timing showed fraudulent intent due to fabricated Jewish laws prohibiting such actions (Exhibit A). These statements were broadcast during Teman's sentencing hearing on December 1, 2020, attended by Teman's family, friends, and colleagues (Exhibit F).

94. These statements were demonstrably false, as Teman's emails contain no such threats, and the rabbis confirmed that "there is not a shred of evidence in the record" for Engelmayer's claims, noting that Judaism permits financial transactions during Passover's Intermediary Days (Exhibit A). Engelmayer's persistence in repeating these falsehoods after correction by the rabbis constitutes a deliberate act of defamation driven by personal animus.

95. Engelmayer's actions constitute religiously motivated hate speech and an abuse of judicial authority, as they rely on fabricating non-existent Jewish laws. Under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014), secular courts lack jurisdiction to legislate religious doctrine, as this violates the First Amendment's Establishment Clause. Engelmayer's invention of Passover laws to defame

Teman and justify his conviction is a non-judicial act, unprotected by judicial immunity, as it exceeds his authority and entangles the judiciary in religious matters (*Mireles v. Waco*, 502 U.S. 9, 11 (1991)).

96. These statements violated Teman's First Amendment right to free exercise of religion by targeting his Jewish identity and misrepresenting Jewish law to harm his reputation and liberty. The rabbis' condemnation of Engelmayer's "dishonest abuse of Jewish practices" underscores the severity of this violation (Exhibit A).

97. At the time of his arrest, Teman's companies were front-page news, often mentioned alongside Latch, which went public at a $1.56 billion valuation. Engelmayer's lies cast doubt on Teman's character, falsely portraying him as anti-Semitic, causing severe reputational harm, mental anguish, emotional and psychological pain, physical illness, and lifelong damage to his reputation. Teman, recognized as a "North American Jewish Community Hero" by the Jewish Federations of North America, can no longer effectively operate JCorps due to this defamation (Exhibit A).

98. The ongoing discovery of the harm caused by Engelmayer's defamation, coupled with Teman's fear for his safety under Engelmayer's jurisdiction, tolls any applicable statute of limitations, ensuring that this claim remains actionable.

99. As a result, Teman is entitled to compensatory damages in an amount to be determined at trial, together with punitive damages for Engelmayer's malicious conduct, as well as attorneys' fees and costs.

# COUNT IV – VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS UNDER 42 U.S.C. § 1983

**(Against Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO)**

100. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

101. The failure of the government to disclose, and Engelmayer to address in.Concurrent with the sentencing hearing on December 1, 2020, Engelmayer's belated acknowledgment of the Biale/Graham conflict, as

captured in the transcript (Exhibit F), revealed a profound violation of Teman's Sixth Amendment right to conflict-free counsel. This delay allowed conflicted counsel to influence critical post-conviction motions, irreparably prejudicing Teman's defense. Similarly, Engelmayer's extrajudicial actions, including his September 2020 meeting with Biale and October 2020 emails with Biale and Graham (¶ 33), facilitated the concealment of this conflict, further undermining Teman's Fifth Amendment right to due process by compromising the fairness of the judicial process.

102.    Engelmayer's refusal to hold hearings on exculpatory evidence, which Biale falsely claimed to have pursued, as affirmed by Ronald D. Coleman (Exhibit D) and corroborated by Shelly Jenkins Pecot (Exhibit E), exacerbated these constitutional violations. This evidence, demonstrating that 18 Mercer witnesses perjured themselves regarding their awareness of GateGuard's fees, could have altered the outcome of Teman's case but remains unreviewed by the Second Circuit due to Engelmayer's inaction.

103.    All Defendants acted under color of law when committing these violations, either through their direct participation in the prosecution, their failure to disclose the conflict, or their judicial oversight of the case. The SDNY AO, under Williams' leadership and continuing under Acting U.S. Attorney Edward Y. Kim, bears institutional responsibility for the systemic failures that permitted these violations to persist.

104.    The ongoing discovery of the harm caused by these constitutional violations, particularly through the emergence of exculpatory evidence and Engelmayer's refusal to address it, tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction, compounded by the psychological toll of his wrongful conviction, further justifies tolling, as it prevented timely pursuit of these claims.

105.    As a result of these violations, Teman suffered harm in the form of a wrongful conviction and prolonged confinement, entitling him to compensatory damages in an amount to be determined at trial, together with punitive damages for the Defendants' reckless disregard of his rights, as well as attorneys' fees and costs.

# COUNT V – VIOLATION OF THE FIFTH AND FIRST AMENDMENTS UNDER 42 U.S.C. § 1983

**(Against Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO)**

106.    Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

107.    Engelmayer's practice of making ex parte calls to SDNY AO colleagues to ensure prosecutorial staffing sufficient to secure convictions, as admitted in the sealed hearing transcript (Exhibit G, Dkt. 321-1), constitutes a direct violation of Teman's Fifth Amendment right to due process. By intervening in the prosecution's staffing decisions, Engelmayer assumed the role of both judge and de facto prosecutor, compromising the impartiality of the judicial process and tilting the scales against Teman.

108.    The government, through Gutwillig, Bhatia, Imperatore, Williams, Mermelstein, and the SDNY AO, further violated Teman's First Amendment religious rights by fabricating false Jewish laws regarding Passover to argue that Teman's timing of RCC transactions demonstrated fraudulent intent (Exhibit A). The rabbis confirmed that the government knew these laws were false, as Soleimani had communicated with Teman during Passover's Intermediary Days, when work is permitted (Exhibit A). Under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014), such actions entangle the government in religious doctrine, exceeding prosecutorial authority and rendering them unprotected by immunity, as they were administrative or investigative in nature (*Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009)).

109.    Engelmayer's extrajudicial communications with Biale and Graham, including his efforts to conceal their conflict (¶ 33), contributed to these violations by biasing the judicial process against Teman, further undermining his due process rights.

110.    All Defendants acted under color of law in committing these violations, either through their prosecutorial actions, their failure to address the conflict, or their judicial oversight tainted by bias and improper communications.

111.    The ongoing discovery of the harm caused by these violations, including the religious rights abuses and Engelmayer's ex parte conduct, tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction further justifies tolling, as it prevented timely pursuit of these claims.

112.    As a result of these violations, Teman suffered harm in the form of a wrongful conviction, prolonged confinement, and severe reputational and emotional damage, entitling him to compensatory damages in an amount to be determined at trial, together with punitive damages for the Defendants' reckless disregard of his rights, as well as attorneys' fees and costs.

## COUNT VI – CIVIL CONSPIRACY

**(Against Engelmayer, Biale, Graham, and Sher Tremonte)**

113.    Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

114.    Defendants Engelmayer, Biale, Graham, and Sher Tremonte entered into an express or implied agreement to conceal the conflict of interest arising from Biale's marriage to Graham, with the intent to defraud Teman of his constitutional right to conflict-free counsel and due process of law. This conspiracy was designed to protect Biale and Graham from ethical accountability, shield Sher Tremonte from liability, and maintain the SDNY AO's prosecutorial advantage by ensuring Teman remained unaware of the conflict.

115.    Overt acts in furtherance of this conspiracy include, but are not limited to: a. Engelmayer's private meeting with Biale in September 2020 at Biale's Brooklyn residence, where he advised Biale on strategies to avoid disclosing the conflict to Teman (¶ 33). b. Engelmayer's email communications with Biale and Graham in October 2020, providing guidance on framing their representation to minimize court scrutiny (¶ 33). c. Biale and Sher Tremonte's failure to disclose the conflict to Teman, despite their fiduciary duty to do so, as evidenced by the engagement letter (Exhibit C). d. Graham's participation in concealing the conflict while working from home with Biale, sharing privileged information that compromised Teman's defense (¶¶

48-50). e. Biale's false representations to Teman and Coleman about pursuing exculpatory evidence from 18 Mercer shareholders, delaying the discovery of critical evidence (Exhibit D). f. The FOIA email from Harris to Bhatia and others, circulated to Mermelstein, revealing efforts to bury the conflict's implications (Exhibit C).

116.    As a direct and proximate result of this conspiracy, Teman suffered damages, including prolonged confinement, financial losses to GateGuard, severe emotional distress, and reputational harm from Engelmayer's defamatory statements. The conspiracy's impact is evidenced by the Walsh Case, where Biale testified against his client without disclosing the conflict (Exhibit B), indicating a pattern of misconduct.

117.    The ongoing discovery of the harm caused by this conspiracy, particularly through Coleman's affirmation (Exhibit D) and Pecot's statement (Exhibit E), tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction further justifies tolling, as it prevented timely pursuit of these claims.

118.    As a result, Teman is entitled to compensatory damages in an amount to be determined at trial, together with punitive damages for the Defendants' malicious and intentional misconduct, as well as attorneys' fees and costs.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

## Request for Disqualification of Judges with Prior Sher Tremonte Involvement

Plaintiff respectfully requests that no judge who has previously presided over any matter in which Sher Tremonte, LLP, or its attorneys, including Justine Harris or Noam Biale, represented a party be assigned to this case, due to the significant conflict of interest posed by the firm's central role as a defendant in

this action. The complaint alleges that Sher Tremonte, Harris, and Biale engaged in fraudulent misrepresentations, breached their fiduciary duties, and conspired to conceal a critical conflict of interest arising from Biale's marriage to Assistant United States Attorney Margaret Graham, thereby causing Plaintiff severe harm, including wrongful conviction and prolonged confinement (¶¶ 81–91, 113–118). A judge who has relied on Sher Tremonte's representations in prior cases may have a personal or professional interest in protecting the integrity of those proceedings, potentially leading to bias in favor of Sher Tremonte to avoid the appearance that large amounts of judicial work must be undone or reexamined due to the firm's alleged misconduct. Such a conflict could compromise the impartiality required under 28 U.S.C. § 455(a), which mandates disqualification where a judge's impartiality might reasonably be questioned. To ensure a fair and unbiased adjudication of this matter, Plaintiff requests that the case be assigned to a judge without prior exposure to Sher Tremonte's representation, thereby safeguarding the integrity of these proceedings and Plaintiff's right to an impartial tribunal.

## WHEREFORE, Plaintiff demands judgment:

(1) Under Count I, for compensatory and punitive damages resulting from Sher Tremonte's, Harris', and Biale's fraudulent misrepresentations, in an amount to be determined at trial, together with attorneys' fees and costs.

(2) Under Count II, for compensatory damages resulting from Sher Tremonte's, Harris', and Biale's breach of fiduciary duty, in an amount to be determined at trial, together with attorneys' fees and costs.

(3) Under Count III, for compensatory and punitive damages resulting from Engelmayer's defamation and First Amendment violation, in an amount to be determined at trial, together with attorneys' fees and costs.

(4) Under Count IV, for compensatory and punitive damages resulting from Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO's violation of Teman's Fifth and Sixth Amendment rights, in an amount to be determined at trial, together with attorneys' fees and costs.

(5) Under Count V, for compensatory and punitive damages resulting from Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO's violation of Teman's Fifth and First Amendment rights, in an amount to be determined at trial, together with attorneys' fees and costs.

(6) Under Count VI, for compensatory and punitive damages resulting from Engelmayer, Biale, Graham, and Sher Tremonte's civil conspiracy, in an amount to be determined at trial, together with attorneys' fees and costs.

(7) Issuing an injunction requiring the timely disclosure of spousal conflicts and the obtaining of a knowing and voluntary waiver before any proceedings involving conflicted counsel may proceed in Teman's case, and prohibiting judges and prosecutors from conferring or coordinating on staffing matters or engaging in extrajudicial actions to conceal conflicts or fabricate religious laws in Teman's case.

(8) Such other and further relief as this Court deems just and proper.


**Dated**: Tel Aviv, Israel

June 28, 2025 / 3rd of Tamuz, 5785 (After sundown)

s/Ari Teman/

Plaintiff, Pro Se

ari@teman.com

1521 Alton Road #888,

Miami Beach, FL 33139

# Exhibits

- **Exhibit A**: Letter from 24 Rabbis to Judge Paul Engelmayer, filed at Docket 326-1 in *United States v. Teman*, Case No. 19-cr-696, dated August 11, 2022, condemning Engelmayer's fabrication of Jewish laws and defamatory statements.

- **Exhibit B**: Transcript from *Walsh v. United States*, Case No. 17 CV 6651 (LAP), documenting Sher Tremonte counsel's testimony as a government witness against his client, John Walsh, without disclosing their conflict with Margaret Graham.

- **Exhibit C**: FOIA email obtained from *Butowsky v. US Dep't of Justice*, Case No. 21-cv-774, revealing communications among Justine Harris, Kedar Bhatia, Rebecca Mermelstein, and others discussing the Biale/Graham conflict impacting "many SDNY cases".

- **Exhibit D**: Affirmation of Ronald D. Coleman, filed at Docket 350-1 in *United States v. Teman*, dated November 22, 2021, affirming that Biale misrepresented efforts to pursue exculpatory evidence from 18 Mercer shareholders.

- **Exhibit E**: Sworn Statement of Shelly Jenkins Pecot, filed at Docket 326, pp. 9–10 in *United States v. Teman*, dated August 21, 2021, confirming that 18 Mercer witnesses were aware of GateGuard's fees, contradicting their trial testimony.

- **Exhibit F**: Transcript of the December 1, 2020, sentencing hearing in *United States v. Teman*, Case No. 19-cr-696, where Engelmayer exposed the Biale/Graham conflict and suspended proceedings.

- **Exhibit G**: Hearing transcript, filed at Docket 321-1 in *United States v. Teman*, where Engelmayer admitted to making ex parte calls to SDNY AO colleagues to ensure prosecutorial staffing for convictions.

- **Exhibit H:** Engagement letter of Sher Tremonte