```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  STEPHEN WALSH,

 4               Plaintiff,

 5         v.                        17 CV 6651 (LAP)

 6  UNITED STATES OF AMERICA,

 7               Defendant.

 8  ------------------------------x
                                    New York, N.Y.
 9                                  March 18, 2019
                                    10:45 a.m.
10
    Before:
11
                    HON. LORETTA A. PRESKA,
12
                                        District Judge
13
                         APPEARANCES
14
    SUSAN GAIL KELLMAN
15  VIVIAN SHEVITZ
    JACQUELINE E. CISTARO
16       Attorneys for Plaintiff

17  U.S. ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK
         Attorneys for Defendant
18  BY:  KEDAR SANJAY BHATIA
         BRENDAN FRANCIS QUIGLEY
19

20  ALSO PRESENT:  Colleen Gieger, Paralegal

21

22

23

24

25
```

 1              THE COURT:  Good morning, ladies and gentlemen.  Won't

 2     you be seated.

 3              This is the United States v. Steven Walsh.

 4              Is the government ready?

 5              MR. BHATIA:  Yes, your Honor.

 6              THE COURT:  Is the defense ready?

 7              MS. KELLMAN:  Yes, your Honor.

 8              THE COURT:  Thank you.  Won't you be seated.

 9              Counsel, would you like to give me an idea of what you

10     have in mind here.

11              MR. BHATIA:  Your Honor, what I'll say is the

12     defendant bears the burden in this hearing.  So we'll defer to

13     them.

14              THE COURT:  That's probably why Ms. Kellman stood up.

15              MS. KELLMAN:  Yes, your Honor.  Good morning.

16              Your Honor, if I may, I just want to introduce who is

17     sitting at counsel table.  Sitting right next to me is Stephen

18     Walsh who is the petitioner in this matter, and Vivian Shevitz

19     is the brainstorm here.

20              THE COURT:  Yes, ma'am.

21              MS. KELLMAN:  At end, your Honor, is Jackie Cistaro,

22     who is a member of our CJA mentoring program and is doing this

23     pro bono.

24              THE COURT:  Yes, ma'am.  Thank you.

25              MS. KELLMAN:  Your Honor, the plan for this morning

 1  was to call -- recognizing we have the burden -- was to put

 2  Mr. Walsh on the stand and to walk him through the highlights

 3  of what we view as responsive to your Honor's questions.

 4          I obviously read both of your Honor's orders, and I am

 5  just going to try to tell the story and at the same time be as

 6  responsive as we can to your Honor's concerns.  I assume,

 7  Judge, if you have additional questions, you'll put questions

 8  to the witness, and we invite you to do that.

 9          THE COURT:  Yes, ma'am.

10          Does the government have anything to add?

11          MR. BHATIA:  No, your Honor.

12          THE COURT:  Thank you.

13          Ms. Kellman.

14          MS. KELLMAN:  Your Honor, at this point, we would call

15  Stephen Walsh to the stand.

16          THE COURT:  Yes.  Please step up, sir.

17          MS. KELLMAN:  Your Honor, are the leg restraints

18  necessary while he's testifying?

19          THE COURT:  Mr. Marshal?

20          UNIDENTIFIED SPEAKER:

21          DEPUTY MARSHAL:  They stay on throughout the day,

22  your Honor.

23          THE COURT:  Thank you.

24  STEPHEN WALSH,

25      called as a witness by the Defense,

1          having been duly sworn, testified as follows:

2               THE DEPUTY CLERK:  Please state your name and spell it

3    for the court reporter.

4               THE WITNESS:  Stephen Walsh, S-t-e-p-h-e-n W-a-l-s-h.

5               THE COURT:  Won't you be seated.

6               Ms. Kellman.

7               MS. KELLMAN:  Thank you, your Honor.

8               Your Honor, if I may, may I approach the witness with

9    a document?

10              THE COURT:  Yes, ma'am.

11              MS. KELLMAN:  The document is Defendant's Exhibit 1,

12   and it is a part of the petition.  It is my client's

13   declaration.

14              THE COURT:  Thank you.

15   DIRECT EXAMINATION

16   BY MS. KELLMAN:

17   Q.  Mr. Walsh, do you recognize that document?

18   A.  Yes, I do.

19   Q.  What do you recognize it to be?

20   A.  An affidavit that I signed prior to this hearing.

21   Q.  What was the stated purpose of you signing that?  Why did

22   you understand you were signing that?

23   A.  In terms of the 2255 on file that was filed for me, this

24   was my statement as to my interaction of what happened with my

25   relationship with Mr. Tremonte.

1    Q.  Now, let's just go back to the very beginning.

2         When you first were arrested, was Mr. Termonte your

3    attorney?

4    A.  No, he wasn't.

5    Q.  Who was your attorney at that time?

6    A.  Well, originally after the arrest was -- the corporate

7    attorney I had was Mr. Earl Nemzer.  He had a conflict.  So

8    they gave me -- I don't remember his name.  It was with

9    Morvillo.  I believe something like Steve Freeman, something

10   like that.  Then he had a conflict.  Then I hired Andrew

11   Lawler.

12   Q.  Mr. Lawler didn't actually start to work on the litigation;

13   right?

14   A.  No.

15   Q.  Did there come a time when you retained a firm in Chicago?

16   A.  Yes.

17   Q.  What was that firm?

18   A.  It was Sonnenschein Nath & Rosenthal I believe.

19   Q.  With whom did you deal?

20   A.  Mark Flessner.

21   Q.  During the time you dealt with Mr. Flessner and his firm,

22   what exactly -- and I don't mean "exactly," but what was

23   happening?  What kind of litigation with respect to your case

24   was ongoing, if any?

25   A.  Well, when I met Mr. Flessner, I was interviewing him.  He

1   was recommended to me.  And he made certain statements where he

2   said he would need to raise -- I would need to have a large

3   amount of money, threeish million dollars.

4   Q.  I didn't hear what you said.

5        Did you say threeish?

6   A.  Threeish million dollars, a number in the $3 million or $4

7   million range.  I told him I didn't have that.  He said the

8   only thing I could do would be to go to trial.  There was no

9   way -- I was facing 25 to 85 years.  I would never survive in

10  prison.

11       I said I didn't have that kind of money.  I had no

12  money.  I had to rely on friends and family to raise the money.

13  He said -- but I had told him I had a house that was purchased

14  with assets in 1982.  And he said he was an expert at tracing

15  and that he could get the proceeds of the house.

16       So I raised some money, and he started.  For the

17  length of time I was with him, twoish, maybe three years -- I

18  don't remember how long -- he spent the entire time trying to

19  get -- he did get $900,000.  Judge Cedarbaum released that with

20  the government's okay if I were to sell the house.  And he

21  spent almost all that time litigating eventually a Monsanto

22  hearing.

23       May I have some water?

24       THE COURT:  Yes.  We'll get that for you, sir.

25       THE WITNESS:  A Monsanto hearing which we lost.  Then

1  he did an appeal.  So most of the time was litigating to get

2  more money.

3  BY MS. KELLMAN:

4  Q.  Would it be fair to say that you retained Mr. Flessner

5  sometime in 2009 following your arrest?

6  A.  Yes.

7  Q.  And you later retained another attorney; correct?

8  A.  Mr. Flessner, after losing the --

9  Q.  Please.  I'm going to take you this in order.

10  A.  Yes.

11  Q.  Did there come a time when you retained another attorney?

12  A.  Yes.

13  Q.  Was that in May of 2013?

14  A.  It sounds right.

15  Q.  So from 2009 when you first retained Mr. Flessner and his

16  firm until May 2013, is that the period of time when the

17  Monsanto hearing and related issues were going on?

18  A.  Yes.

19  Q.  Did there come a time in district court where Mr. Flessner

20  lost the Monsanto hearing?

21  A.  Yes.

22  Q.  Did he file an appeal?

23  A.  Yes.

24  Q.  Did that take additional months or years?

25  A.  Additional funds and time.

1   Q.  So between the period of 2009 and 2013, did your criminal

2   case proceed at all?

3   A.  We never discussed my defense.

4   Q.  Did you ever go through the discovery with those lawyers?

5   A.  No.

6   Q.  Did you know whether or not they had gone through the

7   discovery?

8   A.  I know we gathered a lot.  We gathered a lot.  We never

9   discussed it.

10   Q.  So over all those years, the only issue that was being

11   litigated and addressed was how they were going to get paid?

12   A.  Yes.

13   Q.  Did you ultimately pay them any money?

14   A.  Probably they were paid something in the area of one

15   million four/one million three/one million four.

16   Q.  That was after the sale of your house?

17   A.  The $900,000 which he received from the court pending the

18   sale of the house plus other monies that I raised from friends

19   and family.

20   Q.  Now, in May of 2013, you met Mr. Tremonte.

21        Am I correct? if not, you can correct me?

22   A.  I received a call from Justin Sher, his partner.

23   Q.  And you knew Justin Sher; correct?

24   A.  I knew of Justin Sher.

25   Q.  How did you know of Justin Sher?

1   A.   He was hired by Mr. Flessner to follow the civil case

2   involving my ex-wife in terms of her appeal to keep certain

3   assets.

4   Q.   So you knew Justin Sher.

5        What was the relationship with Mr. Sher and

6   Mr. Tremonte if you know?

7   A.   They were partners in starting a new law firm.

8   Q.   When for the first time did you have a discussion with

9   either of them about having them take over your case?

10  A.   Justin Sher had called me while I was trying to figure out

11  what to do after Mr. Flessner wanted to withdraw from the case.

12  Q.   Well, wait.

13       Mr. Flessner wanted to withdraw from the case after he

14  got a million four?

15  A.   Yes.

16  Q.   And that was because the million four covered only his

17  litigation to get paid?

18            MR. BHATIA:  Objection.

19            THE COURT:  Sir?

20            MR. BHATIA:  Leading.

21            THE COURT:  All right.  Although I think we're

22  probably getting through this more quickly.  There has been

23  some leading going on, but I think most of this is fairly

24  uncontroverted.

25            MS. KELLMAN:  And basically background, Judge.  I was

1   just trying to move us along.

2            THE COURT:  Yes, ma'am.  When we get to something

3   controversial, you can make the objection again.

4            MS. KELLMAN:  Of course.

5   Q.  So there came a time --

6            I'm sorry.  Did you answer that question?

7   A.  There came a time after I had paid him when he didn't think

8   I could give him any more money, and he wanted to withdraw.

9   Q.  Was that at the point when he would have had to start

10  working on your case?

11  A.  Yes.

12  Q.  So there comes a time when you meet with Justin Sher and

13  Michael Termonte; correct?

14  A.  Justin called me and told me that he had followed the case

15  through following my former wife's case.  He believed in the

16  case.  He believed in it.  And he and his partner,

17  Mr. Termonte, started a new firm and that they would represent

18  me.  And he gave me the terms, the financial terms, of the

19  representation.

20  Q.  What were the financial terms?

21  A.  He said he would represent me through trial for $100,000.

22  And then Mr. Flessner didn't pay -- Mr. Flessner owed him

23  $40,000.  And he additionally wanted me to pay that $40,000.  I

24  negotiated that to $25,000.  So he received $125,000 from me.

25  Q.  And that was at the time you retained him?

 1   A.   Yes.

 2   Q.   Where did that money come from?

 3   A.   I raised it from friends and family.

 4   Q.   At that stage of the game, did you have any money of your

 5   own?

 6   A.   No.

 7   Q.   Now, when you say that Mr. Sher said to you that he

 8   believed in your case, what did you understand him to mean?

 9   A.   He thought I was innocent.

10   Q.   I'm sorry?

11   A.   I believed he thought that -- he believed that I was in the

12   right and that I was innocent.

13   Q.   Well, had you discussed the facts with him at that point?

14   A.   No.

15   Q.   So do you know what he based his conclusion on that you

16   were in the right?

17   A.   He had spent time with Mr. Flessner.

18   Q.   Do you know whether he had gone through any of the

19   discovery?

20   A.   No.

21   Q.   No, you don't know?  Or no, he hadn't?

22   A.   I don't believe he had.

23   Q.   So there comes a time in May of 2013 when you retained

24   Mr. Termonte and Mr. Sher.

25            And what happens then after you signed the retainer

1    and you paid them?  What happens next?

2    A.  I went in to meet them and met Mr. Termonte and just

3    started to have conversations.  We didn't really talk much

4    about a defense.  The meetings were very brief.

5              Mr. Termonte would come in and out.  He'd be there for

6    five/ten minutes and go out.  Justin Sher would kind of greet

7    me.  I think he just brought me in.  They had an associate that

8    spent a lot of time with me.

9    Q.  While you were spending time with this associate, were you

10   going over discovery?

11   A.  No.

12   Q.  Where was Mr. Flessner's firm?

13   A.  He was based in Chicago.  He switched to another firm in

14   Chicago.

15   Q.  Do you know whether or not the discovery that he had was

16   transferred over to Mr. Termonte?

17   A.  After a long time with some wrangling back and forth, I

18   believe it was.  Some was, or it all was.

19   Q.  When you say "some wrangling," were you aware of how many

20   weeks or months passed before Mr. Termonte was able to receive

21   discovery?

22   A.  It was a very long time, many, months.  It could have been

23   a year.

24   Q.  Now, how did you know that?

25   A.  Because I attended several -- one or two or three,

 1  hearings, status hearings --

 2  Q.  Court proceedings?

 3  A.  Court proceedings where Mr. Termonte was telling

 4  Judge Cedarbaum why he couldn't be ready.

 5  Q.  Why was that?

 6  A.  Because he hadn't received discovery materials.

 7  Q.  Now, do you recall when your trial -- whether or not a

 8  trial date was actually set once you had Termonte as your

 9  attorney?

10  A.  No.

11  Q.  Do you know whether or not a trial date was ever set for

12  February?

13  A.  What year?

14  Q.  '14.

15  A.  I don't believe so.

16  Q.  Do you know whether or not there was a trial set for

17  November of 2013?

18  A.  No.

19  Q.  Were you in court the day that Mr. Termonte was asking for

20  additional time to have the trial put over to sometime in the

21  summer?

22  A.  I believe so.

23          MS. KELLMAN:  Your Honor, I'd offer as Defendant's

24  Exhibit B the February 5 minutes, February 5, 2014, minutes.

25          THE COURT:  If you're using the off-the-record voice,

1     use your off-the-record voice.

2          (Counsel conferred)

3          MS. KELLMAN:  Exhibit 3.  I apologize, your Honor.

4          THE COURT:  What was 2?  I had the affidavit as 2.

5     What do you have as 2?

6          MS. KELLMAN:  It's the declaration of Mr. Termonte.

7          THE COURT:  Okay.  Thank you.

8     BY MS. KELLMAN:

9     Q.  So on February 5, 2014, there was a status conference

10    before Judge Cedarbaum; correct?

11    A.  I believe so.

12    Q.  Do you know what happened as a result of that conference?

13    A.  I believe she gave him more time.

14    Q.  Do you know whether or not the trial was set over for later

15    in July?

16    A.  No.

17    Q.  Did you discuss with Mr. Termonte before this proceeding in

18    February why you weren't getting ready to go to trial?

19    A.  I don't think so.

20    Q.  Well, between May when you retained him and February, had

21    you ever had a chance to review the discovery with him?

22    A.  No.

23    Q.  With anybody from the firm?

24    A.  No.

25    Q.  Did anybody tell you that they were having trouble getting

1    the discovery?

2    A.  Yes.  I knew that.

3    Q.  That went on for months; correct?

4    A.  A long time.

5    Q.  So as of February when you were in court on this still, you

6    had still not had an opportunity to ever have a discussion with

7    your lawyers about the discovery.  Correct?

8    A.  I have never had a discussion with my lawyers about

9    discovery.

10   Q.  I'm sorry?

11   A.  I have never discussed discovery, other than it was being

12   delayed, with my lawyers.

13   Q.  Up until this February event, this February court

14   appearance, had there ever been discussions between May and

15   February?  Other than discussions about getting discovery, had

16   there been any discussions about a guilty plea?

17   A.  No.

18   Q.  Do you know why that was?

19   A.  Well, I hope I've got the time right, but I had no

20   discussions about a guilty plea -- I always thought we were

21   going to trial -- until right before I entered the plea.

22   Q.  And that was in April, two months later; correct?

23   A.  Whenever the time is.  Yes.

24   Q.  When you say that you only had conversations about going to

25   trial, would you tell the judge what you mean by that.

```
1     A.  I always wanted to tell my story.  I always wanted to be
2     able to have people understand or the court to understand.  I
3     also always wanted to talk to the prosecutors.
4     Q.  And explain?
5     A.  And explain what my role was.
6     Q.  What was your role?
7     A.  I was in charge of trading and investing, and I was
8     overseeing other projects that were for the benefit of the firm
9     with, in most cases, no risk to the firm.  I was building other
10    businesses to benefit the company.
11    Q.  Mr. Walsh, what was --
12    A.  And then I was overseeing trading.
13    Q.  -- what was your background?  Before you came to this
14    business with Mr. Greenwood, what were you doing?
15    A.  I started out after college in 1966 in an esoteric part of
16    the world called puts and calls which became the option
17    business.  And it's now a huge, huge industry.  So I started
18    out as an option trader, kind of a salesman and trader.  I grew
19    very quickly.
20    Q.  Did you work for a company?
21    A.  I worked for a small put-and-call firm called Saul Lerner
22    Company.  I was 22.  When I was 24, they asked me to open my
23    own office.  So I had my own office at 24.  I moved to Chicago,
24    I came back, and I started a firm with some friends, a new
25    put-and-call firm.  And we did exceedingly well.
```

1              In 1973, the Chicago Board Options Exchange started,

2     and options became listed.  At that time, the business was

3     moving to the big firms.  I then went to run an option

4     department at a firm called Clark Dodge which was later taken

5     over by Kidder Peabody & Company, a fine, old invest banking

6     firm.

7     Q.  What did you do at Kidder Peabody?

8     A.  Initially I was the head and manager of the equity and

9     options area.  Shortly after that, I became a partner in the

10    firm.

11    Q.  For how long were you with Kidder Peabody?

12    A.  Five years.

13    Q.  Was that the last job that you had on Wall Street?

14    A.  Before I started my own firm.

15    Q.  This firm?

16    A.  Yes.  This firm.

17    Q.  Would you tell the Court, just by way of background, how it

18    was that you and Mr. Greenwood came together and decided to

19    work together.

20    A.  Paul Greenwood was a client of mine.  He worked at Chase

21    Bank.

22    Q.  He was a client of Kidder Peabody?

23    A.  He was a client of Kidder Peabody, and he did some option

24    trading through me.  So we established a phone relationship

25    probably over a year or so.  Brilliant, very bright.  We had a

1    good relationship, a customer to a firm.  In those days, I was

2    on the sell side.  That was called the buy side.

3    Q.  Okay.

4    A.  And then about a year or so later in the beginning of '79,

5    Mr. Greenwood came to me.  I had never met him, and he said he

6    wanted to talk.  So he came over to the office.

7         We went for lunch.  We talked.  And he told me that he

8    had a customer who was a member of the Rockefeller family and

9    that they would give him $50 million to start an asset

10   management company.

11        Well, $50 million is more than Kidder Peabody had at

12   that time in cash flow.  It was a huge amount of money then.  I

13   said, wow.  I've got some ideas for an option trading and

14   so forth and so on.

15        At that time, I was being also recruited by Goldman

16   Sachs and Merrill Lynch for pretty significant positions, but I

17   loved Kidder Peabody.  So I turned that down, and I thought we

18   were going to start a firm together.

19        After that, he came to me, after we spent a lot of

20   time thinking about things, and he said he didn't have the

21   money.

22        THE COURT:  Did or didn't?

23        THE WITNESS:  Did not have the money.

24        At that time I said -- I had been thinking that Wall

25   Street wasn't using computers in the trading area, and I had a

1   vision --

2   BY MS. KELLMAN:

3   Q.  Aren't all trades done with computers?

4   A.  Today.

5   Q.  When was this?

6   A.  This was in 1979.

7   Q.  Okay.

8   A.  Big computers were used primarily in the back office in

9   operations doing operations and administration work.  The only

10  thing you used a computer for was if a trader was pricing, the

11  prices.  You hit a button, and it would tell you what the stock

12  is.

13  Q.  They weren't used for trading?  Is that what you're saying?

14  A.  They were very primitive, a TV screen with a tape going by,

15  and you could get the price of the stock and some news.

16          I told -- now, options are what's called a derivative.

17  They relate to the stock.  There are certain trades you can do

18  as an arbitrager.  You can lock in profits if they are there.

19          When I started trading options, I had hired a young

20  man from -- I was pretty young myself.  I hired a younger guy

21  from Putnam and got him to come to Kidder Peabody and start

22  following just the 20 stocks that were available.  They were

23  opening up --

24          THE COURT:  When you say "were available," do you

25  mean --

 1          THE WITNESS:  That had listed options.  So the market

 2   was opening up, and they were going to list options on all

 3   stocks.  These were the first equity derivatives following the

 4   growth of the commodities business.

 5   BY MS. KELLMAN:

 6   Q.  By computer?

 7   A.  The computers were only used to see the prices.  My vision

 8   was to use a computer -- you could program a computer to look

 9   at multiple assets, multiple prices at the same time, put in

10   the equation, and then it would spit out the profit or loss

11   number in real time, bang.

12          There's a book called -- there's a book out about the

13   beginning.  We were at the forefront.  I had a concept of

14   marrying technology with trading, of derivatives.

15   Q.  And that was new then?

16   A.  It wasn't out there yet.  People were working on it, and no

17   one knew about it.  I'm not saying we invented it, but we were

18   pretty first.  He said he could build that system.  Paul told

19   me he had two PhDs when he was 21, one in quantitative and also

20   one in psychology.  He's a brilliant guy quantitatively.  He's

21   brilliant quantitatively.

22          I was so impressed with the man's intelligence.  I

23   said, you can really do that?

24          He said, yes.  And I trusted him.  And I brought in --

25   I spoke to another associate of mine with Kidder Peabody who

1 | had raised money for different specialized managers hedge funds

2 | way back then.  And I told him the concept, and he said he

3 | would love to do it with me.  So we raised $4 million and

4 | started the firm.

5 | Q.  That was when?

6 | A.  We opened in September of 1979.

7 |         THE COURT:  And the "we" in that sentence?

8 |         THE WITNESS:  Paul Greenwood --

9 |         THE COURT:  Mr. Walsh, I'm going to ask you.  Let

10 | Ms. Kellman finish her questions.  Let me finish my questions.

11 | Because it's really hard for the court reporter to take down

12 | two people at once.

13 |         THE WITNESS:  I apologize, your Honor.

14 |         THE COURT:  Yes, sir.

15 |         So the question was:  Who is the "we" in the sentence

16 | when you said "we" raised $4 million?

17 |         THE WITNESS:  Barry Wish was the partner who raised

18 | the money, and Paul Greenwood and I were the other two

19 | partners.

20 |         THE COURT:  Thank you.

21 | BY MS. KELLMAN:

22 | Q.  And Mr. Wish was the person who was at Kidder Peabody?

23 | A.  Yes.

24 | Q.  Did he become a part of this business?

25 | A.  Yes.

1    Q.   So now let's fast-forward back to May of 2013, and you've

2    just retained Mr. Termonte to work on this criminal case after

3    finishing with the Monsanto hearings and all that crap.

4    A.   Correct.

5    Q.   When you paid Mr. Termonte the --

6             Was it $125,000?

7    A.   A total of $125,000.

8    Q.   Was it your understanding that that was a trial fee or a

9    fee for a guilty plea?

10            What discussions had you had with him about it at that

11   time?

12   A.   To take me right through trial.  And of course, if he could

13   get a plea, I would listen to that.

14   Q.   In the time between May and February, had you had any

15   discussions about a plea, plea bargaining?

16   A.   No.

17   Q.   I'm sorry?

18   A.   No.

19   Q.   Had you had discussions about the substance of the case?

20   A.   Some but not very deep.

21   Q.   Had you gone over any of the discovery with anyone?

22   Mr. Termonte, Mr. Sher, or anyone from their firm?

23   A.   I don't believe so.

24   Q.   When you say you don't believe so, do you remember going

25   over any discovery with them?

```
 1   A.  No.

 2   Q.  Now, after you learned at the February conference that the

 3   firm was not prepared or not able to proceed with the trial

 4   before the summer, what, if any, discussions did you have with

 5   Mr. Termonte then?

 6   A.  None.

 7   Q.  You were just prepared to wait until the summer?

 8   A.  I was prepared to wait until we were ready for trial.

 9   Q.  Did you have conversations between February and the

10   presumed trial date in July about how you were going to proceed

11   to trial, what you were going to do?

12   A.  I said, what's going on?  You haven't spoken to anyone.

13   You haven't done anything.

14   Q.  When you say "spoken to anyone," what do you mean?

15   A.  You haven't spoken with any potential witnesses who would

16   support what I was telling him.  We hadn't sat down and gone

17   over anything relative a defense.

18   Q.  What were you telling him?

19   A.  I was asking him.

20   Q.  Asking him what?

21   A.  What's going on?  Why aren't we preparing a defense?

22   Q.  What response did you get?

23   A.  I was stalled.

24   Q.  You were getting stalled?

25   A.  Yes.
```

1  Q.  Did you know whether or not he was busy with other matters?

2  A.  I assume he was, but I don't know specifically.  But he was

3  not with me.  He was always in and out of the room.

4  Q.  Approximately between May and February, how many times did

5  you actually have meetings about the case with Mr. Termonte?

6  A.  Between May and?

7  Q.  February and this status conference.

8  A.  In 2014?

9  Q.  '14, yes.

10  A.  Very little.

11  Q.  Were you aware that Mr. Termonte was having difficulty

12  getting your discovery from the Flessner firm?

13  A.  Yes.

14  Q.  Were you aware that there came a time in December, the end

15  of December of 2013, when he actually believed that he had all

16  of the material he needed?

17  A.  I don't remember that.

18  Q.  Now, after that February conference, did anything about

19  your relationship with Mr. Termonte change in terms of the

20  discussions you were having in March?  In April?

21  A.  I don't think so.

22  Q.  Well, did there come a time in April when you were having a

23  conversation with him that wasn't about the progress of trial

24  preparation?

25  A.  What was the date of -- if I'm allowed, what was the date

1   of the plea?

2   Q.  It was the end of April.

3   A.  All right.  So I would say three weeks to a month before

4   the plea allocution, probably closer to three, he asked me to

5   come into the office.

6   Q.  And?

7   A.  And when I got to the office, he said he met with the

8   government.  They agreed to drop five of the six counts which

9   sounded great to me.  And that I could plead to -- I could

10  plead guilty to one count, and it was between 0 and 20 years.

11          At that point, I said, what are you talking about?

12  I'm going to be 71.  How can I possibly even consider anything

13  remotely near that?  And what -- actually, before I said that,

14  the first thing I said was, what would I be pleading guilty to?

15          And he said, you signed those notes.

16  Q.  What did you understand him to mean --

17  A.  What will you say when they asked you about the notes?

18          I said, I'll tell them the truth.

19          And he said, nobody's going to believe you.

20          Then we discussed the 0 to 20 thing, and he said -- 20

21  years or anything near that is not possible.  It's not in the

22  cards.  He said four to six years would be a good result.

23  That's my recollection.

24  Q.  Now, during the course of that discussion, you said that

25  you were happy when he said they were going to dismiss all the

1  counts but this one 0 to 20; correct?

2  A.  It sounded good.

3  Q.  Did Mr. Termonte explain to you anything about the

4  sentencing guidelines and how the guidelines would interact on

5  your guilty plea?

6  A.  No.

7  Q.  Did you have any discussions about the impact of the

8  dismissal of those charges or the non dismissal relative to the

9  guidelines calculation?

10  A.  No.

11  Q.  Did you ever discuss grouping, something called grouping,

12  with Mr. Termonte?

13  A.  I never heard of it.

14  Q.  At the time you had this initial discussion with

15  Mr. Termonte when he said, maybe four to six years --

16        Was it four to six years?

17  A.  That was what he said would be a good result.

18  Q.  Did he take time -- did he tell you what the guidelines

19  were?  What the guidelines were?

20  A.  No.

21  Q.  You had no discussion about guidelines at all?

22  A.  Other than if I was convicted of the whole thing, I was

23  looking at 25 to 85 years.

24  Q.  That's without a plea agreement.

25  A.  That's if I lost at trial.

1    Q.  If you lost at trial.  Okay.

2          Now, did he have a piece of paper for you to look at

3    at that point?  A plea agreement.

4    A.  No, not at that time.

5    Q.  Okay.

6    A.  Not at the first time he mentioned it to me.

7    Q.  What was your reaction?

8    A.  I was, you know, confused.  It sounded good.  I was fearful

9    of 25 to 85 years.  I said, look.  I need to think about it.  I

10   said, I want to go down to Florida and see my mother.

11         So I went down to Florida to think about it.  He

12   called me again once when I was down there and was pressing me,

13   you've got to do this.  You've got to take the plea.

14         I came back, and we had another conversation when I

15   got back in which it was pretty much, is there any way it can

16   possibly be?  Aren't you going to press?  Given my total life,

17   aren't you going to press for probation with community service

18   maybe?

19         He said, yes.  Yes.

20   Q.  How old were you at the time?

21   A.  I was going to be -- I was 70 and turning 71 next year.

22   Q.  When is your birthday?

23   A.  May 7.

24   Q.  And you were having these discussions in April?

25   A.  Right before the plea.  Yes.

1   Q.  When for the first time did you actually see a document

2   called plea agreement?

3   A.  I believe it was emailed to me either the day before or two

4   days before -- two days before the actual allocution.

5   Q.  Did you read it?

6   A.  I tried to read it.  I looked at it, and my eyes focused on

7   what I was pleading guilty to.  And I just -- I had never been

8   able to read -- I'm not a detailed person.  I get very nervous

9   and anxious.  I can't read legal documents.

10  Q.  That's why you have a lawyer.

11  A.  Yes.  But I focused on that, and I kind of like blacked

12  out.  And I said, look.  You've got to explain this to me.  You

13  have to go over this with me.  I can't focus on this.  So I

14  came in the night before the plea.

15  Q.  I'm sorry?

16  A.  So I came in the night before the plea allocution.

17  Q.  Can you just move the mike a little bit closer to your

18  mouth.

19  A.  I then came in the night before.

20  Q.  And the night before the plea was the first time that you

21  sat down and had a discussion with Mr. Termonte about the

22  contents of this plea agreement; correct?

23  A.  Yes.

24          MS. KELLMAN:  Your Honor, I'd offer the plea agreement

25  dated April 21, 2014, as Defendant's Exhibit 4.

```
 1              THE COURT:  Yes, ma'am.

 2              MR. Bhatia:  No objection.

 3              THE COURT:  Received.

 4              (Defendant's Exhibit 4 received in evidence)

 5              MS. KELLMAN:  Your Honor, I'm not clear.  I know I

 6    numbered the previous exhibits.  But I'd like to offer also, if

 7    I haven't, Mr. Walsh's declaration and Mr. Termonte's

 8    declaration and the minutes, the February 5 minutes.

 9              THE COURT:  Any objection?

10              MR. Bhatia:  No.

11              THE COURT:  Received.

12              (Defendant's Exhibits 1, 2, and 3 received in

13    evidence)

14              THE COURT:  One, two, and three.

15              MS. KELLMAN:  The plea agreement is four.

16    Q.  Do you have a copy of that in front of you?  The plea

17    agreement.

18    A.  No.

19    Q.  Let me give it to you.

20              MS. KELLMAN:  May I approach?

21              THE COURT:  Yes, ma'am.

22    BY MS. KELLMAN:

23    Q.  Do you recognize that document?

24    A.  Yes.

25    Q.  And do you recognize that document to be the plea
```

1   agreement --

2   A.  Yes.

3   Q.  -- that you discussed with Mr. Termonte on that day?

4   Correct?

5   A.  That he went over with me.  Yes.

6   Q.  This is the one that you received --

7   A.  Yes.

8   Q.  -- and had it emailed to you earlier; correct?

9   A.  Correct.

10  Q.  Now, on page 2 starting with paragraph A, offense level, do

11  you see where it says the offense level is 7 in paragraph 2?

12  A.  Yes.

13  Q.  By the way, this is an outline of how the sentencing

14  guidelines will affect your case.

15          Did you have discussions with Mr. Termonte about these

16  paragraphs?

17  A.  No.

18  Q.  Did you have any discussion about a $400 million loss

19  figure that would increase your guidelines by 30 levels?

20  A.  Yes.

21  Q.  What, if any, discussions did you have about a $400 million

22  loss?

23  A.  I said to Mr. Termonte that that's a made-up number.  There

24  is no way we lost -- I didn't think we lost any money or

25  certainly not that number.  I don't know what it's based on.

1           Are you telling me it's so big it doesn't make a

2    difference?

3           Yes was his answer.

4    Q.  When you say, "Are you telling me it's so big it doesn't

5    make a difference," were those your words or Mr. Termonte's

6    words?

7    A.  I asked him that question.

8    Q.  Okay.

9    A.  And he said yes.

10   Q.  When he said it represents the loss, what was your reaction

11   to that?

12   A.  We didn't lose that.  I had no reason to believe that we

13   could have possibly lost that kind of money.

14   Q.  That kind of money -- you would have known if you had lost

15   it?

16   A.  I would think.

17   Q.  Now, were you involved in keeping track of the money

18   aspects of the business?

19   A.  No.

20   Q.  Who did that?

21   A.  Mr. Greenwood and Debbie Duffey.

22   Q.  If you know, what were their responsibilities?

23   A.  Everything to do with the money, technology, legal.

24   Everything administrative, financial.  Paul did all the

25   banking, all the legal.  It was part of our agreement when we

1   started the firm.  The only thing I was interested in was

2   investing and trading, and I originally was helping with sales.

3   Q.  And did there come a time when you no longer helped with

4   sales?

5   A.  In 19- -- between 1994 and '96, Paul came with me.  I

6   brought in a partner, James Carter, who was with us on the West

7   Coast.  He was the head of sales.  As the business in the

8   industry changed, he and Paul were doing the formal

9   presentations.  The business had changed where you were talking

10  to your fellow quants who worked for the institutions.  So they

11  were doing the due diligence.

12  Q.  What's a quant?

13  A.  A quantitative person, someone with deep financial

14  backgrounds in financial instruments.  I'm sorry.

15       Paul came to Long Island to talk to me -- I believe it

16  was around 1995 or '96 -- and saying that he and Jimmy were

17  doing all the presentations to the clients.  They thought I was

18  confusing things.

19       I'm a more business-man-to-business-man,

20  seat-of-the-pants kind of person.  And the business had become

21  highly, highly technical.  It had moved from options to

22  futures.  It was very technical.

23       They thought they would be better off handling all the

24  sales and marketing, and I said, that's fine with me.  Thank

25  you.

1    Q.  Thank you.

2          Now, when you say he came to your office, were you

3    guys down the hall from each other?

4    A.  His office was in Greenwich, Connecticut.  I was in Long

5    Island.

6    Q.  Were you ever in the same office together?

7    A.  We were down on 180 Maiden Lane, and I think around

8    1989/'90, we both moved the office to Greenwich, Connecticut.

9    I commuted from Long Island.  And then two years later around

10    '92/'94, maybe '92ish, maybe '91ish, I moved my office to Long

11    Island.  We separated physically.

12    Q.  So you did the trading from your office in Long Island?

13    A.  Actually, the trading was done in the New Jersey office,

14    and I was in verbal and computer communication.

15    Q.  So you monitored the trading offsite?

16    A.  I was in touch with our partner, and I tried to do trading

17    on a daily basis pretty much.

18    Q.  And he was in New Jersey?

19    A.  Yes.

20    Q.  And the financial aspect of the business -- bookkeeping,

21    banking, all that kind of stuff -- where was that done?

22    A.  Greenwich.

23    Q.  Connecticut?

24    A.  Yes.

25    Q.  Let's get back to.  I'm sorry.  I --

1          THE COURT:  Digressed.

2          MS. KELLMAN:  Thank you, Judge.

3   Q.  Back to page 2 of the agreement in paragraph A, so when you

4   asked Mr. Termonte about the $400 million loss, what did he

5   say?

6   A.  As I said, I said, is the number so big it doesn't matter?

7          And he said, yes.  It doesn't matter.

8   Q.  Did you question him further about that?

9   A.  I had told him that the number --

10         THE COURT:  Mr. Walsh, let counsel finish her

11  question, please.

12  BY MS. KELLMAN:

13  Q.  When you told him it didn't matter, did you follow up?  Did

14  you ask him anything more?

15  A.  No.

16  Q.  You accepted that it just didn't matter?

17  A.  I didn't believe the number, but he told me it didn't

18  matter.

19  Q.  What about in paragraph 4 the two-point enhancement for

20  more than ten victims?

21         Did you question him about that or discuss that with

22  him?

23  A.  No.

24  Q.  Did you have any other discussions besides that amount of

25  money with Mr. Termonte about the guideline calculation?

```
 1   A.  No.
 2   Q.  Did you ever discuss something called grouping with
 3   Mr. Termonte?
 4   A.  No.
 5   Q.  Did you ever have a discussion with Mr. Termonte about
 6   something called a Pimentel letter?
 7   A.  No.
 8   Q.  Now let's turn to page 3 if you will.
 9           At the beginning of page 3, it says that your
10   guideline sentencing range is 360 months to life.  That's 30
11   years to the rest of your life in prison.
12           When you read that, did you have a discussion with
13   Mr. Termonte about it?
14   A.  I couldn't read this.  All my discussions with Mr. Termonte
15   revolved around it wouldn't happen.  It couldn't happen.  I
16   would never get anything near the 20 years, even double digits.
17   That's all I focused on.
18   Q.  When you say "double digits," who said you wouldn't get
19   double digits?
20   A.  Mr. Termonte.
21   Q.  So when you saw that you were stipulating --
22           You know what stipulating means; right?
23   A.  Agreeing to.
24   Q.  Yes.
25           When you saw that you were agreeing to a
```

1  30-year-to-life sentence, what did you think?  What did you

2  say?

3          THE COURT:  Is that what this actually says?  Agreeing

4  to?

5          MS. KELLMAN:  It's a stipulation, Judge.  It's

6  stipulated.

7          THE COURT:  I'm only asking about the 30 years.  I

8  thought the stipulated guidelines range is 240.

9          MS. KELLMAN:  Yes.  That's correct.

10          THE WITNESS:  In all my -- do you want me to answer?

11  BY MS. KELLMAN:

12  Q.  Did you understand that the stipulated guideline range in

13  this case would put you in jail for 20 years?

14  A.  I was in no way focused on that.  Mr. Termonte had told me

15  all along that this was a hypothetical situation, sentence or

16  situation or term, and that -- I said to Mr. Termonte, what do

17  you have?  A wink and a nod with the government?

18          And he smiled.  He just smiled and shook his head.  I

19  took it to mean they had an understanding.

20          THE COURT:  Shook his head how?

21          THE WITNESS:  He smiled and just went like this.

22          THE COURT:  Let the record reflect the witness is

23  nodding his head up and down.

24  BY MS. KELLMAN:

25  Q.  Were you concerned about this number, this 240-month

1    guideline, stipulated guideline?  Were you concerned about it?

2    A.  It was not in the cards.  No.  It was never a possibility.

3    Q.  Would it be fair to say that over the course of your

4    representation by Mr. Termonte, that the conversation about it

5    was not in the cards and this was never going to happen

6    happened with some frequency?

7    A.  I don't understand that.

8         MR. BHATIA:  Objection, your Honor.  Mischaracterizes

9    the testimony.

10        THE COURT:  Do it again, Ms. Kellman, please.

11        MS. KELLMAN:  I'll rephrase it.

12   Q.  Was that the only conversation that you had with

13   Mr. Termonte about the fact that you didn't need to worry about

14   the 240 months that you stipulated to?  That you agreed to?

15   A.  We only had from the time -- it was only a three-week

16   period I think.  Maybe it was four.  Maybe it was two.  We only

17   had threeish conversations at most from the time he presented

18   and urged me to take the plea till when I pled.

19   BY MS. KELLMAN:

20   Q.  You told us you only saw this document the day before you

21   pled.  Am I right?

22   A.  I might have received it the night before or the day

23   before.

24   Q.  And for the first time you discussed it with him the day

25   before?

1   A.  The night before.

2         MR. BHATIA:  Objection, your Honor, to the leading.

3         MS. KELLMAN:  I'm just reviewing what he's testified

4 to.

5         THE COURT:  All right.  I think counsel was in fact

6 reviewing what the witness said.  He had said that he only

7 discussed it with him the night before the plea.

8         MS. KELLMAN:  Thank you, Judge.

9   Q.  Did you understand that Mr. Termonte would be able to make

10 an argument or whether or not he would be able to make an

11 argument for less than 20 years?

12   A.  Twenty years was never on the table.

13   Q.  Well, it was in the agreement.

14   A.  Not in my conversations with Mr. Termonte it wasn't.

15         MR. BHATIA:  Objection, your Honor.  Nonresponsive.

16         THE COURT:  All right.  Counsel is obviously going to

17 ask him a different question.

18         What do you want me to do?  Strike the answer?

19 Please.

20         Ms. Kellman.

21 BY MS. KELLMAN:

22   Q.  When you signed this agreement -- by the way, did you sign

23 it in court, or did you sign it in Mr. Termonte's office?  If

24 you remember.

25   A.  I don't remember.

1   Q.  But you did sign it; correct?

2   A.  Yes.

3   Q.  Knowing that it said that you agreed to 20 years; that 20

4   years would be the stipulated guideline range here, the

5   stipulated sentence really.  Correct?

6   A.  I wasn't thinking in those terms.

7   Q.  Because?

8   A.  Because it was not ever going to happen.

9   Q.  That was your fantasy world, or that was --

10  A.  No.  It was based on --

11          THE COURT:  Just a minute.

12          Mr. Walsh, let counsel finish.

13  BY MS. KELLMAN:

14  Q.  That was because you couldn't fathom it or based on

15  conversations you had with your lawyer?

16  A.  The latter.  Based on conversations I had with my lawyer.

17  Q.  Would you tell the Court what conversations you had with

18  your lawyer about this 20-year cap.

19  A.  It was not possible.  It wasn't going to happen.

20  Q.  Now, if you take a look at page 4, the third full

21  paragraph, it says:  "It is agreed that the defendant will not

22  file a direct appeal nor bring a collateral challenge,

23  including but not limited to an application under Title 28,

24  U.S. Code, Section 2255 or 2241" not seeking a sentence

25  modification as long as you got a sentence that was equal to or

1   below the stipulated guideline sentence of 240 months.

2          Do you recall having a conversation with Mr. Termonte

3   about this waiver provision?

4   A.  No.

5   Q.  Did you read this provision?

6   A.  No.

7   Q.  And you had no discussion with him at all about it?

8   A.  He was going to explain the plea to me the night before.

9   Q.  Well, the night before, did you have a discussion with him

10  in which he told you that as long as you get a 20-year

11  sentence, you will not have the right to appeal?

12  A.  He did not mention -- he did not say that.

13  Q.  Now, further down in that paragraph, it says that you agree

14  not to appeal any forfeiture in an amount equal to $5,743,779.

15         You agreed that you wouldn't appeal that forfeiture

16  amount.  Correct?

17  A.  We did not discuss that.  I was in a frame of mind that we

18  had a deal and none of this was pertinent.  I wasn't contesting

19  the forfeiture number.

20  Q.  When you say you had a deal, do you mean this plea

21  agreement?

22  A.  That I was going to receive a single-digit sentence.

23  Q.  Whatever it said in here, you were going to get a

24  single-digit sentence.

25  A.  Yes.

1    Q.  And you and Mr. Termonte did not discuss the details of the

2    plea agreement.

3           Is that what you're saying?

4    A.  He went over the plea agreement, but none of this that

5    you're asking me now was discussed.

6    Q.  Now, you got to court the next morning I think you said.

7    You were going to plead guilty at that time; is that right?

8    A.  Yes, it is.

9    Q.  Did you discuss with Mr. Termonte questions that would be

10   asked of you by the Court?

11   A.  The night before.

12   Q.  Did there come a time when Mr. Termonte said -- withdrawn.

13          Generally speaking, what instructions were you given

14   with respect to the questions that you were going to be asked

15   by the court?

16   A.  Most of the conversation was how I would handle myself or

17   what would take place in the court.

18   Q.  How were you to handle yourself?

19   A.  That I would be answering most, if not all, the questions

20   in the affirmative.  Yes.

21   Q.  So whatever --

22   A.  And to check with him if I had a question.

23   Q.  Did you know that you would not be taking this plea in

24   front of Judge Cedarbaum?

25   A.  No.  I assumed I would.

1   Q.  You assumed you would be taking it in front of

2   Judge Cedarbaum?

3   A.  Yes.

4   Q.  The next day when you came to court and you saw Magistrate

5   Judge Fox, was there any explanation to you about why

6   Judge Cedarbaum wasn't there?

7   A.  I don't remember.

8   Q.  Did you ultimately consent to having a magistrate judge

9   take your plea?

10  A.  No.

11  Q.  Now, there came a time during the allocution where the

12  judge asked you a lot of questions.

13          Am I right?

14  A.  Yes.

15  Q.  About your background, about your mental health, medicines

16  you took, whether or not you were taking this plea knowingly

17  and voluntarily.  Correct?

18  A.  Correct.

19  Q.  And did the judge go over the guidelines with you?

20  A.  I don't recall.

21  Q.  Did there come a time when the judge spoke to you about

22  something called an appellate or an appeal waiver?

23  A.  I heard the word "appeal."  He said something beforehand

24  which I could not understand at all.  I turned to Mr. Termonte,

25  and he said -- he shook his head up and down.  And I answered

1   yes.

2   Q.  Do you recall whether or not the magistrate said that the

3   appeal waiver contained in your plea agreement would constrict

4   your right to appeal?

5   A.  Not at the hearing.  I heard words.

6   Q.  You heard words?

7   A.  I heard words.  I didn't understand them.

8   Q.  Did there come a time when the judge -- instead of asking

9   you yes-and-no questions, where the judge said to you, tell me

10  in your own words why it is that you think you are guilty of

11  this crime?

12  A.  I read a statement that Mr. Termonte gave me to read.

13          MS. KELLMAN:  Your Honor, I'd offer the minutes of the

14  plea from April 25, 2014, as Defendant's Exhibit 5.

15          THE COURT:  Any objection, counsel?

16          MR. Bhatia:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 5 received in evidence)

19  BY MS. KELLMAN:

20  Q.  Now, having heard the word "appeal" during the course of

21  the discussion that you were having with the judge, did you ask

22  Mr. Termonte about what that was about?

23  A.  Repeat that, please.

24  Q.  Either during the proceeding or after the proceeding, you

25  said that you had heard the word "appeal."  Correct?

1   A.  Yes.

2   Q.  And did you ask Mr. Termonte what that was about?

3   A.  No.

4   Q.  Did you at this stage of the game know that you had given

5   up your appellate rights as long as you got a sentence of 20

6   years or less?

7   A.  No.

8   Q.  When for the first time, if you know, did you learn that

9   you did not have a right to appeal?

10  A.  After my sentencing, there was a commotion in the

11  courtroom.  And then I realized what had happened.

12  Q.  When you say there was a commotion, can you tell us as best

13  you can recall what happened.  This was after sentence.

14  A.  Sentence was pronounced.  I became in a state of shock

15  pretty much.  There was a lot of noise.  Mr. Termonte was

16  asking the judge things.  He was asking -- he made statements

17  to the judge that -- he was not -- he did not prepare me for

18  anything like this.  There had never been a sentence like this.

19        He asked the judge if she would sentence to an extra

20  day.  I remember Judge Cedarbaum saying -- I think she said, I

21  couldn't do that.  But are you asking me to consider

22  withdrawing your client's plea?  I will consider that.

23        And then the next thing, Termonte got into a

24  conference with Mr. Naftalis who was one of the AUSAs handling

25  the case.

1    Q.  Let's break this down a little bit.

2         Could you describe Mr. Termonte's demeanor after

3    sentence was imposed.

4    A.  He was flabbergasted.  It wasn't pretty.  He was, you know,

5    very disturbed.

6    Q.  You said he said something to the effect that there's been

7    no sentence like this in a case like this?  Do you remember --

8    A.  He specifically said -- I remember him saying I could never

9    or something to the effect of I could never have prepared my

10   client for this.

11   Q.  In fact, he had not prepared you for a 20-year sentence;

12   correct?

13   A.  Quite the opposite.

14   Q.  And you said I think also that he asked the court to impose

15   a sentence of 20 years and an extra day?  Is that right?

16   A.  I know that now.  I think I heard it, but I know it for a

17   fact having read the transcript.

18   Q.  And what was the judge's response to that if you recall?

19   A.  I think she -- I would be speculating as to what she

20   thought.  But at that, she said, are you saying you would like

21   me to -- are you asking me to consider withdrawal of the plea?

22   Q.  What did Mr. Termonte say if you recall?

23   A.  He conferred with Mr. Naftalis.  He said he didn't really

24   know yet what he wanted to do.  Could he please have a recess

25   while he considered it.

1    Q.  A recess?

2    A.  Yes.

3          MS. KELLMAN:  Your Honor, I'd offer the sentencing

4    minutes from October 29, Defendant's Exhibit 6.

5          THE COURT:  Any objection?

6          MR. Bhatia:  No objection.

7          THE COURT:  Received.

8          (Defendant's Exhibit 6 received in evidence)

9    BY MS. KELLMAN:

10   Q.  Now, following the imposition of the sentence, what

11   happened?

12   A.  In the days afterward?

13   Q.  Yes.  In the minutes after, the days after, the hours

14   after, the days after.

15         Let's start with the minutes after.  Was there a

16   discussion between you and your lawyer about what had just

17   happened?

18   A.  I'm sure there was.  You can imagine my state of mind.  He

19   said he was going to go back and figure out what to do I pretty

20   much think.  He seemed like he was way in over his head at that

21   point to me.  Through a recommendation, Paul Shechtman came on

22   the scene.

23   Q.  Someone recommended Paul Shechtman to you?

24   A.  Yes.

25   Q.  What, if anything, were you told about Paul Shechtman?

1    A.  Superlative credentials.

2    Q.  As vice-president of the United States?  What were his

3    credentials?  As you understood, what were his credentials?

4    A.  Well, I was told --

5            THE COURT:  Gentlemen, ladies.

6            Question.

7    BY MS. KELLMAN:

8    Q.  What, if anything, did you learn about Mr. Shechtman's

9    credentials?

10           THE COURT:  Answer.

11           THE WITNESS:  That he was a very well-respected

12   attorney in the criminal bar.  He was former head of the

13   criminal division at the U.S. Attorney's Office, and he was a

14   wise man.

15   BY MS. KELLMAN:

16   Q.  Did you discuss with Mr. Termonte bringing Mr. Shechtman on

17   board?

18   A.  Yes.  After speaking with Mr. Shechtman.

19   Q.  You spoke with Mr. Shechtman first?

20   A.  Actually either I did or my daughter might have.

21   Q.  When for the first time did you speak with Mr. Shechtman?

22   A.  It may have been a phone call, but we had a meeting -- we

23   had a breakfast in the city on a Sunday right after that.

24   Q.  Was that just Mr. Shechtman, or was Mr. Termonte there as

25   well?

1   A.  Just the two of us, Mr. Shechtman and I.

2   Q.  That was within a week or so of the time that you had

3   received this sentence?

4   A.  It was the Sunday after.

5   Q.  Had you been in touch with Mr. Termonte between the time of

6   the sentence and that Sunday?

7   A.  We had some conversations.

8   Q.  Were they in person or on the phone?

9   A.  On the phone.

10  Q.  What was the nature of those conversations?

11  A.  There was only one thing.  I think I said, what are you

12  going to do?  I hope you can do something.

13          His answer was, I'll do the same for you as any other

14  client I would do.

15  Q.  Was he any more specific?

16  A.  That's indelled in my brain.

17  Q.  So you reached out to Mr. Shechtman.

18  A.  Yes.

19  Q.  And you had this meeting with him on Sunday.

20          What, if anything, did you discuss with him then?

21  A.  What he was thinking of doing.  He asked for a $5,000

22  retainer or check which we gave him.  And he was going to use

23  his influence, I understood -- he told me he would use his

24  influence with the U.S. Attorney's Office to see if they would

25  cooperate with us and that he wasn't sure whether he wanted to

1    pursue seeing the plea withdrawn or another avenue to get a

2    resentencing.  The goal was to get a resentencing or to

3    withdraw the plea.

4    Q.  Those were the two goals, one or the other?

5    A.  Yes.  He was going to get back to me.

6    Q.  Did you enter into a retainer agreement for that $5,000

7    with Mr. Shechtman?

8    A.  I don't know if it was a retainer or we just sent him a

9    check.

10              MS. KELLMAN:  Your Honor, may I approach?

11              THE COURT:  Yes, ma'am.

12              MS. KELLMAN:  This will be Defendant's Exhibit 7.

13   Q.  Do you recognize this document?

14   A.  Not really.  My daughter may have handled this.

15              THE COURT:  Off the record.

16              (Discussion off the record)

17              THE COURT:  Thank you.

18   BY MS. KELLMAN:

19   Q.  And after you paid Mr. Shechtman this money, what, if any,

20   conversations did you have, either with Mr. Termonte alone or

21   with Mr. Termonte and Mr. Shechtman?

22   A.  I don't think I had any more conversations with

23   Mr. Shechtman, and I can't remember anything with Mr. Termonte

24   until I received a copy of a letter that they had sent to the

25   judge unbeknownst to me.

1  Q.  And this was the letter dated November 4?

2  A.  I don't recall the date.

3          MS. KELLMAN:  May I approach?  This is Defendant's 8.

4          THE COURT:  Yes, ma'am.

5  BY MS. KELLMAN:

6  Q.  Do you recognize this letter?

7  A.  Yes.

8  Q.  Is that the letter that you just described?  The one that

9  you hadn't seen until after it was sent.

10  A.  I did not see this before it was sent to the government.

11          MS. KELLMAN:  Your Honor, I'd offer this.

12          MR. Bhatia:  No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 8 received in evidence)

15  BY MS. KELLMAN:

16  Q.  This was a letter written by Michael Termonte with respect

17  to Judge Cedarbaum's inquiry as to whether or not you wanted to

18  withdraw your plea; correct?

19  A.  Yes.

20          MS. KELLMAN:  Your Honor, if I may read it into the

21  record.

22          THE COURT:  Yes, ma'am.

23          MS. KELLMAN:  "Dear Judge Cedarbaum, I write to

24  confirm that Mr. Walsh will not be moving to withdraw his

25  guilty plea.  The government has indicated that for Mr. Walsh

 1    to succeed in withdrawing his plea, it would not offer him a

 2    more favorable agreement.  And Mr. Walsh has accepted

 3    responsibility for his crimes and does not want a trial.  Under

 4    those circumstances, the motion to withdraw would serve no

 5    purpose.

 6         "I also write to request that the court hear further

 7    argument on an appropriate sentence in this case.  At the

 8    hearing last Thursday, certain issues were raised that should

 9    be more fully addressed.  I have spoken with AUSA Benjamin

10    Naftalis who has informed me that the government does not

11    oppose this request."

12         Now, it says in this letter that:  "Mr. Walsh has

13    decided that he will not move to withdraw his plea," which had

14    been the judge's invitation at the end of that sentencing

15    proceeding.

16    Q.  Correct?

17    A.  Yes.

18    Q.  Had you discussed with Mr. Termonte anything about whether

19    or not you wanted to withdraw your plea?

20    A.  No.

21    Q.  Not any time between the day of the sentence until the day

22    you saw this letter?

23    A.  No.

24    Q.  Now, you said that you didn't see this letter until after

25    it was filed; correct?

1    A.  Yes.

2    Q.  So is it your testimony that you were not party to the

3    decision that resulted in this letter informing the court that

4    you would not pursue a withdrawal of your plea?

5    A.  Yes.  I did not see that letter.

6    Q.  And you did not have a discussion with Mr. Termonte in

7    which you told him or he asked you if you want to withdraw your

8    plea?

9    A.  No, I did not.

10   Q.  Did he have a conversation with you in which he said, I

11   don't think you should withdraw your plea?

12   A.  No.

13   Q.  So the first time you heard that you were not interested in

14   withdrawing your plea was when you saw this letter; correct?

15   A.  Correct.

16   Q.  And the letter dated November 4 and filed November 4 you

17   first saw on November 5; correct?

18   A.  Correct.

19   Q.  Did Mr. Termonte show you that letter at that time?

20   A.  No.

21   Q.  Who showed you that letter?

22   A.  I believe it was emailed to me.

23   Q.  By who?

24   A.  It could have been Mr. Termonte or someone from his office.

25   Q.  Do you know whether or not Mr. Termonte provided a copy of

1     that letter to anyone besides you?  To anyone in your family.

2     A.  I believe to my daughter.

3           MS. KELLMAN:  Your Honor, I'd offer as Exhibit 9 a

4     series of emails between Mr. Termonte and my client's daughter.

5     Q.  Do you recognize these emails?

6     A.  I think I've seen them.

7     Q.  Do you want to take a minute and just read them.

8     A.  The highlighted ones?  I don't think I've seen them.

9     Q.  Do you remember whether or not Mr. Termonte mailed that

10     letter, the November 4 letter, to your daughter before it was

11     sent to you?  Does looking at this document --

12     A.  He would have had to have.

13     Q.  Why would he have had to have?

14     A.  He says that he --

15     Q.  Right.  But you said that you didn't remember these.

16     A.  No.

17     Q.  I'm asking you if looking at these emails refreshes your

18     recollection as to whether or not Mr. Termonte sent this to

19     your daughter rather than sending it to you.

20     A.  I found out after the fact that he had sent it to my

21     daughter before sending it to me.

22     Q.  But when you found out, it was on November 5 -- am I

23     correct? -- after --

24     A.  After the letter had been filed already.  It was after the

25     fact.

1   Q.  And do you recall Mr. Termonte telling you that he assumed

2   your daughter would tell you about it?

3   A.  I don't remember that conversation.

4   Q.  Would you take a look at this document.

5   A.  I see.  I saw it there.

6   Q.  That does not refresh your recollection?

7   A.  I can't remember.

8           MS. KELLMAN:  Your Honor, I'd offer these emails as

9   Exhibit 8.

10  A.  I was upset.  I do remember that.

11          MS. KELLMAN:  9.

12          THE COURT:  Any objection, counsel?

13          MR. BHATIA:  No, your Honor.

14          THE COURT:  Received.

15          (Defendant's Exhibit 9 received in evidence)

16          MS. KELLMAN:  Your Honor, if I may read just briefly.

17          THE COURT:  Yes, ma'am.

18          MS. KELLMAN:  This is dated Tuesday, November 4, at

19  11:53.  Mr. Termonte writes:  "We ran it by Sarah and assumed

20  she was sharing it with you."

21  Q.  Had Sarah shared this letter with you or the content of the

22  letter with you --

23  A.  No.

24  Q.  -- on November 4?

25  A.  No.

1  Q.  On November 5, did you receive any email from Mr. Termonte

2  in which he said:  "The letter as filed is attached"?  Do you

3  remember getting that email on November 5?

4  A.  I became aware of it.  I don't remember how I became aware

5  of it.

6  Q.  Do you know whether that was the first time that you had

7  seen that letter after it was filed?

8  A.  Absolutely.  Yes.

9  Q.  Now, what was your reaction to the fact that your right to

10  withdraw your plea had been foreclosed without any discussion

11  with you?  What was your reaction to that?

12  A.  Very, very angry, to put it mildly.

13  Q.  What did you say?  What did you do?

14  A.  How could you do that?  What would be the downside in being

15  able to withdraw my plea?

16  Q.  Now, what, if anything, did Mr. Shechtman do in connection

17  with this $5,000 retainer that you paid him?

18  A.  What did he do?

19  Q.  Yes.

20  A.  He told me he was going to use his influence to work with

21  the U.S. Attorney's Office.

22  Q.  And do you know whether or not he met with anyone in the

23  U.S. Attorney's Office?

24  A.  I'm told he did.

25  Q.  Did he tell you with whom he met?

1    A.   He told me -- I'm not sure -- I think he told me a

2    Mr. Joon.   The name could be wrong.

3    Q.   Joon Kim?

4    A.   Yes.   Someone who replaced him as the head of the criminal

5    division.

6    Q.   Did he tell you that before or after you had a meeting?   If

7    you remember.

8    A.   I think before.   He told me he was going to meet with him.

9    Q.   Did he tell you what the outcome of the meeting was?

10   A.   To the best of my recollection, he told me that he was

11   going to try to take it up to Mr. Bharara, Preet Bharara, the

12   U.S. attorney.

13   Q.   Did you have an understanding of what had happened when he

14   spoke with Joon Kim?

15   A.   Not that I can recall.

16   Q.   Do you know whether or not he ever discussed it with the

17   United States attorney, Mr. Bharara?

18   A.   I don't think he got that far.

19   Q.   Mr. Shechtman told you that he was going to meet with Joon

20   Kim; correct?

21   A.   Correct.

22   Q.   And after the meeting, did he tell you that he actually had

23   the meeting?

24   A.   I don't recall.

25   Q.   Did he tell you what happened if there was a meeting?

1    A.   I don't recall.

2    Q.   Did you have any other dealings with Mr. Shechtman?

3    A.   No.

4    Q.   Did you have any other conversations with Mr. Termonte

5    about how to proceed next?

6    A.   I may have.

7    Q.   You don't recall?

8    A.   No.

9    Q.   Now, does the name Joel Sickler mean anything to you?

10   A.   Yes.

11   Q.   Who was Joel Sickler?

12   A.   He is what's called a judge advocate.  I don't know how

13   that name came about, but I was told that was what he's called.

14   They are criminologist consultants that help try to place you

15   in a good institution, one that would be good for you.

16   Q.   Did there come a time where either you or the Termonte firm

17   retained Mr. Sickler to advise them on an appropriate

18   designation for you?

19   A.   Yes.

20   Q.   Was it Mr. Termonte's firm that retained Mr. Sickler?

21   A.   I don't think so.  I think -- I heard it from someone else.

22   No.  Actually, no.  Another friend recommended it.

23   Q.   Did there come a time when you began communicating with

24   Mr. Sickler?

25   A.   Yes.

1    Q.   What was the nature of that communication?

2    A.   The nature was he recommended different camps to me.

3    Q.   Were there any parameters that he laid out in terms of the

4    camps if you recall?

5    A.   There were more descriptions of the camp and which ones

6    would have the RDAP program which was available to me and

7    pretty much how they worked, just more characteristically, not

8    to make light, but like a travel agent would describe a

9    facility.

10   Q.   So he was laying out the different facilities that might

11   be --

12   A.   And representing that he could get me into those

13   facilities.

14   Q.   Would it be fair to say that these discussions with

15   Mr. Sickler occurred prior to sentencing?  Correct?

16   A.   Absolutely.

17   Q.   Was Mr. Sickler instructed --

18            By the way, do you know if Mr. Sickler had

19   conversations with Mr. Termonte or Mr. Sher?

20   A.   He did.

21   Q.   How do you know that?

22   A.   I believe he did.  Or there was communication, emails back

23   and forth that I saw.

24   Q.   So emails between the Termonte firm, Mr. Sickler, and

25   yourself.  Correct?

1   A.   More Tremonte and Sickler.

2   Q.   And how did you get to see them?

3   A.   I think I saw them after the fact as we went through this

4   process.

5   Q.   Do you know whether or not your daughter had any

6   communication with Mr. Sickler?

7   A.   I don't think so.

8   Q.   I'd like to show you what we've marked as Defendant's

9   Exhibit 10.  This is an email from 10-27-14, just weeks before

10  the sentencing.

11           Take a look at this and tell me if you recognize it.

12           MR. BHATIA:  Your Honor, can we take a look at the

13  document shown to the witness?

14           THE COURT:  Yes.

15           THE WITNESS:  I have seen this.

16  BY MS. KELLMAN:

17  Q.   What do you recognize these emails to be?

18  A.   Those emails were the recommendations of Mr. Sickler of an

19  appropriate minimum or camp, federal camps, that would be good

20  for me, given the expected sentencing.

21  Q.   To whom did Mr. Sickler address his recommendations?

22  A.   It would say in the letter.  I didn't --

23  Q.   Do you know who Valerie is?

24  A.   Yes.  Valerie Gotlib was an associate.

25  Q.   At the Termonte firm?

 1    A.   Yes.

 2    Q.   Who is Justin?

 3    A.   Justin Sher, the other partner.

 4    Q.   And there came a time when you saw this as well; correct?

 5    A.   Yes.

 6    Q.   So if Mr. Sickler wrote to Valerie and Justin explaining

 7    different camps or different facilities that you could go to,

 8    that was the purpose of having retained him.  Correct?

 9    A.   Correct.

10    Q.   So that there would be recommendations; correct?

11    A.   Correct.

12             MS. KELLMAN:  Your Honor, I'd offer this as 11.

13             MR. Bhatia:  No objection.

14             THE COURT:  10.  Received.

15             (Defendant's Exhibit 10 received in evidence)

16             MS. KELLMAN:  If I could read this, your Honor.  This

17    is an email between Valerie -- first it's an email from

18    Mr. Sickler to Valerie and Justin.  It says:  "Valerie and

19    Justin, I know we are scheduled to speak tomorrow at 5:30, and

20    I just want to briefly memorialize here my hopes for a judicial

21    recommendation designation from the court after imposition of

22    sentence in Steve's case.  It is simply this.  If the sentence

23    is less than 24 months, please ask the court to recommend the

24    satellite camp at FCI Otisville."

25             I'm not reading the entire document, Judge, just parts

1    that are pertinent.

2              If the sentence is between 24 months and 42 months,

3    please ask the court to recommend the satellite camp at USP

4    Petersburg.  And that's where the RDAP program was; is that

5    correct?

6              THE WITNESS:  I'm not sure.  I thought it was at

7    Lewisburg.

8    Q.  That's what I said.  The satellite camp at USP Lewisburg.

9              THE COURT:  I thought you said Petersburg actually.

10             MS. KELLMAN:  I apologize.

11             THE COURT:  So what is it?  24 to 42 is --

12             MS. KELLMAN:  Lewisburg.

13             THE COURT:  Ms. Kellman, we can't both talk at the

14   same time.

15             24 to 42 is Lewisburg?

16             MS. KELLMAN:  Yes, your Honor.

17             THE COURT:  Thank you.

18             MS. KELLMAN:  The camp at Lewisburg, Judge.

19             THE COURT:  Go ahead.

20   BY MS. KELLMAN:

21   Q.  And that was where you understood the RDAP program to be;

22   correct?

23   A.  Correct.

24   Q.  And then:  "If the sentence is greater than 42 months,

25   please ask the court to recommend the satellite camp at

1  Otisville."

2  A.  Correct.

3  Q.  Now, were those recommendations within the purview of what

4  you expected, had been led to believe, might be your sentence

5  in this case?

6  A.  Yes.

7          MS. KELLMAN:  Your Honor, I'd like to approach my

8  client with another email.

9  Q.  Do you recognize this document?

10         Let me withdraw that question.  Let me ask it another

11  way.

12         Do you recall a few moments ago I asked you whether or

13  not you obtained Mr. Sickler's services or Mr. Termonte's firm

14  retained Mr. Sickler's services?

15         Do you remember that question?

16  A.  I spoke with Mr. Sickler and told him that I would

17  retain -- have him retained.  So I guess -- he went through the

18  law firm.

19  Q.  So the law firm retained him?

20  A.  That's what that says.  I sent a check.

21  Q.  That was going to be my next question.

22         Did you pay for Mr. Sickler's services?

23  A.  Yes, we did.

24  Q.  Do you remember how much?

25  A.  $5,000.

        1           MS. KELLMAN:  Your Honor, I'd offer this as Defense

        2    Exhibit 11.

        3           MR. Bhatia:  No objection.

        4           THE COURT:  Received.

        5           (Defendant's Exhibit 11 received in evidence)

        6           Forgive me.  What's 11?  10 was the email of

        7    October 27.

        8           What's 11?

        9           MS. KELLMAN:  11 is a letter from Mr. Sickler to

       10    Justin, to the Termonte firm, dated June 11, 2014, in which

       11    they discuss Mr. Sickler's being retained by the firm.

       12           THE COURT:  Thank you.

       13           MS. KELLMAN:  Just a moment, Judge.

       14           (Defendant and counsel conferred)

       15           MS. KELLMAN:  Your Honor, would this be a convenient

       16    time for a quick break?  I don't think we'll be much longer.  I

       17    just want to see if we can narrow this a little bit.

       18           THE COURT:  Why don't we take about five minutes, and

       19    then we'll go until about 1:00, and then we'll break then.

       20           (Recess)

       21           (Continued on next page)

       22

       23

       24

       25

```
 1                (In open court)

 2                MS. KELLMAN:  May I proceed, Judge?

 3                THE COURT:  Yes, ma'am.

 4   BY MS. KELLMAN:

 5   Q.  I just want to go back for a moment, if I can, Mr. Walsh.

 6   We spoke earlier about this letter of February 4 in which

 7   Mr. Tremonte informed the Court that you did not wish to

 8   withdraw your plea.

 9                Do you remember those questions and answers?

10   A.  Yes.

11   Q.  Did you want to withdraw your plea?

12   A.  Why wouldn't I have?  Yes.

13   Q.  Had you been asked about it, what would you have told your

14   lawyer?

15   A.  To try to get the plea withdrawn.

16   Q.  If the lawyer said, "But the government won't offer you a

17   better plea," would you still have wanted to withdraw your

18   plea?

19   A.  If I could, yeah.

20   Q.  That's what I'm asking you.  If the judge invited you to

21   withdraw your plea and you had that opportunity, would you have

22   withdrawn your plea?

23   A.  I believe so, yes.

24   Q.  If the government wasn't going to offer a better plea, what

25   was your hope?
```

1  A.  Then I would have had to go to trial.

2  Q.  That's what you wanted to do; am I right?

3  A.  I wanted to get my story out, yes.

4  Q.  I think you testified about this earlier, but following the

5  sentencing, or during the sentencing proceeding, you heard

6  something about, I think you said, something about your right

7  to appeal, correct?

8       Let me rephrase it.  When was the first time that you

9  understood that you had given up your right to appeal as long

10  as your sentence was under 20 years or less?

11  A.  After I was sentenced, and I understood what happened.

12  Q.  Tell us what you understood.  Tell us what triggered your

13  understanding of that appellate waiver.

14  A.  Everything that I said before.  There was a commotion

15  afterward, and Tremonte was struggling to find, you know,

16  figure out what to do.  And he asked Judge Cedarbaum, I know

17  now, and I remember that, to add a day to the sentence, now I

18  understand why he did.  And she said, are you saying you would

19  like me to consider withdrawing your plea, your client's plea?

20  And he said -- I remember him saying I don't know what I want

21  to do yet.  Could I ask, and huddled with Mr. Naftalis, the

22  U.S. assistant attorney, and came back, and there was no

23  argument between the government and us.  And asked for a recess

24  to figure out what course they would like to take.

25  Q.  Now, in the plea agreement, there is a loss figure of $440

1   million at the beginning of the agreement, in the guideline

2   calculation.

3   A.  Correct.

4   Q.  Further down, there is a different monetary amount, and

5   it's in the $50 million range, and it says that is the amount

6   of money that you're personally responsible for.  Do you recall

7   that?

8   A.  Yes.

9          MR. BHATIA:  Objection, your Honor.  Mischaracterizes

10  the record.

11         MS. KELLMAN:  I'll read it from the --

12         THE COURT:  Go ahead and read it.

13         MS. KELLMAN:  Yes.  Reading from page four, your

14  Honor, the bottom of the third paragraph from the top.

15         The defendant further agrees not to the appeal any

16  term of supervision -- any term of supervision.

17         Next sentence:  Defendant also agrees not to appeal

18  any forfeiture amount that is less than or equal to

19  $50,743,779, and the government agrees not to appeal any

20  forfeiture amount that is greater than that.

21  Q.  What did you understand that number to mean?

22  A.  I understood the 50 million to be a number that they

23  attributed to me personally, benefiting by.  Which is, I didn't

24  understand that number because that's more money than I did.

25  And the 400 million was amount that the victims would lose,

 1    which I didn't understand at all, because I didn't think we

 2    were losing money.  In fact, I know we weren't.  I mean, I

 3    believe we weren't.

 4    Q.  Let me ask you a question about that.  In connection with

 5    victims losing money, was there any restitution order entered

 6    in which you were obligated to pay restitution to any victims?

 7    A.  I have no restitution.

 8    Q.  You had a discussion with -- I imagine many discussions

 9    with Mr. Tremonte about where that $440 million number came

10    from, correct?

11    A.  No, we did not.

12    Q.  You didn't discuss it with him?

13    A.  No.  It was the number that the government used.

14    Q.  When you saw it in the agreement the night you were going

15    over it, did you question him about it?

16    A.  I had been -- talked about that number way before that with

17    him.

18    Q.  What did he say?

19    A.  What I said -- it didn't matter.

20    Q.  That same paragraph includes the appellate waiver that you

21    said you were not aware of, correct?  The top of the paragraph,

22    I'll read it.

23          It is agreed (1) that the defendant will not file a

24    direct appeal nor bring any collateral challenge, including,

25    but not limited to, an application under Title 28, United

1    States Code, Section 2255 and/or Section 2241, nor seek a

2    sentence modification pursuant to 3582 of any sentence equal to

3    or below the stipulated guideline range of 20 months.

4              Do you understand --

5              THE COURT:  20 months?

6              MS. KELLMAN:  I'm sorry.

7    Q.  240 months.  You understand?

8    A.  I don't even understand what you just read, and I doubt

9    anyone in the courtroom does either.

10   Q.  Okay.  You now understand that this plea agreement included

11   a waiver of your right to appeal as long as you got sentenced

12   to 20 years or less, correct?

13   A.  Yes, now I do.

14   Q.  You did not understand that at the time, correct?

15   A.  No.

16   Q.  By "at the time," I mean you did not understand at the time

17   you reviewed the document with Mr. Tremonte, correct?

18   A.  Repeat that, please?

19   Q.  You did not understand this appellate waiver at the time

20   you reviewed the plea agreement with Mr. Tremonte?

21   A.  Absolutely not.

22   Q.  Did you have any discussion with him about this appellate

23   waiver at that time?

24   A.  No.

25   Q.  At the time you pled guilty, did the judge tell you that

1   you were giving up your right to appeal, that you would not be

2   able to appeal any sentence 20 years or below?

3   A.  As I said before, I heard the word "appeal," I didn't

4   understand anything else, and I turned to Mr. Tremonte, and he

5   said -- signaled to say yes.

6   Q.  If you knew that you were giving up the right to appeal,

7   would you have opted to go to trial?

8        Let me rephrase that.  If you knew your plea agreement

9   required you to give up your right to appeal as long as you got

10  a 20-year sentence or less, would you have opted to go to

11  trial?

12  A.  Certainly if I thought I was exposed to anything near 20

13  years.  Keep in mind my age at the time.

14  Q.  One thing further.  Have you had any direct contact with

15  the receiver in this case who was appointed on behalf of the

16  investors?

17  A.  From when?  At the beginning, yes.

18  Q.  At the beginning.  Since you've been in jail?

19  A.  No.

20  Q.  Were you able to assist the -- back then.  Were you able to

21  assist the receiver in any way?

22  A.  Very much so.

23  Q.  How so?

24  A.  Well, immediately, I turned over everything I had, for

25  starters.  And then there was a specific occasion when we had

1   many billions, billions of dollars of security positions,

2   arbitrage positions, probably somewhere between 7 and

3   $12 billion worth, and my head trader called me and said that

4   they were going to give the order to unwind the positions to a

5   bank, and I said, oh, no, no, they don't want to do that.  It's

6   going to cost them many, many, many, many millions of dollars.

7   And he said well, you should call Val Miller, or that's who I

8   called.  He was one the fellows working with Brick Kane, the

9   receiver.  And I called him and I said, you want to let us

10  unwind this.  They're going to charge you a fortune and

11  probably get picked off.  You had to be an inside -- you had to

12  be a dealer in the market to get the lowest price.  And that's

13  what we did for a living.  And they redirected the order and

14  gave us the order to unwind the positions.

15  Q.  To the best of your understanding, have any of the -- by

16  the way, were the investors in your businesses, were they

17  individuals or were they institutions?

18  A.  Institutions.

19  Q.  Exclusively?

20  A.  Exclusively.

21  Q.  Do you have an understanding as to whether or not any of

22  those institutions have actually in fact lost any money in

23  connection with any trades that you were involved with?

24  A.  I believe that no institution lost money off of their

25  investment.  I believe that everyone received all their

1 | investment, and maybe a small profit, based on the information
2 | I have.
3 |       MS. KELLMAN:  Your Honor, may I approach the witness?
4 |       THE COURT:  Yes, ma'am.
5 | Q.  Do you recognize this document, Mr. Walsh?
6 | A.  Yes, I just looked at it.
7 | Q.  What do you recognize it to be?
8 | A.  A statement of the money flows collected and liquidated by
9 | the receiver.
10 | Q.  Can you tell the Court the extent of the loss, if any, to
11 | investors that involved in these transactions?
12 | A.  Well, as of date it says that $28 million is still owed to
13 | investors, and that the receiver's currently holding $31
14 | million plus still to be distributed.
15 | Q.  So there is additional money to be distributed, so no
16 | institutions have lost money; is that correct?
17 | A.  No, correct.  Yes.
18 |       MS. KELLMAN:  Your Honor, I'd offer this letter, it's
19 | December 13, 2018, it's addressed to Ms. Shevitz, and it comes
20 | from the receivers.
21 |       THE COURT:  What's the number on it, please?
22 |       MS. KELLMAN:  13.
23 |       THE COURT:  Thank you.
24 |       MS. KELLMAN:  12.
25 |       MR. BHATIA:  Your Honor, may I have a brief -- may we

1    have brief voir dire?

2            THE COURT:  Yes, sir.

3    BY MR. BHATIA:

4    Q.  The date on this document is 2018, right?

5    A.  Just read it today.

6    Q.  That's 10 years after you were arrested?

7    A.  Yes.

8    Q.  You had not seen this document prior to today, correct?

9    A.  No, but I am aware of the status of the moneys returned

10   throughout the course.

11   Q.  And those efforts took years, correct?

12   A.  I believe at the time of my trial, around 99 percent were

13   already returned.  At the time I was sentenced.

14   Q.  That itself was five years after the scheme ended, correct?

15   A.  Correct.

16           MR. BHATIA:  Your Honor, no objection in light of

17   that.

18           THE COURT:  All right.  12 is received.

19           (Defendant's Exhibit 12 received in evidence)

20   Q.  Mr. Walsh, do you know what a focus report is?

21   A.  Yes.

22   Q.  What is it?

23   A.  It's a statement of your financial condition that you -- a

24   member firm, a securities dealer, reports to it's what's called

25   to -- your regulating exchange or in our case the New York

1   Stock Exchange.  That's a report, a monthly report of the

2   financial condition of your firm that we have to file with the

3   New York Stock Exchange on a monthly basis.

4   Q.  While you were at the business, did you have occasion to

5   see those reports?

6   A.  Debbie Duffy, the controller and compliance officer sent

7   that to me every month.

8   Q.  Debbie Duffy was, you said, the compliance officer?

9   A.  Compliance and controller, treasurer of the business.

10  Q.  Where was she physically located?

11  A.  With Paul Greenwood in Greenwich.

12  Q.  And you were then regularly kept up to date as to these

13  filings and these focus groups?

14  A.  I received a copy of the report on a monthly basis.

15  Q.  Did anything in those reports -- and the reports included

16  what exactly?

17  A.  Profit and loss for that month, and the statement of year

18  capital position, how much money you had.

19  Q.  Was there ever a time when -- did you review them regularly

20  when you got them?

21  A.  I looked at two numbers.

22  Q.  What were those?

23  A.  The net profit or loss for the month, and the excess

24  capital; in other words, above the money we were using, how

25  much additional capital we had to invest.

1  Q.  Was there anything in any of the reports you viewed while

2  you were actively working there that caused you concern?

3  A.  No.

4  Q.  Anything that would have triggered your intellect to say,

5  wait, what's going on here?

6  A.  No.

7  Q.  Did you see audits as well?  Was the company audited?

8  A.  We were audited by every single regulatory organization.

9  NASDAQ, New York -- every one, the option exchanges, the

10  commodity exchanges, we were audited by probably endless number

11  of people.  Plus our independent auditor was Deloitte & Touche.

12  Q.  Did you have occasion to review any of those audits?

13  A.  I didn't.

14  Q.  You did not?

15  A.  No.

16  Q.  Was it ever called to your attention that any of those

17  audits produced any irregularities?

18  A.  No.

19          MS. KELLMAN:  Nothing further.

20          THE COURT:  Thank you.  Cross-examination, counsel.

21  CROSS-EXAMINATION

22  BY MR. BHATIA:

23  Q.  Good morning, Mr. Walsh.

24  A.  Good morning.

25  Q.  You attended SUNY Buffalo; is that correct?

1   A.  Yes.

2   Q.  You graduated in 1966?

3   A.  Correct.

4   Q.  After graduating, that's when you started working at Saul

5   Lerner & Company in New York?

6   A.  Yes.

7   Q.  You spent four or five years there; is that right?

8   A.  Four.

9   Q.  Four.  And then you started your own firm, right?

10  A.  I had a small stock exchange firm called Reich & Company,

11  and then I started a firm with other partners, and then I

12  started a firm with called Ragnar Options Corp.

13  Q.  You testified earlier today that you were 24 when you

14  started your own firm; is that right?

15  A.  No.  No.  We started Ragnar or Walsh WG, the firm we are

16  talking about today?

17  Q.  The first one?

18  A.  The first firm?  I was in my mid 20s.

19  Q.  You said you did exceedingly well in that business with

20  your friend; is that right?

21  A.  I said I did very well.

22  Q.  You were involved in developing the use of computers in

23  options trading; is that right?

24  A.  That was my idea.  I would tell Paul what the features we

25  needed, and he would put it in the system.

 1  Q.  You helped to develop the concept of merging computers and

 2  finance; is that right?

 3  A.  I helped to -- I would say I helped to, I was an early

 4  contributor to the development of using computers for realtime

 5  trading.

 6  Q.  In 1979, you started your company with Paul Greenwood?

 7  A.  Yes.  And Barry Wish.

 8  Q.  That company changed names and partners, but it eventually

 9  became WG Trading?

10  A.  Yes.

11  Q.  So by 2009, you had been working in the financial services

12  industry for more than 40 years?

13  A.  Correct.

14          THE COURT:  Counsel, go just a little more slowly.

15          MR. BHATIA:  Yes, your Honor.

16          THE COURT:  Please.

17  Q.  You had been working with Paul Greenwood for around 30

18  years; is that right?

19  A.  Yes.

20  Q.  During your career you held a Series 1 license?

21  A.  I'm not sure.  I held different licenses, Series 7 and one

22  or two others.

23  Q.  Is there something I can show you that would refresh your

24  recollection?

25  A.  Yeah.

1          MR. BHATIA:  Your Honor, may I approach the witness?

2          THE COURT:  Yes.

3   A.  Okay.

4   Q.  I'm showing you what has been marked for identification as

5   Government Exhibit 1022.  Have you finished looking at this?

6   A.  I read -- you want me to look at the first page to see what

7   my registrations are.

8   Q.  Yeah.

9   A.  Okay.

10  Q.  Thank you.  So, I'll ask again did you --

11         THE COURT:  Does that refresh your recollection.

12  Q.  Does that refresh your recollection?

13         THE COURT:  As to what licenses you held.

14  Q.  As to --

15         THE COURT:  Is this your off-the-record voice,

16  Mr. Walsh?

17         THE WITNESS:  Yes, it is, your Honor.

18  A.  Yes, I mean, I'll take it as a given.

19  Q.  Does this refresh your recollection about the licenses you

20  held?

21         MS. KELLMAN:  If I may, I think the answer is no.  But

22  we have no objection to just -- if I could take a look at the

23  document, probably I have no objection to admitting it.

24         THE COURT:  Sure.  Let's go.

25         MS. KELLMAN:  Your Honor, we have no objection,

 1   subject to the discussion that I've had with the prosecutor as
 2   to certain redactions that will be made.  As to the licenses,
 3   perhaps just easier to admit them in evidence.
 4           THE COURT:  Is that all right with you, counsel?
 5           MR. BHATIA:  That's fine with the government.
 6           THE COURT:  Received.
 7           (Government's Exhibit 1022 received in evidence)
 8   Q.  Mr. Walsh, looking at what's on the screen, from Government
 9   Exhibit 1022, you held a Series 1 license; is that right?
10   A.  Yes.
11   Q.  And you also held Series 3, 4, and 40 licenses?
12   A.  Yes, yes, according to the screen, yes.
13           MR. BHATIA:  You can take this down.
14   Q.  By 2009, is it fair to say you were an experienced
15   financial services professional?
16   A.  Yes.
17   Q.  You understood how the industry worked?
18   A.  Yes.
19   Q.  You understood how to read financial documents?
20   A.  Not really.  I'm not a reader of financial documents.
21   Q.  You had worked in the industry for 40 years; is that right?
22   A.  Yes.
23   Q.  You had owned your own companies?
24   A.  Yes.
25   Q.  You also held licenses that allowed you to be a supervisor

 1   in the industry?

 2   A.   Yes.

 3   Q.   So, your testimony today is you do not know how to read

 4   financial documents; is that right?

 5   A.   I could read them, but I didn't work with them.  I could

 6   read them well enough to pass the exam, but that wasn't my area

 7   of expertise.

 8   Q.   In your 40 years, you had received trading reports in the

 9   course of your work?

10   A.   Yes.

11   Q.   In your 40 years, you had also received balance sheets in

12   the course of your work?

13   A.   The focus report that I mentioned.  It wasn't a balance

14   sheet.  Yes, I can read a balance sheet.

15   Q.   You also previously served as the co-chairman and co-CEO of

16   the New York Islanders?

17   A.   Correct.

18   Q.   You also served as a trustee of the University at Buffalo

19   Foundation?

20   A.   Correct.

21   Q.   I'd like to direct your attention to the document marked

22   for identification purposes only as Government Exhibit 1013.

23            MR. BHATIA:  Your Honor, may I approach the witness?

24            THE COURT:  Only if you speak more slowly.

25            MR. BHATIA:  I will, your Honor.  I'm showing the

1     witness the document marked as Government Exhibit 1013.

2     Q.  Mr. Walsh, do you recognize this document?

3     A.  Yes, I do.

4     Q.  What is this document?

5     A.  It is a promissory note that I signed.

6            MS. KELLMAN:  Your Honor, I'm going to object to this.

7     This is not relevant to this hearing.

8            THE COURT:  Counsel?

9            MS. KELLMAN:  And this line and this document is not

10    relevant to this hearing.

11           THE COURT:  Counsel?

12           MR. BHATIA:  Your Honor, I think to the extent the

13    defendant is challenging whether he would have proceeded to

14    trial, some amount of the underlying evidence is.  But it's not

15    the main focus of the hearing today, I agree, but some amount

16    of --

17           THE COURT:  Why don't you pick your best.

18           MR. BHATIA:  Will do.

19           The government offers Exhibit 1013.

20           MS. KELLMAN:  I object, your Honor.  I don't think

21    that by showing the witness a document, the government is going

22    to be able to argue that he could never have gone to trial

23    because there is a note.  And I think it's -- I don't want to

24    say -- I'll use a different word.

25           I think it is naive to think through cross-examination

1  the government can establish that this defendant shouldn't have

2  gone to trial.  It is something he should have been discussing

3  with his lawyer.

4          MR. QUIGLEY:  It goes to a couple of things that are

5  relevant to the hearing today.  One is the strength of the

6  government's case.  Mr. Walsh allocuted in his plea allocution

7  that he had signed this promissory notes.  Second, and I think

8  more directly pertinent to the hearing, it goes to the loss

9  amount and the scale of the loss both attributable to Mr. Walsh

10 directly and attributable to Mr. Walsh, to the conspiracy as a

11 whole.  And, of course, under 2B1.1, a defendant's liable for

12 the reasonably foreseeable loss of his co-conspirators.

13          I would add, I think this is not a subject we're going

14 to dwell on.  I think we're going to show him three or four of

15 these to get a sense of the numbers at issue.  So we think it's

16 relevant.  To the extent any type of a 403 applies here, it's

17 not something we are going to dwell on.

18          THE COURT:  Is this related to the loss amount or tell

19 me how it relates to whether or not Mr. Walsh would have gone

20 to trial?

21          MR. QUIGLEY:  Sure, your Honor.  I think it relates to

22 the evidence -- he testified on direct that he was -- he tried

23 to develop the theme on direct and in his papers he was not

24 involved in the fraudulent side of WG Trading.  This will

25 establish that in fact he signed these promissory notes which

1    are misappropriating investor funds, so he was involved.  It

2    rebuts his defense that he wasn't personally involved in the

3    misappropriation of invested funds.

4        Secondly, it goes to the loss amount, because it

5    shows -- and the forfeiture amount, it gives a sense of the

6    scale of the numbers.  We'll see these are in the millions

7    dollars, even if we go through three or four of them, we're

8    well into the millions if not the tens of millions.  I think

9    that is relevant.  And these notes began in I believe about

10   1998, so it gives the Court a sense of the scale of the loss

11   and the fraud.

12       THE COURT:  Is this going to require us to have a

13   trial within a trial about whether or not Mr. Walsh knew what

14   was happening with respect to the promissory note or that this

15   was something sent to him to sign?  Do we have to do that?

16       MS. KELLMAN:  Yes, Judge.

17       MR. QUIGLEY:  He's already opened the door to that,

18   your Honor, by saying -- he testified on direct how

19   Mr. Greenwood was in Connecticut, Mr. Greenwood did everything

20   in Connecticut, and he was just sitting in Long Island doing

21   trading.  I think it directly goes to impeachment of what he

22   said on cross.

23       THE COURT:  Ms. Kellman?

24       MS. KELLMAN:  Your Honor, I think in answer to your

25   Honor's question, I believe that it will open the door to quite

1    a lengthy trial as to what those notes are and why he signed

2    them and what they were represented to him to be.  And it also

3    opens the door to what, if any, losses and what the

4    government's view of what losses is, which is in our view

5    completely erroneous, and it is why this individual would have

6    gone to trial.  Because the government's theory of the case was

7    completely misunderstood in terms of what the numbers were.

8          THE COURT:  Let me ask this question.  I take it the

9    government does not dispute the return of most of the funds to

10   the investors.

11         MR. QUIGLEY:  That's right.

12         THE COURT:  We all understand that intended loss is

13   also a measure of the amount of the loss, right?

14         MR. QUIGLEY:  That's right, your Honor.  I'm sure I

15   know the Court's familiar with it.  But I think it is

16   application note 3C to 2B1.1 --

17         THE COURT:  I have it memorized.

18         MR. QUIGLEY:  It's come up a few times, your Honor.

19   But that amounts returned to investors prior to essentially

20   discovery of the scheme by law enforcement are credited against

21   loss.  Amounts returned to investors after that are not.

22         I think here we would argue that the 400 million

23   figure or it is actually above 400 million figure accurately

24   characterizes the loss prior to the discovery of the scheme by

25   law enforcement.  The fact that investors -- even if investors

1    were out zero, as they may be now in 2019, 10 years later, that

2    doesn't matter for what the loss amount is in 2009 under 2B1.1.

3         THE COURT:  I think we all agree to that.  That the

4    amount of the intended loss -- apparently we don't all agree to

5    that, Ms. Kellman.

6         MS. KELLMAN:  It is the intended loss, your Honor,

7    that is really the problem here.  There is no intended loss.

8    The government is counting -- there is no actual loss.  There

9    is no intended loss.

10        The government from the very beginning of this case

11   quantified every dollar that an investor didn't have as loss.

12   But in fact, those moneys were moneys that were invested.  So

13   you can't call them losses, can't even call them intended

14   losses if they were in the marketplace doing what they were

15   supposed to be doing.

16        The reason that investors are getting their money back

17   now is because all of the company's assets, meaning all of

18   their investments, are being liquidated.  So they're getting a

19   return on their capital.  They're getting their money back.

20        The money wasn't lost.  Because if it was lost, where

21   would it be coming back from.  It was invested, and now the

22   company's gone, it's being dissolved, and the investors are

23   getting their money back.

24        THE COURT:  Let me just ask Ms. Kellman a question.

25   What do you say the promissory note was for?

1          MS. KELLMAN:  I'm going to let my colleague with the

2     Court's permission explain that, your Honor.

3          MS. SHEVITZ:  Mr. Walsh, first of all, does not ever

4     dispute that he signed those notes.  He signed the notes.

5          THE COURT:  What were they for?

6          MS. SHEVITZ:  They were for, as explained to him, and

7     this is where we'd have to have another hearing, as Greenwood

8     explained to him, that on the first note they were for

9     allocation of charges against the accounts.  Maybe he should

10    have asked more at the time.  He didn't.  And they were for --

11    he didn't know if they were cumulative, he didn't think they

12    were cumulative.  We could go into that.  But that's his

13    defense at trial.

14          What they were for is Mr. Greenwood told him it was

15    for allocation of the charges -- he's telling me -- I probably

16    have it wrong.  The allocation of -- expenses?  Expenses

17    against the accounts of the two principals.  I'm probably

18    saying that wrong too.  I'm saying that wrong.

19          MS. KELLMAN:  I have no problem with having the

20    defendant, having Mr. Walsh answer the question as to what --

21    did he sign the notes, yes.

22          THE COURT:  All right.  I got it.

23          MS. SHEVITZ:  What I want to say is the government's

24    theory of loss is they're taking the section called credits

25    against loss, in the guidelines, which is, I don't know where

 1   it is, E, and they're saying that -- they're confusing apples

 2   and oranges.  They did this in another case that predated this

 3   that I had, which happened to be the same lawyer that he had,

 4   one of his lawyers.

 5        And they're saying credits against loss.  But first

 6   you have to find out if there is an actual loss.  And there was

 7   no actual loss, because it also talks about the value of the

 8   securities.  The Halliburton case and Kutokske -- I'm probably

 9   pronouncing it wrong -- from the Second Circuit talk about the

10   extent of the loss, if any, in a securities case.  And you have

11   to value the securities that remain there.  It's not what all

12   the investors paid and they lost all that money.  That's not

13   what loss is.  So, all of the money was there in the form of

14   investments.

15        Now we can talk about credits against losses.  That

16   does not apply because they were no losses.  But the government

17   has confused this in a number of cases.

18        THE COURT:  So my question to you, follow up, is this

19   is separate and apart from the intended loss in the more normal

20   case?

21        MS. SHEVITZ:  Intended loss is something else.  Now, I

22   believe there is a new guideline provision or interpretation

23   that says intended loss has to mean really intended loss, do

24   you intend for there to be a loss.  And for sure, Mr. Walsh

25   would say at trial, and Mr. Walsh takes the position now, and

1   we take the position there's no actual loss, and there's no

2   intended loss because things were invested.

3          He wasn't involved in the marketing.  So he doesn't

4   know what was said to any of the investors at that time.  He

5   took money and he invested it, and it's all there.

6          Now, it took some time for the receiver to get it

7   back.  Maybe if nobody had intervened at the time, you know, we

8   all would have gotten back before.  That's the thing.  It's all

9   there.  It's not a Ponzi scheme.  Whatever Greenwood said to

10  them when he was cooperating, it's not that.  There's a value

11  of the securities equal the amount of the securities -- the

12  investor claims.

13         THE COURT:  All right, Mr. Quigley.

14         MS. SHEVITZ:  That's why you go to trial.  There's no

15  loss --

16         THE COURT:  I got it.

17         MS. SHEVITZ:  He signed notes.  Yes, he did, and he

18  he'll say he should have known, absolutely, he had these

19  licenses, and he should have known.  That's his position.  He

20  should have known.

21         THE COURT:  Okay.  Mr. Quigley.

22         MR. QUIGLEY:  Your Honor, we don't intend to get into

23  more than he signed the notes and introduce the notes into

24  evidence.  But I think defense counsel, both of their comments

25  highlight why the notes are relevant here.  Because they both

1    said all the money was invested, all the money was with

2    investors, and the notes show that they weren't.

3         THE COURT:  May I see it, please, counsel.  How does a

4    note show that?

5         MR. QUIGLEY:  It shows the money going to Mr. Walsh,

6    so it is certainly probative of where the money went.  It

7    didn't go into an index arbitrage fund.  It would be a very

8    strange investment in which an investment was made --

9         THE COURT:  What do you mean it goes to him?  He's

10   promising to pay.  How does it go to him?  The undersigned as a

11   general partner, etc., etc., promises to pay.

12        MR. QUIGLEY:  He would repay -- what he said in his

13   plea allocution, I'm quoting:  I caused WGTI, an entity whose

14   financial information was incorporated into audited financial

15   statements of WGTC, to issue promissory notes that falsely

16   stated that I owed and would timely repay tens of millions of

17   dollars to WGTI.

18        THE COURT:  So the money is not going to him though.

19        MR. QUIGLEY:  It is.  These are used to cover the

20   money, to paper over the money that's going to him.  And he

21   said:  I did so knowing that the books and records and audited

22   financial statements of WGTC would be materially misstated as a

23   result, and that such misstatements would and did operate as a

24   fraud and deceit upon WGTC's limited partners.

25        MS. KELLMAN:  That's the problem, Judge, because from

1    day one, he has said that I didn't know, I wasn't a part of

2    that.  And his lawyer explained to him that the only way he

3    could plead guilty was to read that statement.  And he said he

4    wouldn't do it.  And then he said, well, we'll get this behind

5    us, and I can't try this case for months, and you're only going

6    to get a single digit figure.

7              They looked at numbers from under two years to two to

8    four years, and they kept everything low.  And they said your

9    only choice here is to plead.  If you want to plead, this is

10   what you have to plead to, and he read it, and he told his

11   lawyer it wasn't true.  And he read it.

12             THE COURT:  All right.

13             What?

14             MR. QUIGLEY:  That's fine, your Honor.

15             THE COURT:  All right.  I will accept them into

16   evidence, just put them all in.  Is there any dispute that they

17   were all signed?

18             MS. KELLMAN:  No, your Honor.

19             THE COURT:  No, right?  Received.  Let's go.  In fact,

20   why don't we break.  How about that.

21             (Government's Exhibit 1013 received in evidence)

22             THE COURT:  2 o'clock, friends?

23             (Recess)

24             (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1                    (In open court)
2               THE COURT:  Mr. Walsh, do you want to come on up?
3    Shall we continue with cross, counsel?
4               MR. BHATIA:  Thank you, your Honor.  I want to clarify
5    one issue for the record.  In the exhibit that we introduced
6    regarding promissory notes, that's a subset of the total number
7    of promissory notes.  The full set was admitted as an exhibit
8    in the Monsanto hearing.  If you'd like a copy, we can provide
9    one.
10              THE COURT:  Thank you.
11   BY MR. BHATIA:
12   Q.  Mr. Walsh, you said on direct that you wanted a chance to
13   tell your story; is that right?
14   A.  Yes.
15   Q.  You said that repeatedly, right?
16   A.  Yes.
17   Q.  Isn't it true that in May 2009 you met with the United
18   States government for a proffer session?
19   A.  Yes.  I am not sure of the date, but I had two meetings
20   with the government.
21   Q.  They asked you questions and you gave them answers?
22   A.  Yes.
23   Q.  Another thing you said on direct is that Mr. Greenwood
24   handled most of the operations at WG Trading?
25   A.  All.
```

1   Q.  All of the operations?

2   A.  Yes.

3   Q.  Isn't it true that at the proffer session, you told the

4   government that you and Greenwood spoke on the telephone?

5   A.  Yes, all -- regularly.

6   Q.  You said you spoke often with Mr. Greenwood on the

7   telephone?

8   A.  Yes.

9   Q.  You said you spoke as much as five times each day?

10  A.  That's not true, but often.

11  Q.  It's your testimony you did not speak -- you told the

12  government that you spoke with Mr. Greenwood up to five times

13  each day?

14  A.  There could be some days when we spoke for 20 times in a

15  day, and there could be a week when we didn't speak.

16  Q.  Isn't it true that you told the government that you and

17  Mr. Greenwood spoke about any business decision that the two of

18  you made?

19  A.  I spoke to him about any decision I made.  It turns out he

20  never spoke to me about some -- a lot of the decisions he made.

21  Q.  When you met with the government for a proffer session,

22  isn't it true that you told them that you and Mr. Greenwood

23  spoke about any decisions the two of you made?

24  A.  I thought we did.

25  Q.  You didn't receive a cooperation agreement after those

1  proffer sessions; is that right?

2  A.  No.

3  Q.  Let's jump forward --

4          THE COURT:  Yes, that is right?

5          THE WITNESS:  Yes, not to my knowledge.

6          THE COURT:  Thank you.

7  Q.  That proffer session where you told the government about

8  speaking with Mr. Greenwood, that occurred after you were

9  arrested in connection with this case?

10  A.  Before or right after.

11  Q.  Did you have any proffer sessions with the government

12  before you were arrested in this case?

13  A.  I don't think so.

14  Q.  So anything you told the government about your interactions

15  with Mr. Greenwood happened after you were arrested?

16  A.  Well, you have the dates, I mean, I would think so.

17  Q.  Let's jump forward a few years.  You entered a plea

18  agreement in connection with this case; is that right?

19  A.  Correct.

20  Q.  I'd like to direct your attention to page six of Defense

21  Exhibit 4.  Can we pull that up.

22          You signed this plea agreement; is that right?

23  A.  Correct.

24  Q.  That's your signature there maybe in the middle of the

25  page?

1    A.   Yeah.   Yes.

2    Q.   You signed this document on April 25, 2014?

3    A.   Yes.

4    Q.   Before you signed this agreement, you spoke to your

5    attorney about the agreement, right?

6    A.   Yes.

7    Q.   He gave you a copy of the agreement before you actually

8    signed it?

9    A.   Yes.

10   Q.   You had the opportunity to ask him any questions you had

11   about the agreement?

12   A.   I've already testified that I told him I couldn't read it,

13   and I needed to come in to have him explain it to me.

14   Q.   You later told Judge Fox under oath that there was nothing

15   in the plea agreement that you did not understand; is that

16   right?

17   A.   I answered -- the answer is yes.  I answered everything as

18   I was told to do.  Instructed to do.

19   Q.   You were under oath during your plea hearing; is that

20   right?

21   A.   Yes.

22   Q.   Judge Fox asked someone to swear you in?

23   A.   Yes.

24   Q.   You had to stand and say you swore to tell the truth.

25   A.   It's all right here.

 1   Q.  You told Judge Fox that you understood everything in your

 2   plea agreement?

 3   A.  That's how I answered, yes.  That's how I was directed to

 4   answer.  Instructed to answer.

 5   Q.  Were you lying?

 6   A.  That's how I was instructed to answer, so I thought I was

 7   doing the right thing at that time.

 8   Q.  It's your testimony that you were instructed to answer

 9   Judge Fox untruthfully; is that right?

10   A.  It turns out I did, yes.  But I was doing as instructed by

11   my attorney, because I thought I had a deal.

12   Q.  You told Judge Fox something that you didn't -- that you

13   knew was not true, because your attorney told you to?

14   A.  At the time of the trial -- yes, yes, yes.

15   Q.  Let's take a look at the first page of the plea agreement.

16   You agreed to plead guilty to securities fraud?

17   A.  Yes, I did.

18   Q.  And the agreement makes clear that the maximum penalty for

19   securities fraud is 20 years' imprisonment?

20   A.  That's what it says.

21   Q.  By signing the agreement, you agreed that for the purposes

22   of the guidelines, the loss from your offense exceeded $400

23   million; is that right?

24   A.  I answered yes.

25   Q.  And by signing this agreement, you stipulated that your

1   offense involved 10 or more victims?

2   A.  I answered yes to the questions.

3   Q.  Are you familiar with the United States sentencing

4   guidelines?

5       I'll ask this question again.  You, by signing the

6   agreement, you stipulated that a loss from your offense

7   exceeded $400 million.

8   A.  Yes, I didn't -- I discussed my conversation with

9   Mr. Tremonte about that.

10  Q.  In the plea agreement, though, you yourself was

11  acknowledging that that fact was true, right?

12  A.  Yes, I did.

13  Q.  Are you familiar with the United States sentencing

14  guidelines?

15  A.  I wasn't then.  I am a little more now.

16  Q.  So, you weren't familiar at the time with the way loss was

17  calculated?

18  A.  No, not really.

19  Q.  Loss might mean something aside from what it means to a lay

20  person?

21  A.  I wasn't familiar with it.

22  Q.  By entering this agreement, you also acknowledged that the

23  sentencing guidelines range was 360 months to life

24  imprisonment.

25  A.  Yes, I have said that.

1  Q.  But because of the statutory max, the stipulated range was

2  20 years, right?

3  A.  Zero to 20 years my understanding was.

4  Q.  By entering this agreement, you acknowledged that entry of

5  a guilty plea authorized the judge to sentence you up to 240

6  months' imprisonment, right?

7  A.  I didn't understand that, but I said "yes" to the question.

8  Q.  But, you wrote, you signed an agreement that said you

9  acknowledged that you would be sentenced?

10  A.  I think that's very clear.

11  Q.  This is the same agreement you were given prior to signing?

12  A.  I think that's very clear, yes.

13  Q.  I am asking you if that's true.

14  A.  Yes.

15  Q.  That was the same agreement that you signed with your name?

16  A.  Yes.

17  Q.  So you can be sentenced, according to this agreement, to

18  anything from zero to 20 years, right?

19  A.  Yes.

20  Q.  That was less than the 25 to 85 years' imprisonment that

21  you were worried about?

22  A.  Yes.

23  Q.  So, this gave you a benefit of being subject to less in

24  prison, right?

25  A.  I would be dead.  But yes.

1   Q.  No one forced you to sign the plea agreement, right?

2   A.  Nobody put a gun to my head, no.

3   Q.  Did anyone force you to sign the plea agreement in other

4  ways, other than putting a gun to your head?

5   A.  I was convinced that it was in my interest to sign the plea

6  agreement.

7   Q.  Thank you.  Mr. Tremonte told you that the maximum penalty

8  for this violation was 20 years' imprisonment, right?

9   A.  Yes.

10  Q.  You understood, prior to signing the agreement and prior to

11  entering a plea of guilty, that that was the maximum?

12  A.  Yes.

13  Q.  He also said that he believed that the most likely sentence

14  would be below that?

15  A.  He said I would not be sentenced anywhere near the 20

16  years.

17  Q.  He never promised you a specific sentence, did he?

18  A.  No.

19  Q.  He never said that he could guarantee a specific sentence?

20  A.  No.

21  Q.  Your plea agreement, again, said you could be sentenced up

22  to 20, right?

23  A.  I think we've established that, sir.

24  Q.  April 25, 2014 was the day you signed this agreement?

25  A.  Yes.

1    Q.  That was the same day you had a hearing in front of Judge

2    Fox, right?

3    A.  Yes.

4    Q.  Mr. Tremonte represented you at that hearing?

5    A.  Yes.

6    Q.  You were also represented that day by Justin Sher?

7    A.  Yes.

8    Q.  He was with you that day?

9    A.  I'm not sure.  I think so, maybe.

10   Q.  Is there something I could show that you would refresh your

11   recollection?

12   A.  I'll take your word for it.

13   Q.  I want to get your word on it.  Is there something I could

14   show you that would refresh your recollection?

15   A.  You can show me something that he was there.  But I believe

16   you.

17             THE COURT:  Do we care?

18             MR. BHATIA:  No, your Honor.

19             THE COURT:  That's what I thought.

20   Q.  You were under oath before Judge Fox, right?

21   A.  Yes.

22   Q.  That was the same oath you are under today to tell the

23   truth?

24   A.  Yes.

25   Q.  Under oath, you told Judge Fox that you understood what the

```
 1   indictment was alleged in Count Two?

 2   A.   I thought I did understand it.

 3   Q.   But you told Judge Fox you understood it?

 4   A.   Yes, I did.

 5   Q.   Under oath you told Judge Fox that you had a sufficient

 6   opportunity to speak with your attorney about Count Two?

 7   A.   Yes, I did.

 8            THE COURT:   Slow down.

 9            MR. BHATIA:   Thank you.

10   Q.   Under oath, you told Judge Fox that you had reviewed the

11   plea agreement with your attorney, correct?

12   A.   Yes, I did.

13   Q.   You told him that there was nothing in the agreement that

14   you did not understand?

15   A.   Yes, I did.

16   Q.   Under oath, you told Judge Fox that you were satisfied with

17   the assistance from your attorneys?

18   A.   Yes, I did.

19   Q.   Under oath, Judge Fox asked if you understood the range of

20   possible penalties that you were subjecting yourself to, right?

21   A.   I guess, yes.

22   Q.   Is that right?

23   A.   I don't remember.  But if it's in there, then it's true.

24   Q.   Judge Fox asked you again whether you were certain you

25   understood the range of penalties, right?
```

1   A.  If it's in there, it's true.  I don't remember.  But of

2   course it must be true.

3          I'm confused where you're trying to go here.

4   Q.  Let me pull up the transcript to see if -- is there

5   something I could show you that would refresh your

6   recollection?

7   A.  I take your word for it.  You have the transcript.

8          MR. BHATIA:  Can we pull up --

9          MS. KELLMAN:  For the record, the transcript is in

10  evidence.

11         THE COURT:  It says what it says.  I get the point.

12         MR. BHATIA:  Okay.

13  Q.  Judge Fox asked you if there had been any promises made to

14  you concerning your sentence, right?

15  A.  It's in the transcript.

16  Q.  When you entered your guilty plea, you knew that the

17  sentencing guidelines were one factor that a judge would

18  consider in entering your sentence.

19         You knew that the sentencing guidelines were one

20  factor that judges consider when entering a sentence?

21  A.  I was not focused on that, and I wasn't even thinking about

22  that.  I thought I had a deal.

23  Q.  But, you understood that the guidelines that were in your

24  agreement were one thing that the courts consider?

25  A.  I wasn't even thinking about it, so it wasn't a question of

1  understanding.  It wasn't on my mind.  I was unaware of it.

2  Q.  Is it your testimony you were unaware that the guidelines

3  were a factor?

4  A.  No, that's not my testimony.  I'm trying to explain to you

5  it wasn't on my mind.  I didn't think about it.

6  Q.  One more question about the plea hearing.  Are you

7  conceding that the things said in your plea hearing were all

8  truthful?

9  A.  I'm saying that --

10        MS. KELLMAN:  Objection to the form of the question.

11        THE COURT:  Sustained.  Don't answer.  Go ahead.

12  Q.  I'll ask a different question.  The transcript of your

13  sentencing proceeding accurately reflects what happened that

14  day, correct?

15  A.  Yes, I guess so, I suppose so.  Yes.

16  Q.  It reflects the questions that Judge Fox asked and that you

17  answered?

18  A.  I suppose so, yes.

19  Q.  Prior to entering a plea, you knew you had the right not to

20  plead guilty?

21  A.  Yes.

22  Q.  You knew you had the right to go to trial?

23  A.  Yes.

24  Q.  You knew that you would be presumed innocent?

25  A.  I didn't necessarily know that, but yes.

1   Q.  You knew the government had the burden of proof at a trial?

2   A.  Yes.

3   Q.  You knew that at trial you would have had the opportunity

4   to confront witnesses against you?

5   A.  Yes.

6   Q.  You could cross-examine the government's witnesses?

7   A.  I am aware of that.

8   Q.  And those included Paul Greenwood and Deborah Duffy?

9   A.  Yes.

10  Q.  There was an appeal waiver in your plea agreement too,

11  correct?

12  A.  I am aware of that, yes.

13  Q.  You were answering truthfully when you told Judge Fox you

14  were aware of the appeal waiver?

15          MS. KELLMAN:  Objection.

16          THE COURT:  Yes, ma'am.

17          MS. KELLMAN:  Your Honor, if your Honor looks at that

18  language, I think you'll see that the actual question and

19  answer are not about the defendant's waiver.

20          THE COURT:  Sustained.  Sustained.

21  Q.  You were aware that the plea agreement constricted your

22  ability to appeal?

23  A.  No, I wasn't.

24  Q.  Were you answering truthfully when Judge Fox asked you if

25  you were aware that your appeal waiver was constricted?

1   THE COURT:  Let counsel finish the question.  Repeat

2   it again, please, sir.

3   Q.  You were answering truthfully when you responded that you

4   understood that the appeal waiver constricted your ability to

5   appeal?

6   A.  As I said before, I did not understand what -- Magistrate

7   Fox said when I heard the word "appeal," I turned to

8   Mr. Tremonte, and he shook his head indicating to say yes, and

9   I did.

10  Q.  I'd like to direct your attention to the plea transcript,

11  before Judge Fox, that's Defense Exhibit 5.  In particular page

12  14.  It's your testimony, correct, that you heard the word

13  "appeal," when Judge Fox asked you a question?

14  A.  I heard the word "appeal."  Yes.

15  Q.  But it's you didn't hear the word "constrict"?

16      MS. KELLMAN:  Can I just inquire for a moment, is the

17  government now asking whether or not this witness understood

18  that he was being erroneously -- having the appellate waiver

19  erroneously explained to him as a way of suggesting that he

20  should have known it was waived completely?  I just don't get

21  what we get out of this inquiry.

22      THE COURT:  I don't think that's the question either.

23  Do you want to rephrase the question, counsel?

24      MR. BHATIA:  Yes, your Honor.

25  Q.  You heard the word "appeal," right?

1  A.  Yes.

2  Q.  You did not hear the word "constrict;" is that your

3  testimony?

4  A.  I didn't hear, I didn't understand anything he said.  No, I

5  didn't hear the word "constrict."

6          THE COURT:  Does the witness have the plea transcript

7  in front of him?

8          THE WITNESS:  Yes.

9          MR. BHATIA:  We pulled it up on the screen.

10          THE COURT:  That's all right.  Can you see it?

11          THE WITNESS:  Yes, your Honor.

12          THE COURT:  Go ahead, counsel.

13  Q.  You had the opportunity to ask Judge Fox any questions that

14  day?

15  A.  Yes, I did.

16  Q.  He didn't force you to give a yes or no answer?

17  A.  No, he didn't.

18  Q.  In fact, there were times when you told Judge Fox that you

19  weren't sure, right?

20  A.  Not that I recall.  Unless it's in the transcript, then I

21  guess it's so, but I don't recall that.

22  Q.  I direct your attention to page at the bottom half of page

23  15 of the same exhibit.  You told Judge fox in response to a

24  question, "I don't believe so, your Honor," right?

25  A.  Can I see the question?  I just have the answer.

 1              Okay.

 2   Q.  So you did take the opportunity to, during your plea

 3   hearing, to consult with your attorneys if you had questions,

 4   right?

 5   A.  Specifically, on the one about the appeal.  I think -- I'm

 6   not sure if there was any other one that I consulted with him,

 7   I don't think so.

 8   Q.  You -- withdrawn.

 9              You testified earlier today about the events that took

10   place at your sentencing, right?

11   A.  Yes.

12   Q.  And you eventually hired Paul Shechtman to help you?

13   A.  Yes.

14   Q.  To represent you?

15   A.  That's true.

16   Q.  Did you ever speak with Paul Shechtman about whether or not

17   to withdraw your plea?

18   A.  Yes.

19   Q.  During your sentencing, you recall that Judge Cedarbaum

20   asked you a few questions?

21   A.  Not specifically, but --

22   Q.  If Judge Cedarbaum asked you any questions, you would have

23   responded truthfully, right?

24   A.  Absolutely.

25   Q.  Is there something I could show you that can refresh your

 1   recollection about whether Judge Cedarbaum asked you any

 2   questions?

 3   A.   Sure.

 4        MR. BHATIA:  Can we pull up for the witness the

 5   document marked as Defense Exhibit 2.

 6        MS. KELLMAN:  I'm going to object to this.  I don't

 7   see the relevance of any of this.

 8        THE COURT:  I haven't memorized that particular

 9   transcript, so I'm not sure what the questions are.  What are

10   we doing here, counsel, please?

11        MR. BHATIA:  The defendant was asked if he had read

12   the presentencing report, and the presentencing report confirms

13   many of the facts that he said he didn't understand.

14        MS. KELLMAN:  Your Honor, we'll concede he read it.

15   He read it, and his lawyer wrote a letter about it, and he read

16   the lawyer's letter as well.  We concede that.

17        THE COURT:  All right.  Go ahead, counsel.

18   Q.   In your presentencing report, the probation department

19   concluded that the loss from the offense exceeded $400 million;

20   is that right?

21   A.   I guess so.

22   Q.   You read the presentencing report, right?

23   A.   I skimmed it, yeah.

24   Q.   You told Judge Cedarbaum you had read it, right?

25   A.   Whatever I said.  If I said that, then, yes, that's -- I

 1    truthfully answered at the time.

 2    Q.  Judge Cedarbaum asked you if you had any objections to the

 3    presentencing report, right?

 4    A.  Yes.  You have the transcript.  I'm sorry, but you have the

 5    transcript.

 6             THE COURT:  I'm not sure we need to ask the witness to

 7    recite from memory the transcript.

 8             MR. BHATIA:  No further questions.

 9             THE COURT:  Thank you.  Redirect?

10             MS. KELLMAN:  Very briefly, Judge.

11    REDIRECT EXAMINATION

12    BY MS. KELLMAN:

13    Q.  Mr. Walsh, you were asked a few questions on

14    cross-examination about proffer sessions that you had with the

15    government?

16    A.  Right.

17    Q.  Do you recall those questions?

18    A.  Yes.

19    Q.  Would it be fair to say that when you met with the

20    government, in September of 2009, that the purpose of that

21    proffer was limited specifically to discussing -- to a

22    discussion about your assets in connection with a bail package?

23    A.  That's correct.

24    Q.  And it was not with an eye towards cooperating with the

25    government; am I correct?

1   A.  You are absolutely correct.

2            MS. KELLMAN:  Your Honor, I'd like to offer as

3   Defendant's Exhibit 12 -- 13.  Just the following, if I may,

4   Judge.  This is an FBI 302 dated 9/15/2009.  I can put this

5   together on a separate piece of paper.  But it indicates that

6   Mr. Walsh is meeting with the government, and then it says

7   Walsh and his counsel advise the meeting would be limited to a

8   discussion of Walsh's assets in accordance with the provisions

9   of a bail package.  Period.

10  Q.  Is that what you recall?

11  A.  Yes.

12  Q.  Do you know whether or not your attorney filed objections

13  to the presentence report?

14  A.  Filed some technical.

15  Q.  Spelling mistakes?

16  A.  Well, just some technical stuff I remember.  Nothing

17  pertinent -- nothing about the numbers.

18  Q.  Government just asked you about probation's calculation of

19  the loss amount to exceed $440 million.  Do you know whether or

20  not probation does its own investigation into what the loss is?

21  A.  No, I don't.

22  Q.  Did anybody in probation ask you to explain the $440

23  million loss figure?

24  A.  No.

25  Q.  I apologize because I've called it a loss figure.  Is the

1    $440 million a loss figure?

2    A.  I don't believe so and I never did.

3          MR. BHATIA:  Objection.

4    Q.  Why not?

5          MR. BHATIA:  Objection, your Honor.  This is a legal

6    conclusion.

7          THE COURT:  Sir?

8          MR. BHATIA:  This is a legal conclusion that the

9    defendant can't testify to.

10         THE COURT:  Ms. Kellman?

11         MS. KELLMAN:  I'll rephrase it.

12   Q.  As far as you know, sir, were there any losses sustained by

13   your investors?

14   A.  As far as I know?

15   Q.  Yes.

16   A.  As of this moment, no, and didn't think so at the time.

17   Q.  Well, 2009, would it be fair to say your investors' money

18   was tied up in investments, correct?

19   A.  In 2009?  Oh, when the firm was liquidated.  Yes, that's

20   what I thought.

21   Q.  The purpose of the liquidation was to return money to the

22   investors, correct?

23   A.  That's what the purpose of the -- yeah, that would be the

24   purpose of, obviously, of liquidating the positions we had.

25   Q.  So, investors had investments, and the purpose of the

1   liquidation was to get rid of those positions and return the

2   money to the investors, correct?

3   A.  That -- yes.

4   Q.  At the time that you met with your attorney to discuss the

5   plea agreement, the day before and the days before you actually

6   pled -- withdrawn.

7        Did you feel any pressure from your attorney about how

8   to resolve this case and whether or not to enter into the plea?

9   A.  Absolutely.  Yes.

10  Q.  How so?

11  A.  You have to take this plea.  You're going to get a good

12  result.  I already said, earlier, testified that I wanted to --

13  I told him that I could explain why I signed the notes.  And he

14  said no one would believe you.

15  Q.  And did you think that you had signed the notes for an

16  innocent purpose?

17  A.  Absolutely, yes.

18  Q.  I think I asked you this, but just in case, did you go over

19  all of the questions with Mr. Tremonte before you saw the

20  magistrate the following day?

21  A.  I don't know if we went over all of them, but it was very

22  clear, he made it very clear the way in which he wanted them

23  answered.

24  Q.  Can you share with the Court what you understood him to be

25  telling you?

```
 1    A.  Answer in the affirmative except for when it's an obvious

 2    no.

 3    Q.  Did he give an example of what's an obvious no?

 4    A.  Is your name Stephen Walsh.  I am not saying that's what he

 5    told me.

 6    Q.  Do you use drugs?  An obvious no.

 7    A.  Yes, yes, an obvious no.

 8    Q.  You were asked some questions in the very beginning of the

 9    cross-examination about whether or not -- whether or not you

10    did work, you had a position at the New York Islanders,

11    correct?

12    A.  Yes.

13    Q.  Were you involved in any way, shape, or form at the

14    Islanders in their financial business?

15    A.  No.

16    Q.  Were you involved in any of the other financial -- any of

17    the other entities that the government described in terms of

18    their financial --

19    A.  No, I was not a numbers guy.

20    Q.  Were you ever involved in any businesses, in bookkeeping,

21    accounting, check writing, anything like that?

22    A.  No.

23              (Continued on next page)

24

25
```

1    BY MS. KELLMAN:

2    Q.  And I think you were asked just at the end of

3    cross-examination about your discussions with Mr. Shechtman.

4            Do you recall those questions?

5    A.  Yes.

6    Q.  Did you discuss with Mr. Shechtman the idea of withdrawing

7    your plea, the advantages and disadvantages of withdrawing your

8    plea?

9    A.  It didn't go that far.  When I met with him, he was trying

10   to determine the best course for him to take, and he wanted to

11   use his influence to first go and see if he could work

12   something with out the U.S. Attorney's Office.

13           That was what he said, that he was going to do that

14   first.  And then he was considering whether or not to ask to

15   withdraw the plea.

16   Q.  And in exchange, you retained him for $5,000; correct?

17   A.  Correct.  Yes.

18   Q.  Did Mr. Shechtman report back to you -- withdrawn.

19           Did he tell you he actually met with people at the

20   U.S. Attorney's Office?

21   A.  I'm not sure if he did or Termonte did or I found out

22   somehow another way.

23   Q.  That there was a meeting?

24   A.  Yes.  I'm pretty sure.  Yes.  I think he had two meetings.

25   Q.  As a result of those meetings, did anybody tell you -- did

1  anybody advise you that withdrawing your plea would be a

2  mistake?

3  A.  No.

4  Q.  Did you see the letter of November 4 in which

5  Judge Cedarbaum was informed that you had made a decision not

6  to withdraw your plea?

7  A.  Only after the letter had been delivered to the judge

8  without my approval.

9  Q.  I'm sorry?

10 A.  Without my approval.

11         MS. KELLMAN:  Nothing further.

12         THE COURT:  Thank you.

13         Any recross, counsel?

14         MR. BHATIA:  Very, very briefly, your Honor.

15         THE COURT:  Sir.

16 RECROSS EXAMINATION

17 BY MR. BHATIA:

18 Q.  Ms. Kellman asked you questions about one proffer session

19 you had with the government; is that correct?

20 A.  Yes.

21 Q.  You also had another meeting with the government; right?

22 A.  Correct.

23 Q.  Where you discussed WG Trading?

24 A.  Yes.

25 Q.  And you discussed situations involving Bear Stearns?

1    A.  Yes.

2         MR. BHATIA:  Your Honor, the government offers the

3    document marked as 1019.  It's a 302 from another meeting with

4    the government.

5         MS. KELLMAN:  Objection.  I don't see how it's

6    relevant.  The witness has just answered the question that he

7    had that second meeting, and he answered the questions about

8    the subject matter.  I don't know how the content of it is

9    relevant.

10        MR. BHATIA:  Your Honor, defense counsel introduced

11   the 302 under the idea that the defendant only spoke about his

12   assets and was not speaking about other criminal conduct.  This

13   302 makes clear that's not true.

14        MS. KELLMAN:  Actually, Judge, I only offered the

15   first page and only the portions that I read on a particular

16   date.  And I said, on that date, did you only discuss the bail

17   package?  So I was very clear about what I asked.  I only

18   offered the statement that I read.

19        THE COURT:  What's the relevance of this?

20        MR. BHATIA:  The relevance, your Honor, is that the

21   defendant testified earlier today that he never had any

22   intention of doing anything other than going to trial.

23        Maybe I'm overstating it just a bit but not by much.

24   He testified that he never wanted to do anything other than go

25   to trial until his lawyers came into the picture, and I think

1    this document shows that that's not true.

2         THE COURT:  I'll take it for what it's worth.

3    Received.

4         (Government's Exhibit 1019 received in evidence)

5         MR. BHATIA:  Nothing further, your Honor.

6         MS. KELLMAN:  Your Honor, we haven't seen that

7    document.

8         MR. BHATIA:  I'll provide a copy.

9         Nothing further, your Honor.

10        THE COURT:  Thank you.

11        Anything else?

12        MS. KELLMAN:  No, your Honor.

13        THE COURT:  All right.  You may step down, sir.

14        THE WITNESS:  Thank you, your Honor.

15        THE COURT:  Thank you.

16        (Witness excused)

17        THE COURT:  Any further witnesses?

18        MS. KELLMAN:  No, your Honor, not for the petitioner,

19   your Honor.  Thank you.

20        THE COURT:  Any witnesses for the government?

21        MR. BHATIA:  Yes, your Honor.  The government calls

22   Michael Termonte.

23        THE COURT:  All right.  Come right on up, sir.

24   MICHAEL TREMONTE,

25        called as a witness by the Government,

1          having been duly sworn, testified as follows:

2              THE DEPUTY CLERK:  Can you please state your first and

3     last and spell it out for the court reporter.

4              THE WITNESS:  Michael Termonte, M-i-c-h-a-e-l

5     T-e-r-m-o-n-t-e.

6              THE COURT:  Won't you be seated.

7              THE WITNESS:  Good afternoon, your Honor.

8              THE COURT:  Good afternoon.

9              Counsel.

10    DIRECT EXAMINATION

11    BY MR. BHATIA:

12    Q.  Mr. Termonte, you and I have never met; correct?

13    A.  We have not.

14    Q.  You declined to meet with me and discuss your case?

15    A.  That's correct.

16    Q.  And you declined to meet with anyone from the government

17    regarding this case?

18    A.  I declined to meet with anyone.

19    Q.  Where did you go to law school?

20    A.  NYU.

21    Q.  When did you graduate from law school?

22    A.  1998.

23    Q.  How many years have you practiced law?

24    A.  Since 1998 continuously.  So 20 years.

25    Q.  And you also spent several years as an assistant

1    United States attorney?

2    A.  I did.

3    Q.  In the Eastern District of New York?

4    A.  In the Eastern District, yes.

5    Q.  Can you give us an estimate of approximately how many

6    criminal cases you had handled prior to 2014.

7    A.  That would be tough.  Dozens and dozens.

8    Q.  In 2014, you negotiated a plea agreement with Mr. Walsh;

9    right?

10   A.  I did.  Between the government and Mr. Walsh.  Yes.

11          MR. BHATIA:  Your Honor, I should just note one thing

12   now.  Because the defendant declined to meet with us and is

13   identified as an adverse party, we would request to lead the

14   witness.

15          THE WITNESS:  I'm not the defendant.

16          THE COURT:  Thank goodness.

17          MR. BHATIA:  We request to lead the witness.

18          THE COURT:  Any objection, Ms. Kellman?

19          MS. KELLMAN:  No, your Honor.

20          THE COURT:  Yes, sir.

21   BY MR. BHATIA:

22   Q.  When did you begin representing Mr. Walsh?

23   A.  I don't remember the precise date, but I would say a year

24   or more prior to the entry of the plea.

25   Q.  And in 2014, you were negotiating to obtain a plea

 1    agreement; right?

 2    A.  By early 2014, yes.  Possibly earlier.  We had extensive

 3    discussions with the government about a possible resolution

 4    short of trial.  I don't remember exactly when they started,

 5    but certainly by January of 2014, yes.

 6    Q.  The defendant was facing several counts; correct?

 7    A.  The indictment -- I don't remember the precise number.

 8    Five or six counts.

 9    Q.  Is there something I could show you to refresh your

10    recollection about the various counts?

11    A.  The indictment would refresh my recollection.

12    Q.  Could I show you a section of the PSR that recites the

13    various counts?

14    A.  Yes.  That would work too.

15    Q.  I'd like to direct your attention to the document marked as

16    Government Exhibit 1003 and, in particular, pages 4 and 5.

17              THE COURT:  Off the record.

18              (Discussion off the record)

19              MR. BHATIA:  Let me know when you've finished reading

20    these pages.

21              THE WITNESS:  It looks like there were six counts as

22    to Mr. Walsh.

23    BY MR. BHATIA:

24    Q.  And Mr. Walsh was facing one count of conspiracy?

25    A.  That is correct.

1   Q.  And he was facing counts of commodities fraud?

2   A.  Yes.

3   Q.  And he was facing a count of securities fraud?

4   A.  Yes.

5   Q.  And the conspiracy count carries a five-year maximum term

6   of imprisonment?

7   A.  That's correct.

8   Q.  And the commodities fraud count carries a ten-year maximum

9   term of imprisonment?

10  A.  I believe that's right.

11  Q.  And securities fraud of course carries a 20-year maximum.

12  A.  Yes.

13  Q.  If the defendant was convicted of all six of the counts

14  against him, he could have been sentenced well in excess of

15  that 20 years?

16          MS. KELLMAN:  Objection.  Misstates the law.

17  Grouping.

18          THE COURT:  I'm sorry, Ms. Kellman?

19          MS. KELLMAN:  Grouping.

20          THE COURT:  Counsel?

21          MR. BHATIA:  Your Honor, I think grouping applies only

22  under the sentencing guidelines.

23          MS. KELLMAN:  It applies to what the defendant is

24  facing and how one would figure out what the defendant was

25  facing.  We just don't hand up the high numbers.

1              THE COURT:  Yes, sir.

2              MR. BHATIA:  The statutory maximum sentence that he

3    could have been sentenced to was higher than 20 years.

4    Q.  Is that correct?

5    A.  Under the original indictment with the six counts, yes.

6    Q.  You met with the government on March 3, 2014, to discuss a

7    plea agreement; correct?

8    A.  I don't remember the precise date.  We met with the

9    government multiple times, including in March.  I don't

10   remember specifically meeting on March 3.

11   Q.  Can I show you something to refresh your recollection about

12   that date?

13             MS. KELLMAN:  We'll stipulate it was March 3.

14             THE COURT:  Yes.  Thank you.

15   BY MR. BHATIA:

16   Q.  When you met with the government, you asked for a plea deal

17   that would allow Mr. Walsh to plead guilty to one count of

18   conspiracy; is that correct?

19   A.  On that occasion and on other occasions, we were trying to

20   convince the assistants to agree to a single count, yes, of

21   conspiracy with a five-year statutory maximum, the goal being

22   of course to limit Mr. Walsh's exposure at sentencing to a

23   maximum of five years.

24   Q.  The government did not agree to allow him to plead just to

25   one count of conspiracy; correct?

 1    A.  They did not.

 2    Q.  And you also asked them to consider at a later meeting

 3    whether they would allow him to plead to only one count of

 4    commodities fraud; is that correct?

 5    A.  We did try.  I think it was on more than one occasion, but

 6    we did try to convince him of that as well.

 7              THE COURT:  Slowly.

 8              THE WITNESS:  I'm sorry, your Honor.

 9              THE COURT:  Not you.

10              You slow down.

11    BY MR. BHATIA:

12    Q.  You tried to get the government to agree to the lowest loss

13    amount possible; correct?

14    A.  We tried to get them to agree to a lower loss amount than

15    the number that ended up in the plea agreement.  Yes.

16    Q.  You asked them, for example, to consider only the loss

17    related to one investment rather than all of the investments.

18    A.  We tried every argument we could think of to convince them

19    that they should agree to a lower loss amount, but we succeeded

20    only in convincing them to agree to the number that ended up in

21    the plea agreement.

22    Q.  You were concerned about the loss amount because it's an

23    important part of the sentencing guidelines calculation;

24    correct?

25    A.  We were very concerned about the loss amount because under

1  the applicable provision of the federal sentencing guidelines

2  then in effect, given the loss amounts that we were discussing

3  with the government, it was difficult to imagine a scenario

4  where Mr. Walsh would not be facing a sentence that was so high

5  as to be essentially tantamount to a life sentence, given the

6  fact that he was already at that time either 70 years old or

7  close.  Yes.

8  Q.  The government did not agree to limit the loss under your

9  various ideas to the numbers you initially wanted; right?

10  A.  They did not.  They were unyielding.

11  Q.  You told the government that you were concerned about the

12  statutory maximum term; right?

13  A.  We did.

14  Q.  When you told the government that Mr. Walsh -- excuse me.

15      When you proposed a plea to only Count Three alleging

16  commodities fraud, you told the government that Mr. Walsh was

17  prepared to plead guilty; right?

18  A.  Well, we indicated that there was likely a willingness to

19  plead guilty to some plea arrangement, and we also indicated

20  that there was a greater willingness to plead guilty to a plea

21  arrangement which would cap his exposure.  And we told the

22  government that he was more likely to plead to a five-year cap.

23  When they rejected that, we said more likely to plead to a

24  ten-year cap and so son.

25  Q.  You eventually had a conversation where the government

1  proposed a plea to the securities fraud count; correct?

2  A.  At some point, yes, we did.

3  Q.  The benefit of that agreement is that it would have capped

4  Mr. Walsh's sentencing exposure at 20 years; correct?

5  A.  Would have and did.  Yes.

6  Q.  That was the count to which Mr. Walsh ultimately pled

7  guilty; correct?

8  A.  Yes.  With a 20-year statutory maximum, yes.

9  Q.  And by pleading guilty, the defendant also earned a

10  three-level reduction from his base offense for the acceptance

11  of responsibility; correct?

12  A.  I believe that's right.  I don't think that they gave us a

13  hard time over the third point.  Yes.  That's correct.

14  Q.  And that's a benefit he would have lost if he had gone to

15  trial; correct?

16  A.  Yes.  That's correct.

17  Q.  His codefendant had also pled guilty by that time; correct?

18  A.  Mr. Greenwood.  Yes.

19  Q.  Mr. Walsh could have pled guilty to the securities fraud

20  count without a plea agreement; right?

21  A.  I suppose he could have pled guilty to the indictment.  He

22  could have pled, as we say, open.  That would have been to all

23  counts.  Yes.

24  Q.  Sometimes that's called pleading pursuant to a Pimentel

25  letter?

```
 1    A.  I haven't come across that very often, but I have heard
 2    that phrase used.  Yes.
 3    Q.  But then if he had pled guilty to only the count of
 4    securities fraud, the government would not have been required
 5    to dismiss the other counts; right?
 6    A.  If he had pled guilty only to the charge of securities
 7    fraud?  I'm not sure I understand.
 8    Q.  I'll move on.
 9         Before Mr. Walsh signed the plea agreement, you spoke
10    to him about it?
11    A.  About the plea agreement?
12    Q.  Yes.
13    A.  Yes.
14    Q.  You gave him a copy of the agreement?
15    A.  Yes.
16    Q.  And you reviewed the agreement with him; correct?
17    A.  Yes.
18    Q.  You explained the terms of the agreement to Mr. Walsh?
19    A.  Yes.
20    Q.  He was released on bail at the time; right?
21    A.  Correct.
22    Q.  So you met with him in a conference room somewhere?
23    A.  We spoke to him on the phone, and we met with him in our
24    conference room.  Yes.
25    Q.  So there weren't marshals walking around?
```

1    A.  There were not.

2    Q.  You knew that the wording of a plea agreement is important;

3    right?

4    A.  I did.

5    Q.  Based on your years of experience in criminal law?

6    A.  Yes.

7    Q.  And the stipulated guidelines was also important; correct?

8    A.  Yes.

9    Q.  The stipulated loss was important?

10   A.  Yes.

11   Q.  The number of victims was important?

12   A.  Yes.

13   Q.  You knew the appeal waiver was also an important part of

14   the agreement; right?

15   A.  Every last word in that agreement is important.

16   Q.  So you knew you had to carefully review the agreement

17   yourself?

18   A.  Yes.

19   Q.  And you carefully explained the agreement to Mr. Walsh;

20   correct?

21   A.  Yes.

22          THE COURT:  Counsel, you really need to slow down.

23   I'm going to take your script away if you don't slow down.

24          MR. BHATIA:  That's the last time you'll have to tell

25   me, your Honor.

1     THE COURT:  All right.

2  BY MR. BHATIA:

3  Q.  The plea agreement itself said that the guideline

4  sentencing range is 30 years to life imprisonment; right?

5  A.  360 months to life.  The plea agreement indicated, yes,

6  that that was the recommended sentence under the sentencing

7  guidelines.

8  Q.  And because the statutory max was 20 years, it brought the

9  stipulated guideline sentence down to 20 years; right?

10  A.  It was effectively 20 years.  Yes.

11  Q.  You explained to Mr. Walsh that the guidelines calculation

12  could influence his eventual sentence?

13  A.  Of course.  Yes.

14  Q.  You answered any questions that he had about the agreement?

15  A.  We did.

16  Q.  You never told him, I'm done answering your questions?

17  A.  No.

18  Q.  You told him that no one could predict what his sentence

19  would be within the 20-year range; correct?

20  A.  I did.

21  Q.  It could be zero.

22  A.  Yes.

23  Q.  It could be 20.

24  A.  Yes.

25  Q.  Did you ever tell the defendant that he absolutely would

1   not get a 20-year sentence?

2   A.  I did not.

3   Q.  You did tell Mr. Walsh that you did not expect he would get

4   a 20-year sentence; correct?

5   A.  I did.

6   Q.  That in your professional experience, it was likely to be

7   less than 20 years?

8   A.  Yes.  That's correct.

9   Q.  That was your best estimate that you could come up with?

10  A.  Well, I didn't give an estimate, and I was adamant with

11  Mr. Walsh, as I am with every criminal defendant, that it's not

12  up to me.  It's up to the sentencing judge.

13        What I did indicate to him, in sum and substance,

14  although I don't remember the precise words, was that it struck

15  me as unlikely under the totality of the circumstances and

16  given the arguments that we had at our disposal, given what I

17  understand about sentences in other roughly comparable cases, I

18  told him I thought it was very unlikely that he would get 20

19  years.

20  Q.  That's similar to what you told other defendants when you

21  were explaining the sentencing range in a plea agreement?

22  A.  Similar in spirit.  Every case is different, but, yes.

23  Q.  And you never promised him that he would get 20 years of

24  course; right?

25  A.  Certainly not.

1    Q.  You told Mr. Walsh that you recommended that he accept the

2    plea offer?

3    A.  Yes.  I recommended that he accept the plea offer.  That's

4    correct.

5    Q.  And that was based on your review of the evidence in the

6    case?

7    A.  That's correct.

8    Q.  You had reviewed the transcript from the Monsanto hearing

9    in this case?

10   A.  Yes, we had.

11   Q.  You had a sense of the expected testimony from Paul

12   Greenwood?

13   A.  We did.  We had much more in this case than we typically

14   have at the plea negotiation stage in terms of information

15   about who the likely witnesses were and what they were likely

16   to say because there had been this Monsanto litigation.

17   Q.  And you knew the government had copies of the promissory

18   notes that Mr. Walsh signed?

19   A.  Yes, as did we.

20   Q.  You had reviewed agreements between WG Trading and its

21   investors?

22   A.  Yes, we had.

23   Q.  You had seen copies of presentations that WG Trading gave

24   to its investors about how they only invested in index

25   arbitrage strategy; right?

  1    A.  Yes.

  2    Q.  And you recommended that Mr. Walsh accept the agreement, in

  3    part, because of the strength of the government's case?

  4    A.  Correct.

  5    Q.  And you also recommended that he accept the agreement in

  6    part --

  7            THE COURT:  Counsel, hand the script up here.  One

  8    more time.  I'm telling you.  You need to slow down.

  9            MR. BHATIA:  I understand.

 10    Q.  Another reason that you recommended that he accept the

 11    agreement was because he faced significant sentencing exposure

 12    if he went to trial; right?

 13    A.  Correct.

 14    Q.  So if he went to trial and was convicted on all the counts,

 15    he faced a wide sentencing range; right?

 16    A.  Yes.  We discussed with him the difference between pleading

 17    under the agreement that we eventually arrived at which capped

 18    his exposure at the statutory limit of 20 years and going to

 19    trial with likely very, very high sentencing guidelines where

 20    his exposure was not capped at 20 years.

 21    Q.  Did you ever tell Mr. Walsh that he had to accept the plea

 22    offer?

 23    A.  No.

 24    Q.  Did you ever pressure Mr. Walsh to accept the offer?

 25    A.  Certainly not.

1   Q.  You represented Mr. Walsh at his plea hearing and

2   sentencing; correct?

3   A.  I did, together with my partner, Justin Sher.  Yes.

4   Q.  And at both of those hearings, the defendant was required

5   to answer questions from the judge; correct?

6   A.  Correct.

7   Q.  Did you ever instruct Mr. Walsh to say that he did not

8   read -- excuse me.  Withdrawn.

9       Did you ever instruct Mr. Walsh to say he did read the

10  agreement even if he did not read it?

11  A.  No.

12  Q.  Did you ever instruct Mr. Walsh to say he understood the

13  plea agreement even if he did not understand it?

14  A.  No.

15  Q.  Did you ever instruct Mr. Walsh to say he understood his

16  sentencing exposure even if he did not understand it?

17  A.  No.

18  Q.  Did you instruct him to say that he understood his appeal

19  waiver even if he did not understand it?

20  A.  No.

21  Q.  Did you ever instruct Mr. Walsh to say anything untruthful

22  to the judges?

23  A.  Certainly not.

24  Q.  In Mr. Walsh's plea agreement, he stipulated that for the

25  purposes of the guideline sentence, the loss from the scheme

1   was greater than $400 million.

2           Do you recall that?

3   A.  I do.

4   Q.  In the PSR, the probation department also calculated the

5   loss to be more than $400 million; correct?

6   A.  That's my recollection.  I think the probation department's

7   calculation -- I don't know this for a fact, but I assume that

8   it was based on a calculation that was provided by the

9   government.

10  Q.  In 2014, were you familiar with the way the loss was

11  calculated under the sentencing guidelines?

12  A.  Yes.

13  Q.  And you had handled other fraud cases where there was a

14  significant loss value; correct?

15  A.  I had.

16  Q.  So you knew that any loss value over $400 million was

17  treated the same for the purposes of the guidelines?

18  A.  I take you to mean that $400 million was the outer limit

19  under the 2B1.1 table under the sentencing guidelines.

20          Is that what you mean?

21  Q.  That's what I mean.

22  A.  Yes.  $400 million was the upper limit.  If your loss was

23  over $400 million, then you were at the far end of the table.

24  Q.  So losses above $400 million all sort of gave the same

25  enhancement under the guidelines?

 1   A.  It wouldn't matter -- 500, 600, 700.

 2   Q.  You testified earlier today that you had read the Monsanto

 3   hearing before recommending the plea offer.

 4          Do you recall that?

 5   A.  My testimony?  Yes.

 6   Q.  And you had reviewed bank records that were produced by the

 7   government?

 8   A.  Yes.

 9   Q.  You had reviewed the promissory notes signed by Mr. Walsh?

10   A.  Yes.

11   Q.  And you had seen the reports from the receiver in the civil

12   case; correct?

13   A.  Yes.

14   Q.  And you had seen reports of interviews with potential trial

15   witnesses?

16   A.  Yes.

17   Q.  So you knew that the receiver had reported that there was a

18   1.5 -- there were $1.5 billion in claims when the receiver took

19   over; correct?

20   A.  As I sit here today, I don't remember the precise amounts.

21   I remember reviewing the receiver's report.  What sticks out in

22   my mind is that by the time -- around the time that we were

23   negotiating the plea, we knew already that a very large --

24   roughly $800 million worth of assets had been recovered by the

25   receiver.

1          I think it was our understanding that something like

2    80 percent of the principal amount of all investments made

3    during the period covered by the indictment had been returned

4    by then.

5          It was our understanding, I think from reviewing the

6    reports but also from communicating with counsel for the

7    receiver, that the receiver anticipated receiving upwards of

8    90 percent and potentially even more than that.

9          So that's what stands out in my mind.  Yes.  We

10   reviewed the receiver's reports in connection with our

11   representation, both before and after the plea.

12   Q.  Were you aware that in the receiver's report, it says there

13   was a shortfall when the receiver took over?

14             THE COURT:  When the receiver what?

15             MR. BHATIA:  When the receiver took over.

16             THE WITNESS:  I generally recall that.  I do not

17   recall the numbers.

18   BY MR. BHATIA:

19   Q.  Is there something I could show you that would refresh your

20   recollection?

21             THE COURT:  Counsel.

22             MR. BHATIA:  We'll move on.

23             THE COURT:  I'm not going to tell you again.  You just

24   have to slow down.  You are making the reporter crazy.  Do it

25   again.

```
 1  BY MR. BHATIA:

 2  Q.  Is there something that I can show you that would refresh

 3  your recollection about what the receiver said regarding a

 4  shortfall?

 5  A.  There may well be.  I don't remember the specific

 6  documents, but if you show it to me, I'll let you know if I've

 7  seen it before.

 8          MR. BHATIA:  Can we pull up for the witness the

 9  document marked for identification purposes only as Government

10  Exhibit 1011, in particular, page 4.

11  Q.  I would direct you to the last paragraph.

12  A.  Is that the part beginning -- thank you.

13          So I have a distinct recollection of the

14  next-to-the-last sentence in the upper paragraph that you've

15  got isolated on the screen which reads:  "The preliminary --"

16          MS. KELLMAN:  This is not in evidence.  Nor do I think

17  it should be.

18          THE COURT:  Right.

19          THE WITNESS:  This refreshes my recollection.

20          THE COURT:  Counsel, what do you want to do?

21          MR. BHATIA:  We would offer this into evidence.

22          MS. KELLMAN:  I object.  We just don't see how it's

23  relevant.  I think we're so far afield.

24          THE COURT:  The witness is starting to say that his

25  recollection is refreshed.
```

```
 1              You want to ask him about what?
 2   BY MR. BHATIA:
 3   Q.  Does this refresh your recollection regarding what the
 4   receiver's report said about the shortfall when they took over?
 5   A.  It refreshes my recollection as to what the receiver said
 6   about how much money was going to be realized by the receiver's
 7   recovery efforts.  It generally refreshes my recollection that
 8   there was a discussion of a shortfall.
 9              I do not remember, as I sit here right now unaided,
10   how much of a shortfall there was according to the receiver's
11   report.  I remember there being one.  I don't remember how big
12   it was.
13              MR. BHATIA:  We can take this down.
14   Q.  You knew that the government had proof that Mr. Walsh and
15   Mr. Greenwood had signed promissory notes worth more than $553
16   million; correct?
17   A.  I remember the government having and producing to us in
18   discovery promissory notes.  From what I can recall, the notes
19   Mr. Greenwood signed totaled just shy of $300 million, and the
20   notes that Mr. Walsh signed were in the neighborhood of 240 or
21   250.  That's my recollection, 240 or 250 million.
22   Q.  In a fraud case, the sentencing guidelines loss calculation
23   is important; right?
24   A.  It is very important to the calculation of the sentencing
25   guidelines, yes.
```

1    Q.  And in Mr. Walsh's case, the loss value was a significant

2    factor driving the guidelines calculation; correct?

3    A.  It was the overwhelming factor, clearly the most important

4    factor driving the guidelines calculation.  Yes.

5    Q.  You were concerned about a high guidelines range and wanted

6    to keep it as low as possible; right?

7    A.  Yes.  We were very concerned about that.

8    Q.  And you submitted a letter -- let me walk back a second.

9         You had seen a preliminary draft of the presentencing

10   report once it had been produced?

11   A.  I think that's right.  I don't have a distinct recollection

12   of how many iterations of the PSR we saw, but I think that's

13   right.

14   Q.  Do you remember submitting a letter in response to that

15   first draft of the PSR?

16   A.  I remember that we filed objections to the PSR.  Correct.

17   Q.  One of those objections was to an enhancement related to

18   sophisticated means being used; right?

19   A.  That sounds right.

20   Q.  And you successfully convinced the probation department not

21   to recommend that that enhancement apply; right?

22   A.  I remember -- I don't remember the details specifically.  I

23   remember we convinced probation to give on some of the

24   enhancements, and I remember that we convinced the assistants

25   to change language in the plea agreement right up until the

1   11th hour in Mr. Walsh's favor.  I don't remember all the

2   specifics of what we managed to achieve, but I know that we

3   negotiated on both fronts.

4           (Government counsel conferred)

5           MR. BHATIA:  Your Honor, may I approach the witness?

6           THE COURT:  Yes.

7           MR. BHATIA:  I'm showing the defendant -- excuse me.

8   The witness -- the document marked as Government Exhibit 1023.

9           THE COURT:  Do you recognize that document?

10  BY MR. BHATIA:

11  Q.  Do you recognize this document?

12  A.  It appears to be an iteration of the document I was

13  referring to earlier as the objections that we filed to the

14  PSR.  It's not signed.  So I don't know if it's the last one.

15          MR. BHATIA:  The government offers Exhibit 1023.

16          MS. KELLMAN:  I object, your Honor.  The witness has

17  identified it as an iteration of the document he prepared, and

18  he doesn't know if it was submitted.  It's not signed.

19          THE COURT:  Counsel?

20          MR. BHATIA:  We withdraw the document.

21          MS. KELLMAN:  I didn't hear what the assistant said.

22          THE COURT:  Ma'am?

23          MS. KELLMAN:  I didn't hear what the assistant said,

24  Judge.

25          THE COURT:  He's withdrawing the document.

1      MS. KELLMAN:  Thank you.

2      (Government counsel conferred)

3  BY MR. BHATIA:

4  Q.  Did you ever tell Mr. Walsh that for the purposes of the

5  guidelines, the loss amount was so large that the precise value

6  was not important?

7  A.  Did I ever tell him -- I'm sorry?  That the loss was so

8  large that the precise amount was not important?

9  Q.  That's right.

10  A.  I don't remember saying that.  I remember saying, again in

11  sum and substance, that in my view, the government had

12  sufficient evidence to prove at a Fatico hearing that the loss

13  amount was significantly north of $400 million.

14      So in that sense, you know -- it's not that it wasn't

15  important.  It's just that they could, in my view at the time,

16  easily succeed in proving at a Fatico hearing a number north of

17  $400 million.

18  Q.  That was based on your review of the evidence in the case;

19  right?

20  A.  Correct.

21  Q.  And the evidence that you said was more than you usually

22  have in a case at this stage.

23  A.  Yes.  Again, we had the benefit of the Monsanto hearing

24  testimony.  We knew that, you know, the government's

25  characterization of the documents relevant to calculating the

1  loss amount would be corroborated by the testimony of multiple

2  witnesses with contemporaneous firsthand knowledge of the

3  events.  So, yes.

4  Q.  And it would also be corroborated by documentary evidence;

5  correct?

6  A.  Yes.

7          THE COURT:  Counsel, I'm getting out my water gun now.

8  BY MR. BHATIA:

9  Q.  And in Mr. Walsh's plea agreement, you also stipulated to a

10  certain number of victims for the purposes of the sentencing

11  guidelines; correct?

12  A.  I believe we did, yes.

13  Q.  There was an enhancement relating to having ten or more

14  victims; right?

15  A.  Yes.

16  Q.  And the probation department also found that there were ten

17  or more victims; right?

18  A.  That's my recollection, yes.

19  Q.  Was your belief -- did you believe that the government

20  could prove that there were ten or more victims at a Fatico

21  hearing?

22  A.  We did.

23  Q.  And that was also based on your review of the evidence in

24  the case?

25  A.  Correct.

1    Q.  Do you recall that at sentencing you said:  "I don't think

2    anyone expected that we would be at the outer range of the

3    hypothetical guideline sentence"?

4    A.  I do remember that, yes.

5    Q.  You said that because based --

6            MS. KELLMAN:  Objection.  He's leading, and he's

7    testifying, Judge, "You said that because."  Let him ask a

8    question.

9            THE COURT:  Counsel has been given the latitude to

10   lead.

11           MS. KELLMAN:  Understood, Judge.  First of all, this

12   witness hasn't been at all hostile to the government.  So why I

13   consented to the leading -- I don't think there's a need for

14   it.  Given the answer before he asked the question, he's a

15   lawyer.  If he's hostile, I have no objection.  But he hasn't

16   shown any hostility to the government whatsoever.

17           THE COURT:  What's the question you want answered,

18   counsel?

19           MR. BHATIA:  Whether he told Judge Cedarbaum that

20   statement, because he did not think --

21           MS. KELLMAN:  It's the "because," the explanation for

22   why he said it, providing the answer to the witness for why he

23   said it is what I'm objecting to.  Did he say it to the judge?

24   Yes.  Why?

25           THE COURT:  I've given counsel the opportunity to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    lead.  The witness is a lawyer.  So if he doesn't like the

2    answer suggested in the leading question, he's a big boy.

3    He'll figure it out, and he will tell us.

4           Counsel, go ahead and ask the question.

5    BY MR. BHATIA:

6    Q.  When you said that to Judge Cedarbaum, did you say that

7    because going into the sentencing hearing, you hadn't expected

8    a 20-year sentence?

9    A.  I said what I said -- at that point in the sentencing

10   hearing, I uttered that sentence and a couple of other

11   sentences in an effort, put colloquially, to throw a wrench

12   into the works.

13          I did not believe at that moment that the 20-year

14   sentence that Judge Cedarbaum had imposed was fair.  Nor did I

15   believe that -- well, how to put this politely.

16          I thought at that time -- I had a very deep concern

17   that Judge Cedarbaum might not be fully in possession of her

18   faculties and able to make the fine judgments that are required

19   to determine the appropriate sentence in a case like this one

20   or, for that matter, any case.

21          So I said a number of things at that juncture in the

22   sentencing hearing to throw a wrench into the works.

23   Q.  Going into the sentence, you understood that a 20-year

24   sentence was possible; correct?

25   A.  Yes.

Case 7:15-cv-05545-LLSAP Document 122 Filed 06/28/25 Page 142 of 199  142

1    Q.  And you understood that the United States government had

2    recommended a 20-year sentence.

3    A.  Yes.  As had the probation department.

4    Q.  That's right.

5        And you understood that you had stipulated and

6    believed the government could prove a loss of over $400

7    million; correct?

8    A.  Correct.

9    Q.  And that there were more than ten victims; right?

10   A.  Yes.

11   Q.  And all of that led to a guidelines range that was, in some

12   sense, even higher than 20 years.

13   A.  Yes.  The issue was not whether or not that sentence could

14   be imposed.  Getting back to the comment that I made and my

15   explanation for it, that wasn't the issue.  Reasonable minds

16   could debate the appropriateness of such a high guideline

17   sentence under the facts and circumstances of this case.

18       What I was worried about -- the metaphor that I used

19   in discussions with people at the time was like if you're at a

20   ballgame and the umpire makes a call against your side, even if

21   it's a controversial call, you live with it.

22       But if you later come to appreciate or find out or

23   hear evidence suggesting that the umpire wasn't fully aware of

24   what was going on or wasn't fully able to appreciate what was

25   happening in front of them, that calls into doubt the

1    appropriateness of the outcome.  That's where my head was at at

2    the time.

3    Q.  Immediately after the sentencing, Mr. Walsh hired Paul

4    Shechtman to represent him, along with you; right?

5    A.  Yes.  I don't remember if it was within hours or a day or a

6    couple days.  It couldn't have been within hours because I know

7    that I was receiving emails I think from Mr. Walsh's family

8    indicating that he was speaking to a number of defense lawyers,

9    all of whom were known to me.  And Paul Shechtman was among

10   them.

11          Pretty soon after the sentencing hearing, yes.  They

12   engaged Mr. Shechtman.  That was my understanding.

13   Q.  You worked with Mr. Shechtman following the sentencing to

14   see if you could find some way to have the sentence undone;

15   right?

16   A.  Among other things.  I mean, Mr. Shechtman came in, and the

17   family was obviously distraught.  We all were.  The

18   proceeding -- the sentencing proceeding had ended but was not

19   closed.

20          It wasn't clear to any of us exactly what to make of

21   how the proceeding concluded, and we were very busy marshaling

22   resources and researching any number of issues in connection

23   with what had happened and what to do next.

24          Mr. Shechtman was brought in, as I understood it, to

25   advise generally on all of the issues that were at play at that

1    time, which were complicated.

2    Q.  You considered all the avenues that you could think of to

3    either have the plea withdrawn or to have the sentencing

4    changed somehow; right?

5    A.  That we could think of, that Mr. Shechtman could think of,

6    that the assistants could think of.  There was a very, very

7    robust conversation amongst the parties about that.  Yes.

8    Q.  You tried to get further argument -- excuse me.

9        Ultimately, you tried to get further argument on

10   sentencing; correct?

11   A.  I think that's correct, yes.

12   Q.  And the U.S. Attorney's Office consented to that request;

13   correct?

14   A.  They did.  There was some back-and-forth with the office

15   about -- I don't remember the exact details, but I think there

16   was some question as to whether or not Mr. Walsh was going to

17   move to withdraw his plea.

18       I think there was some connection in the minds of the

19   assistants between on the one hand if we moved to withdraw the

20   plea and on the other hand whether they would consent to

21   reargument.

22       I don't remember all the details of the conversation,

23   but I think at the end of the day, what we collectively

24   resolved -- and by that time, Mr. Shechtman was taking the

25   lead.

```
 1              What we collectively resolved was that we would not

 2    move to withdraw the plea on the one hand.  On the other hand,

 3    the government would consent to additional argument.  That's my

 4    recollection.

 5              MR. BHATIA:  Your Honor, may I have one moment?

 6              THE COURT:  Yes, sir.

 7              (Government counsel conferred)

 8    BY MR. BHATIA:

 9    Q.  Mr. Termonte, you said that after the sentencing, you had

10    discussions with various parties; correct?

11    A.  Yes.  With the client, with his family, with Mr. Shechtman,

12    and with the assistants.

13    Q.  You anticipated my next question.

14              You also spoke to the defendant about what to do next;

15    right?

16    A.  To some extent.  I don't remember the details.  I think

17    pretty much as soon as Mr. Shechtman came in, he was

18    principally responsible for communications with the family.

19              He was taking the lead in any number of respects.  I

20    don't remember exactly who I was talking to in the family.  We

21    were in communication with Mr. Walsh, but we weren't the only

22    ones at that point.

23    Q.  And you were also in communication with his family;

24    correct?

25    A.  Yes.  Again, I don't remember sort of who was in
```

1  communication with the greatest frequency, but, yes.  We were

2  in communication with Mr. Walsh and his family.

3  Q.  You ultimately filed a letter with Judge Cedarbaum;

4  correct?

5  A.  About what?  You'll have to be more specific.

6  Q.  You filed a letter asking for additional argument on

7  sentencing; correct?

8  A.  I believe that's right.

9  Q.  Do you know what prompted you to file that letter?

10  A.  As I said, these conversations that we were having with the

11  assistants and Mr. Shechtman.  I believe in a series of phone

12  calls and email exchanges, we were essentially discussing with

13  the assistants and negotiating with the assistants about

14  whether or not we would move to withdraw the plea, about

15  whether or not they would consent to us submitting additional

16  argument, about whether or not we were going to have meetings

17  at the office with the leadership of the U.S. Attorney's Office

18  and when.  And we were formulating a strategy for having those

19  conversations, principally between myself and Mr. Shechtman and

20  the client and his family.

21        MR. BHATIA:  Thank you, your Honor.  No further

22  questions.

23        THE COURT:  Thank you.

24        Cross-examination, counsel.

25        MS. KELLMAN:  I have a few questions, Judge, if I may.

1    CROSS-EXAMINATION

2    BY MS. KELLMAN:

3    Q.   Good afternoon, Mr. Termonte.

4    A.   Good afternoon.

5    Q.   We don't really know each other.  Am I right?

6    A.   We don't.

7    Q.   We know who we are, but we don't know each other.

8    A.   I know who you are, but we're not acquainted as friends.

9    Q.   We haven't had any cases together.

10   A.   We have not.

11   Q.   You were retained in this case in or around May of 2013;

12   correct?

13   A.   That sounds right.  I don't remember the precise date.

14   Q.   And you had inherited this case after a firm in Chicago had

15   abandoned it; correct?

16   A.   I don't know that they had abandoned it.  I don't know what

17   their arrangement was.  We took over at about that time, and we

18   took over from -- I think Mr. Flessner was the lead attorney.

19   We didn't have much communication with Mr. Flessner, other than

20   to demand documents from him which --

21   Q.   Which you didn't get?

22   A.   I don't know that he ever produced them.

23   Q.   Now, would it be fair to say that from the time you were

24   retained in May, for the next several weeks and months, that

25   you were in regular communication with the Flessner firm,

1   either via emails or writing, demanding that they turn over the

2   discovery?  Am I right?

3   A.  Someone at my firm was.  Yes.

4   Q.  And you were trying very hard to get your hands on the

5   discovery so that you could learn about the case; correct?

6   A.  Correct.

7   Q.  Did you know that there had been a Monsanto hearing that

8   involved Flessner and his firm?

9   A.  I did.

10  Q.  And did you, at the time you were retained, have a copy of

11  the minutes from that hearing?

12  A.  I don't remember when we got the minutes.  My general

13  recollection is that we had the minutes before we got the

14  discovery which eventually came not from Mr. Flessner's firm

15  but from the government.

16  Q.  So in fact, the Flessner firm basically never turned over

17  the discovery to you; correct?

18  A.  I think they turned over one or two redwells.

19  Q.  And they were, if I remember correctly, approximately 87

20  gigabytes of data there?

21  A.  There was an awful lot of discovery.  I don't remember the

22  number.

23  Q.  Do you remember representing to Judge Cedarbaum that it was

24  in excess of 87 gigabytes or over a million pages?

25  A.  I don't remember in particular.  We represented that it was

1   a very, very large amount of discovery.

2   Q.  Over the course of the next several months -- meaning

3   September, October, November -- you eventually got what you

4   believed to be the bulk of the discovery from the government.

5   Correct?

6   A.  My understanding is we got all of it.  I don't remember the

7   precise sequence, but the government produced, to my memory --

8   they produced in tranches.  I don't know if we contracted or if

9   Mr. Walsh contracted, but we engaged a vendor.  And we began up

10  loading and sorting the weeds from the chaff, yes.

11  Q.  And would it be fair that once you had all the discovery,

12  you then sent it to get digitized?

13  A.  Before we had it all.  Like I said, I think it came in

14  tranches.  But, yes.  And not all of it.  There are categories

15  of discovery that you can only deal with in a digitized way.

16          I think a very substantial component of the discovery

17  was trading records.  It wasn't really clear how useful they

18  would be.  But nevertheless, we had those uploaded because it's

19  otherwise impossible to go through them.  I don't know that we

20  digitized like the 302s or hearing transcripts.

21          MS. KELLMAN:  May I have just a moment, Judge.

22          (Defense counsel conferred)

23          MS. KELLMAN:  May I have just one minute, Judge?

24          THE COURT:  Yes, ma'am.

25  BY MS. KELLMAN:

1   Q.  Do you recall that there was a hearing in or around

2   February of 2014 before Judge Cedarbaum?

3   A.  That sounds right.  I don't remember the precise date.

4   Q.  Will you take my representation that there was such a

5   status conference on February 5, 2014?

6   A.  I've heard lawyers ask questions that way.  I'm inclined to

7   believe you if you tell me that.  I don't remember it.

8   Q.  Do you want me to show you the transcript?

9         MR. QUIGLEY:  We'll stipulate that there was a

10  February 5 status conference.

11        THE COURT:  Thank you.

12  BY MS. KELLMAN:

13  Q.  In preparation for that conference, did you also write

14  Judge Cedarbaum a letter on February 3 of 2014?

15  A.  I expect we did.

16  Q.  And in that letter, did you tell Judge Cedarbaum, among

17  other things, that you have a firm trial date in several other

18  cases that were interfering with your ability to deal with this

19  case exclusively?  Correct?

20  A.  That sounds right.

21  Q.  And that in fact, you had a civil case in New York State

22  Supreme Court I believe in January; correct?

23  A.  Again, it sounds right.  I don't remember the details.

24  Q.  Do you remember telling Judge Cedarbaum in February --

25  withdrawn.

1    A.  We were trying to get Judge Cedarbaum to give us more time.

2    Yes.

3    Q.  I'm trying to get to why.  So please bear with me.

4    A.  Okay.

5    Q.  Do you recall telling Judge Cedarbaum at that February

6    conference that in fact you hadn't really gotten all the

7    discovery together until the end of December?

8    A.  That sounds right.

9    Q.  And that you hadn't really had a chance to review it

10   because it was coming in in different tranches and ultimately

11   had to be digitized by this one company?

12   A.  That is correct.

13   Q.  And that you ultimately got it at or around the end of

14   December, but then you were starting a January trial in

15   New York County, a civil trial.  So you were preoccupied with

16   that preparation in December.  Correct?

17   A.  It sounds right that we told her that.  Yes.

18   Q.  And I assume if you told her that, it was true.

19   A.  I actually don't think that trial went forward, but at the

20   time that we said it, it was certainly true.

21   Q.  In February when you were before the court, you said at

22   page --

23          I'm reading off the minutes, your Honor, from the

24   February 5, 2014, status conference.

25          THE COURT:  Go ahead.

1     MS. KELLMAN:  Just to read from it.

2  Q.  On the third page at line 23, you said:  "We had a trial,

3  as I detailed in my letter in December.  December was going

4  into early January.  We're working very hard, as we have since

5  we were engaged in this case."

6          But you had this trial, this other trial.  Correct?

7  By February you knew if you had the trial or not; correct?

8  A.  I don't recall, but if I said it, it was true.

9  Q.  And you also told Judge Cedarbaum that you couldn't really

10  focus on this case the way you needed to in February because

11  you had two very firm trial dates in the Southern District

12  before Judge Crotty and Judge Forrest and that was going to be

13  taking all of the firm's time and resources until those two

14  trials were over.  Correct?

15  A.  Those were my trials, my time.  Yes.

16  Q.  And my client hired you; correct?

17  A.  Your client hired me and Justin and our associates.  Yes.

18  Q.  So you weren't able to work with him until sometime after

19  April because you were otherwise occupied.  Is that fair?

20  A.  I was definitely distracted with other things, but I and my

21  colleagues worked continuously on his case from the beginning.

22  Q.  Now, when you complained to Judge Cedarbaum that you needed

23  more time because you had not yet had a chance to review the

24  discovery, she said to you, well, you've seen the Monsanto

25  minutes; correct?  And you know all about the case.

1              Isn't that right?

2  A.   That sounds right.  I don't remember specifically.

3  Q.   And didn't you tell the judge in response to that that

4  in fact you didn't have the important things that you needed

5  like impeachment material; that there was no cross-examination

6  in the Monsanto hearing?

7  A.   That sounds right.

8  Q.   So this is as of February, you are just coming off -- you

9  get the discovery finally organized by the end of December.

10  January you're in trial in Manhattan, and now this is the

11  beginning of February, and you still haven't had a chance to go

12  through anything except the Monsanto hearing which you yourself

13  say is insufficient to get a handle on the case because you

14  didn't have the documents you needed.  Correct?

15  A.   I think that's generally right with qualifications.  I

16  think you're suggesting that we didn't go through anything

17  other than the Monsanto hearing which is just not right, and

18  although --

19  Q.   Isn't that what you told Judge Cedarbaum?

20  A.   If I could finish.

21              Although I was distracted -- I think the first one

22  went before Judge Forrest, but the second one before

23  Judge Crotty did not.  I had colleagues and another partner who

24  was working on the case.

25  Q.   Which partner was working on the case?

1    A.   Justin Sher.

2    Q.   Did he meet with my client?

3    A.   I'm sure he did.  I don't remember it specifically.

4    Q.   You don't know?

5    A.   I don't remember.

6    Q.   And you were on trial during April -- correct? -- in the

7    Judge Forrest case?  That's what you told Judge Cedarbaum, that

8    that was a firm trial date.  Correct?

9    A.   I don't remember if I was on trial or not.

10   Q.   I have yet another unnumbered page in the transcript.  I'm

11   reading from the top:  "Mr. Termonte, it's very rare in my

12   experience that all cases that are scheduled for trial in fact

13   go to trial."

14        At line 4:  "Mr. Termonte:  These too.  We are

15   contrary confident that they will.  They have been adjourned

16   before.  Judge Forrest and Judge Crotty have both made it very

17   clear that they will not permit another adjournment."

18        Did you say that to Judge Cedarbaum?

19   A.   It sounds right, but I still don't remember whether or

20   not -- I know that a trial before Judge Forrest went forward.

21   I don't know if it was that one.  And the trial before

22   Judge Crotty did not.  It resolved.

23   Q.   Now, in your February letter to Judge Cedarbaum, one that

24   preceded this status conference, you explained to the judge all

25   the difficulty that you had getting the discovery from the

1    Flessner firm; correct?

2    A.  I know that we did describe to Judge Cedarbaum in letters

3    and in open court the difficulties we had with obtaining

4    discovery from Mr. Flessner's firm.  Yes.

5    Q.  Did you tell Judge Kram --

6    A.  I've never been before Judge Kram.

7            THE COURT:  That's because you're not old enough.

8            MS. KELLMAN:  But I started when I was nine, just to

9    be clear.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   Q.  Did you tell Judge Cedarbaum, in your letter of February 3:

 2   As the foregoing detailed description of our efforts to obtain

 3   and organize the discovery show, we did not possess a complete

 4   set of the files necessary to defend Mr. Walsh until November,

 5   and could not begin to review them until late December of 2013.

 6   For all practical purposes, we have not had access to the

 7   discovery -- we only had access to the discovery in this case

 8   for one month.

 9        Does that sound right?

10   A.  It does.

11        THE COURT:  I'm going to get my water gun out for you

12   too, soon.

13        MS. KELLMAN:  I caught myself, you saw that.

14   Q.  And you further told her that, moreover, because we have

15   not had a firm trial date in the Walsh trial, that you set up

16   other trial dates, before and after, correct?

17   A.  Again, it sounds right.

18   Q.  You were trying a seven-day jury trial in New York County,

19   Mitzner v. Pauline Power?

20   A.  I actually don't remember the case.

21   Q.  You won it apparently.  You don't even remember?

22   A.  Well, is that a question?

23        MS. KELLMAN:  Your Honor, I offer the February 3

24   letter.

25        THE COURT:  Any objection, counsel?

1          MR. BHATIA:  No objection.

2          THE COURT:  Received.

3  Q.  Would it be fair to say that sometime after that conference

4  with Judge Cedarbaum --

5  A.  Which one?

6  Q.  I'm sorry?

7  A.  Which one?

8  Q.  The February conference with Judge Cedarbaum, the one we've

9  just been talking about, you began discussing -- withdrawn.

10         That you told Judge Cedarbaum during the course of

11  this conference that, in all reality, it was going to be

12  difficult for you to focus on this case in terms of the

13  discovery and trial preparation until after the April cases

14  were resolved, correct?

15  A.  Again, it sounds right.

16  Q.  Okay.  So, would it be fair to say that in and around early

17  March, you approached the government with respect to a

18  potential guilty plea for your client, correct?

19  A.  Yeah, not quite.  I mean, the government had approached us,

20  substantially earlier than that.  I think at the time, I don't

21  remember when John O'Donnell, who was the lead AUSA at the time

22  that my firm was engaged, I don't remember when he first raised

23  it.  But I remember him raising it early and often.  I remember

24  help raising the possibility of a reverse proffer.  I remember

25  him suggesting, as is not uncommon, that we discuss a

1    resolution.  I don't remember when those discussions began in

2    earnest.

3    Q.  Would it be fair to say that you have characterized, you

4    characterized to the government that you believe that your

5    client was in denial?

6    A.  When?

7    Q.  When you tried to talk to him about a guilty plea?

8    A.  In denial about what?

9    Q.  I don't know.  I'm asking you if you used the term "my

10   client is in denial" when you began to have discussions with

11   the government about a guilty plea.

12   A.  I don't recall saying that, but it's certainly possible.

13   Q.  You testified on direct examination that, in your view, the

14   government had sufficient evidence to prove the loss in this

15   case.  Correct?

16   A.  I think what I said on direct was that, in my view, the

17   government had ample evidence, more than enough, to prove at a

18   Fatico hearing a loss amount in excess of $400 million, yes.

19   Q.  And actually, you said "sufficient," because I wrote it

20   down.

21   A.  Okay.

22   Q.  But, why are you talking a Fatico hearing which is

23   something that happens after a plea.  Would it be fair to say

24   that up until that February conference, you had never had a

25   conversation with Mr. Walsh about anything other than a trial?

1    Am I right?

2    A.   I'm sorry, could you ask that again?

3    Q.   Yes.  Would it be fair to say that before this February

4    conference, that you had had no conversations with Mr. Walsh,

5    other than how to prepare and proceed to trial.  Correct?

6    A.   I don't have a clear recollection.  But it would be

7    extremely unusual for me to get involved in a case and not talk

8    about anything other than trial for the first six months of the

9    representation.  I don't think that's ever happened.  But I

10   don't remember clearly here.

11   Q.   When was the -- can you think of another case where you

12   didn't have any discovery or any information about the case,

13   for six months?

14             MR. BHATIA:  Objection, your Honor.  Mischaracterizes

15   the prior testimony.

16             THE COURT:  I'll permit it.  You may answer, sir.  Do

17   you need it again?

18             THE WITNESS:  I think I get the gist of the question.

19             THE COURT:  Go ahead.

20   A.   I can think of lots of cases where I had a whole lot less

21   in terms of a detailed understanding of what the government's

22   theory and proof were.  As I said before, as you know, we had

23   the transcript of the Monsanto hearing, which, although no

24   substitute for discovery, it is more than I think I've ever had

25   before in terms of information about the government's theory,

1  the evidence that it intends to put on, and how it was going to

2  prove its case.  It's very unusual, as you know, it is a very

3  unusual circumstance.

4  Q.  Really.  So in six months' time, you've never had a case

5  where you've had this much information about a case before you

6  got the discovery.  You never learned as much in a case in six

7  months as you learned in this case in six months?

8  A.  I don't think I said that.  What made this case unusual is

9  there had been essentially a kind of mini summary version of

10  the government's anticipated proof at trial, at a pretrial

11  hearing.  That's very unusual.

12          I looked at this issue in connection with another case

13  recently.  I think the number of Monsanto hearings that have

14  been conducted in this circuit until very recently was like in

15  the single digits.  So it is a very, very rare occurrence that

16  you have that kind of information about how the government is

17  going to try its case.

18  Q.  Is that an expression you often use, "single digits"?

19  A.  I'm sorry, I don't understand what you mean.

20  Q.  You just said the number of cases would be in the single

21  digits.  Is that an expression you use with some frequency,

22  "single digits"?

23  A.  No, but that's my understanding of how many Monsanto

24  hearings have been in the Second Circuit.

25  Q.  Did you explain, however, to Judge Cedarbaum how

1    insufficient the minutes were when she raised to you the

2    possibility that you could bring yourself up to speed by

3    reading the Monsanto minutes, and you told her that it didn't

4    have impeachment, which was important, correct?

5    A.   Sure, yes.

6    Q.   And it didn't have any cross-examination, correct?

7    A.   Yeah, I mean, I meant what I said.  We couldn't go to

8    trial, we couldn't prepare for trial adequately with just the

9    minutes of the transcript of the Monsanto hearing.

10   Q.   Would it be fair to say you couldn't make a decision as to

11   whether or not trial would be an appropriate modality until you

12   had a chance to look at the discovery?

13   A.   I would want to look at the discovery before making that

14   decision, yes.

15   Q.   As of the end of -- as of the February conference, before

16   Judge Kram -- God, I'm so sorry.  Before Judge Cedarbaum, you

17   had not had an opportunity to fully review the discovery, or in

18   any meaningful way to review the discovery, correct?

19   A.   Until we started getting the rolling production, we were

20   not in a position to evaluate discovery.  We didn't have it.

21   Q.   That's not what you told Judge Kram.  You told her, as the

22   rolling discovery came in, it was being sent to another company

23   to digitize it, and it wasn't until the end of December that

24   you were finally in possession of all the discovery.  Correct?

25   That's what you told her.  I know you weren't under oath.

1   That's what you told her, correct?

2   A.  Here's what I remember.  It sounds right.  I don't have the

3   minutes in front of me.  But, the reality was, we had the

4   Monsanto transcript, and then we started to get the discovery

5   on a rolling basis.

6         As I remember it, and I wasn't deeply involved in the

7   technical details, but we got CDs in tranches, three, four,

8   five CDs at time.  As we got them, we tried to determine what

9   was on them and what we could review in-house ourselves review

10  quickly.  Obviously, we were not convinced at the time that we

11  had a lot of time.  We were engaged in an effort to try to

12  convince Judge Cedarbaum to give us more of it.  But we

13  reviewed what we were able to review, and what we couldn't

14  review ourselves, we sent off to the vendor, and that was that.

15  Q.  What documents were you able to review that suggested to

16  you or made you feel comfortable with the number of 440 million

17  in losses?  What made you agree to that number?  What documents

18  had you seen that supported that number?

19  A.  Yeah, I don't remember everything that we looked at.  As I

20  recall, there were various categories of evidence that bore on

21  that question.  The question of the magnitude of the loss

22  amount that the government could prove.

23  Q.  What did you look at in the discovery?

24  A.  I'm answering the question.

25        So, there were the promissory notes, we had those

early on.  Those indicated that there was a number attributable

to Mr. Walsh in the 240 to $250 million range.  There was a

number attributable to Mr. Greenwood in the 290 to $300 million

range, and our understanding, based on review of other

documents, was that those promissory notes represented an

amount of money that either made its way directly to Mr. Walsh

and Mr. Greenwood, or had been expended in the form of

expenses, or had been lost in connection with certain

investments that weren't disclosed to investors.  And so our

understanding in connection with just the promissory notes, if

memory serves, was that the government could calculate loss

amount based on those alone.  So that was one.

        We reviewed the 302s of the interviews of the

government's cooperating witnesses and the various witnesses

that the government had interviewed in connection with its

investigation.

        We reviewed the receiver's report, the receiver's

reports and the documents associated with those reports.  Those

were, from the perspective of calculating loss amount, scary

documents.  The receiver had, by the time we got involved,

calculated numbers well in excess of a value of the promissory

notes as a potential loss amount.

        And we reviewed documents in connection with any

number of investments that Mr. Walsh had been involved in, in

one capacity or another, that were unauthorized investments,

1  right. So if you look at the -- in the discovery, we got all

2  of them. If you look at all the investment agreements that

3  were provided to the investors, those investment agreements

4  said basically you can do A, B and C with my money. There were

5  documents that we reviewed in connection with investments that

6  were not A, B and C. I don't remember all of them, but

7  specifically I remember three categories of.

8         One, the Signal Apparel investments; two, the Orion, I

9  think it was a financial services firm of some kind

10  investments; and then the third category was real estate

11  investments. There were others, I just can't remember them off

12  the top of my head.

13         If you added up those numbers, based on the documents

14  that we looked at, just pertaining to the unauthorized

15  investments, forget the promissory notes, forget the receiver

16  reports, I don't remember the exact numbers, but you could come

17  up with something like 200 million on Signal, 200 million on

18  Orion, and a couple 10 million on the real estate investments.

19         So, from the perspective of thinking how the

20  government was going to argue loss amount, there were any

21  number of ways that they could have gotten to over 400 million.

22  If they just focused on the unauthorized investments, they were

23  over four. If they just focused on the promissory notes, they

24  were well over five. If they used the methodology employed by

25  receiver report, you were in a much bigger number than that.

1    And then, the most worrisome of all, when we did the

2 math after looking at the statements, the most worrisome of all

3 was if you accept the proposition that misrepresentations were

4 made to basically every investor over a 10-year-plus period,

5 then arguably every dollar that comes in is factored into the

6 loss amount calculation under the guidelines without any

7 reduction for amounts that go back.  Now, in my view, that's

8 utterly perverse, but that's how the guidelines work.

9    Those are all least four that I remember off the top

10 of my head ways that the government could, in my view, could

11 easily gotten into a loss amount well north of 400 million.

12 Q.  These were facts that were not known to you before

13 February 5, correct.  That's what you told Judge Kram --

14 A.  No, didn't tell any judge -- hold on.  I accurately

15 represented to Judge Cedarbaum that, if we were going to trial,

16 that was not something that we could do without looking at

17 discovery, that the discovery was voluminous, and that we

18 didn't have it, and we needed more time.  Full stop.  Okay.

19 And the categories that I just described to you, I did not know

20 nearly as much about them before I got the discovery, as I did

21 afterwards.  But --

22 Q.  You got the discovery?

23 A.  And we reviewed it and those were the conclusions that we

24 came to.

25 Q.  Did you discuss those with your client?

 1    A.  Yes, we did.

 2    Q.  You said that you couldn't have known --

 3    A.  We also discussed, by the way --

 4    Q.  Excuse me, I'm asking a question.

 5    A.  Okay.

 6    Q.  You said you couldn't have come to these conclusions

 7    without reviewing the discovery, which you concede you didn't

 8    get to look at before December, because you didn't have it

 9    until December?

10    A.  Correct.  You could not evaluate the government's

11    characterization of the proof at the Monsanto hearing fully

12    without benefit of additional materials, which we did get.

13    Q.  So you had to rely on the government's representations, for

14    example, you had to rely on the government's representations

15    that anybody was being defrauded.  Because you didn't have any

16    documentation to back that up, correct?

17    A.  Before we got the discovery, correct.  After we got the

18    discovery, we did.

19    Q.  I'm talking about before you got the discovery.

20    A.  Okay.

21    Q.  I'm talking as of February when you still hadn't had a

22    chance to evaluate the discovery.

23          By the way, all the things you just recited in your

24    answer, I assume that you took notes as you went through the

25    discovery.  Or did you memorize all this?

1   A.  No, I mean, I don't know, I'm not a big note taker.  I tend

2   to type things and work them up into memos and stuff.  But I

3   wasn't the only one.

4   Q.  Did you produce them to the government?

5   A.  Did we produce them to the government?

6   Q.  That was the question.

7   A.  We certainly never gave any of our work product to the

8   government.

9   Q.  The government asked you for certain documents, didn't

10  they?

11  A.  No.

12  Q.  I'm asking you to produce any memos you have with the

13  discovery that you reviewed before March 1st of 2014.

14  A.  Understood.

15  Q.  You've characterized this $440,000 --

16          THE COURT:  Million.  Million.

17  Q.  Sorry, Judge.  Million as loss, correct?

18  A.  Hold on a second.  I think you're talking about the $440

19  million number that's stipulated to in the plea agreement.  Am

20  I right about that?

21  Q.  Correct.

22  A.  Okay.  That is the loss amount.  And you asked me questions

23  about what I reviewed that suggested to me that the government

24  could prove that loss amount.

25  Q.  You've already answered that question.  Now I'm asking you

1    a different question.

2    A.   Okay.

3    Q.   I'm asking you why you think that was a loss.

4    A.   Why do I think it was a loss?

5    Q.   Other than the government telling you it was a loss, what

6    makes you think it was a loss?

7    A.   Sure.  If you look at the investor agreements, as we did,

8    once we got them in discovery.

9    Q.   So as of the time you were negotiating the plea, you had

10   not looked at these things, correct?

11   A.   No.

12   Q.   You started negotiating the plea a week after you saw the

13   judge, and you told the judge you hadn't looked at it?

14           MR. BHATIA:  Objection, your Honor.

15           MS. KELLMAN:  Can I finish my question?

16           THE COURT:  Yes.

17   Q.   Are you saying you were able to review 87 gigabytes of

18   material in that one week?

19   A.   No, I'm not.

20           MR. BHATIA:  Your Honor, we are asking that the

21   witness be allowed to finish the end of his answers.

22           THE COURT:  Sure.

23   Q.   When you were negotiating this plea with the government,

24   and agreed to stipulate to a guideline range of 360 to life,

25   you felt confident that your client couldn't do that because,

1   one, he either wouldn't live that long, or the statute capped

2   it at a measly 20 years, correct, so he was safe.  Correct?

3   A.  No.  He was not safe.  He was unfortunately facing the

4   prospect of a potential 20-year sentence.  And we were doing

5   our level best, under the circumstances and given the evidence,

6   to avoid that.

7   Q.  Would it be fair to say you characterized the potential

8   exposure that Mr. Walsh faced to him as being a single digit

9   kind of risk?

10  A.  What I remember telling him was that if he got a sentence

11  in the five-to-seven-year range, that would be a home run.

12  Q.  Does the name Sickler mean anything to you?

13  A.  It does.

14  Q.  Who is Mr. Sickler, Joel Sickler?

15  A.  He is a bureau of prisons consultant.

16  Q.  Did your firm consult with Mr. Sickler in connection with

17  potential designations for Mr. Walsh?

18  A.  Yes, I believe that Mr. Walsh -- one of us did.  Either the

19  firm did or Mr. Walsh did I think Mr. Walsh did.

20  Q.  Mr. Walsh did what, consult?

21  A.  Engaged him.  Engage his services.

22  Q.  Do you know whether or not it was in fact your partner

23  Justin Sher who retained?

24  A.  It may have been, I don't remember.

25          MS. KELLMAN:  Your Honor, may I approach?

1          THE COURT:  Yes, ma'am.

2          MS. KELLMAN:  Showing the witness an e-mail between

3    Justin Sher and Joel Sickler.

4          I believe this is in evidence, Judge.

5    Q.  I'd like you to take a look at that and see if it refreshes

6    your recollection that it was Justin Sher who engaged the

7    services of Mr. Sickler.

8    A.  I don't think I'm on this e-mail.

9    Q.  But you can read your client's name -- I mean your

10   partner's name?

11   A.  It suggests to me very strongly that Justin engaged him,

12   yes.

13   Q.  Who was taking lead on this case during the negotiating

14   stages, you or Mr. Sher?

15   A.  I think we were both quite involved, but I think it's fair

16   to say I was taking the lead.

17   Q.  Was Mr. Sher present at any of the negotiations with the

18   government?

19   A.  He was.

20   Q.  Would it be fair to say that when a law firm has

21   discussions with the jail expert, a BOP expert in designations,

22   that it would make sense to give this expert a sense of what

23   kind of a sentence you might be anticipating, so that he could

24   gear his research to the amount of time the person might be

25   facing, correct?

```
1   A.  Yeah, as I remember --

2   Q.  Yes or no?

3   A.  Yes.

4   Q.  It is a yes or no question.

5   A.  Sure.

6   Q.  You agree with me, for example, if somebody was facing

7   mandatory life, and there was not much choice the judge had,

8   that you'd ask this expert to look at the best penitentiaries

9   for your client, based on whatever personal circumstances that

10  person had, correct?

11  A.  That is correct.

12  Q.  So there would be a relationship in your request between

13  that time which your client was facing, and the kind of

14  institution that might reasonably be recommended for a

15  designation, correct?

16  A.  Yeah, I think that's the purpose of engaging them.  They

17  know that world, and you give them information, and they make

18  suggestions.

19  Q.  And the information you give them is based on what you

20  hope, anticipate, expect, the sentence to be, correct?

21  A.  Look, as I recall, Mr. Sickler reviewed the PSR, he

22  prepared a memo, which indicated that he had reviewed the PSR

23  with Mr. Walsh, and he indicated that there were three, in his

24  view, likely outcomes.  One -- if I remember off the top of my

25  head, 24 to 36, I think there was a comment in his report to
```

1    the effect we would have to be extremely lucky for that to

2    happen.  Another range in the north of 36 months to like 50

3    months or something like that.  And then 120 months.  And then

4    there's a comment, if I remember the report correctly, saying

5    we really have no idea, it's up to the judge, we are basically

6    looking at a crystal ball, but we're going to use these three

7    basic ranges.  A low end of two to three years, a middle single

8    digits range, and a 10-year range, because that put Sickler in

9    a position to propose potential BOP facilities, which, as I

10   understand it, you qualify for some if you are in the low

11   range, you qualify for others if you are in the middle range,

12   and if you're over 10 years, there's a different set of options

13   available to you.

14   Q.  So if I understand your testimony, Mr. Sickler had an

15   opportunity to review the presentence report, which recommended

16   a 20-year sentence, correct?

17   A.  It's in his report that he reviewed the PSR, yes.

18   Q.  You just said he reviewed the presentence report.  Are you

19   now saying you don't know whether he did or not?

20   A.  I was not with him when he did his analysis.

21   Q.  Do you think he was lying to you when he told you that?

22   A.  I just have the benefit --

23   Q.  Mr. Tremonte, a moment ago you testified that before he

24   gave you these recommendations, he read the presentence report

25   and discussed it with Mr. Walsh.

1    A.  No.

2    Q.  Do you now say --

3    A.  We are not having a real disagreement.  What I am saying is

4    the report he prepared -- I don't remember talking to the man.

5    The report that he prepared said that he reviewed the PSR in

6    connection with his analysis.

7    Q.  And I am asking you then, did the PSR, am I correct the PSR

8    recommended a 20-year sentence?

9    A.  The PSR -- again, I don't have it in front of me.  The PSR

10   says his sentencing range is zero to 20.  The PSR says that his

11   guidelines range is effectively zero to 240 months, and the PSR

12   says, again, if memory serves, you can show it to me,

13   probation, like the government, recommended a guideline

14   sentence.

15   Q.  That's what I asked you.  That's all I asked you.

16   A.  Yes.

17   Q.  So, as a result of reading the probation report and

18   determining that the probation department and the government

19   were recommending a 20-year sentence, Mr. Sickler provided --

20   who is Valerie by the way?

21   A.  An associate.  Valerie Gotlib.

22   Q.  Was an associate of your firm?

23   A.  Was.

24   Q.  And so Mr. Sickler wrote a letter, an e-mail to Valerie and

25   Justin, about this very topic, and that was what institutions

1   as a result of reading the probation report, and hearing that

2   there was a 30 year -- a 20-year recommendation, wrote and said

3   the following:

4           If the sentence is less than 24 months, please ask the

5   Court to recommend the satellite facility at FCI Otisville.

6           Was there anything in the presentence report that you

7   recall spoke to a 24-month sentence?

8   A.  Only in the sense that he has a guidelines range.  We asked

9   for a 24-to-36-month sentence in our sentencing submission.  It

10  was clearly something that we were determined to do in

11  consultation with the client, was seek a sentence that was way

12  below the 20-year recommendation of the probation department.

13  Q.  But you didn't say that he looked at your sentencing memo.

14  You said that, after looking at the presentence report, and the

15  government's recommendation, that he would then formulate

16  recommendations.  And he recommended, after looking at a

17  20-year recommendation from probation and the government, he

18  recommended if the sentence is in the 24-month range, ask for a

19  recommendation of the satellite camp at Otisville.  If it is

20  between 24 and 42 months, then ask for a designation at the

21  satellite camp at USP Lewisburg.  If it is greater than 42

22  months, well, then go back to your request for the satellite

23  camp at Otisville.

24  A.  So what's the question?

25  Q.  Do you recall whether or not that's what Mr. Sickler wrote

1    to your firm in connection with his recommendations?

2    A.  I don't, although it sounds generally correct to me.

3         MS. KELLMAN:  May I approach, your Honor?

4         THE COURT:  Yes, ma'am.

5    A.  Yeah, again, I'm not on this e-mail, but this sounds like

6    what I heard at the time.  Which was Mr. Sickler was offering

7    recommendations, had been engaged to make recommendations, and

8    he took it upon himself, based on the information that was

9    available to him and the conversations that he had with our

10   client, Mr. Walsh, to make recommendations on three different

11   categories.  It looks like number one is if the sentence is

12   less than 24 months --

13   Q.  I just read them all.

14   A.  Okay.

15   Q.  You say that you're not on this e-mail.  But this is Justin

16   Sher's e-mail address; am I correct?

17   A.  That's entirely consistent --

18   Q.  This is your firm?

19   A.  If I can finish.  It's entirely consistent with my

20   understanding of what Mr. Sickler was saying at the time.

21   Q.  I am not asking you that.

22        MR. BHATIA:  Objection, your Honor.

23   Q.  I asked about an e-mail address.

24        THE COURT:  Stop.  Stop.  Question.

25   Q.  Is this Mr. Sher's e-mail address?

1    A.  It is.

2    Q.  Is it Valerie Gotlib's e-mail address?

3    A.  It was.

4             MS. KELLMAN:  I'd offer it, your Honor.

5             MR. BHATIA:  It's already in evidence, your Honor.

6             MS. KELLMAN:  Then I don't offer it.

7             THE COURT:  Thank you.

8             THE WITNESS:  Your Honor, may I have a little more

9    water?  I'm out of water.

10            THE COURT:  Certainly.

11   Q.  By the way, at the time that sentence was pronounced, you

12   didn't ask for any recommended designation, correct?

13   A.  We did not.

14   Q.  Would you agree with me that was, because given the nature

15   of the sentence, that there was, it would be fair to say, some

16   kind of pandemonium that exploded at the end of the sentencing

17   proceeding?

18   A.  To be precise, it was our view that the sentencing

19   proceeding had not ended, and that sentence had not been

20   pronounced.  So at that time, it would not have been

21   appropriate to ask for a designation.

22   Q.  Was that because you believed that because the judge had

23   given you an opportunity to explore the possibility of your

24   client withdrawing his plea; is that right?

25   A.  We had requested that, and the judge, as I interpreted her

1  words at the time, agreed.

2  Q.  I think you told us that some time shortly after that day,

3  in October, that Paul Shechtman was retained to participate in

4  this litigation, correct?

5  A.  Yes.

6  Q.  And did you have conversations with Mr. Shechtman about

7  what his role would be?

8  A.  Yes.

9  Q.  What did he tell you; what did you tell him?

10 A.  I told him I understood that he was going to be taking the

11 lead.  That he was being brought in to essentially advise the

12 client as to the best next steps under these difficult

13 circumstances.

14 Q.  Well, when you say advise the client as to the next best

15 steps, what was Mr. Shechtman -- did Mr. Shechtman work for the

16 United States attorney's office at any point in his life?

17 A.  I think he did.  I'm not sure.

18 Q.  Really.  Do you know whether or not he was the chief of the

19 criminal division?

20 A.  It wouldn't surprise me.

21 Q.  But you don't know that as you sit here today?

22 A.  I think I remember seeing his picture up, upstairs at the

23 U.S. attorney's office, yes.

24 Q.  Would it be fair to say Mr. Shechtman was going to be

25 taking the lead, he was going to go up to the U.S. attorney's

1  office and try to negotiate Mr. Walsh out of the mess that he

2  found himself in, correct?

3  A.  Are you asking if I agree with your characterization?

4  Q.  Yeah.

5  A.  No.

6  Q.  Okay.

7  A.  Mr. Shechtman was brought in by the family to advise them

8  for reasons that they discussed with him.  He said to me, look,

9  I'm here, let's see if we can figure this out.  And he advised

10  on every step from that moment forward that we took, or that

11  Mr. Walsh took in connection with this matter.

12  Q.  Would it be fair to say that whatever it was he was doing

13  on behalf of Mr. Walsh, you were a partner in that.  You

14  understood what he was doing.  He wasn't keeping it secret from

15  you, correct?

16          MR. BHATIA:  Objection, your Honor, to the knowledge.

17          THE COURT:  We can ask so far he knows.  Are you able

18  to answer that one, sir?

19          THE WITNESS:  I think so.

20          THE COURT:  Yes, sir.

21  A.  He was having communications with Mr. Walsh and his family

22  separate from me.  But I don't know that -- I have no reason to

23  believe he kept anything secret from me.

24  Q.  But then you and he had conversations, correct?

25  A.  We did.

179 179

1    Q.  Did he repeat to you or discuss with you the kinds of

2    conversations that he was having with Mr. Walsh and his family?

3    A.  To some extent, yes.

4    Q.  It wouldn't have been important for you to know what was

5    going on before -- withdrawn.

6          You went up and saw the U.S. attorney to discuss

7    possible resolution or possible ways forward after that aborted

8    sentencing, correct?

9    A.  With Mr. Shechtman, yes.

10   Q.  Yes.  And did you also have conversations with Mr. Walsh

11   about it?

12   A.  I believe so.  I don't remember the specifics but I believe

13   so.

14   Q.  So maybe not all at the same time, but at some point, you

15   had in your head Mr. Walsh's thoughts and Mr. Tremonte's

16   thoughts.

17   A.  I definitely had my own thoughts.

18   Q.  I assume you had your own thoughts.  But you also had the

19   benefit of Mr. Walsh's thoughts and Mr.  -- and Mr. Shechtman's

20   thoughts?

21   A.  I don't know what they discussed apart from me.

22   Q.  He didn't tell you and neither one of them told you.  You

23   met with them, and neither one of them told you what they

24   discussed?

25   A.  I don't remember having conversations with Mr. Shechtman,

1    certainly not extensive ones, about what he discussed with

2    Mr. Walsh.  I remember having extensive discussions with

3    Mr. Shechtman about the research we were doing, the decisions

4    we had to make, and the strategy for withdrawing the plea,

5    making additional arguments, how to approach the U.S.

6    attorney's office.  And one that we had a lot of back and forth

7    about was whether or not to initiate a proceeding, I forget

8    exactly what it's called, but to suggest to the district that

9    it was warranted under the circumstances to initiate an

10   investigation into Judge Cedarbaum's potential disability.

11   Q.  This was under the rules for judicial conduct and judicial

12   disability proceeding?

13   A.  Correct.

14   Q.  And you did a fair amount of research on that?

15   A.  We did -- I don't remember exactly.

16   Q.  Why was that?

17   A.  Why?

18   Q.  Yeah.

19   A.  We researched it because we wanted to know how you would do

20   it.  How would you formally call into question or try to

21   initiate an investigation by the district into the competency

22   of a sitting district court Judge.

23   Q.  Would you do that just because you thought her sentence was

24   high?

25   A.  No.

1    Q.  Why would you even think about doing something like that?

2    A.  Well, as I testified before, we had been in front of Judge

3    Cedarbaum on a couple of occasions by the time we got to the

4    sentencing hearing.  And there were aspects of her speech and

5    aspects of her demeanor and aspects of her conduct that

6    suggested to me and to others, though we're no mental health

7    professionals, that there were cognitive issues.

8    Q.  Would it be fair to say you had concerns about whether or

9    not she was cognitively impaired?

10   A.  We certainly did.

11   Q.  And did you undertake that as a potential direction that

12   you might go post sentencing?

13   A.  Yes, we thought about it.  We internally we thought about

14   it at my firm, we talked about it at some length with

15   Mr. Shechtman.  We did research on it.  I believe we prepared a

16   memo, which is one of several that we shared with

17   Mr. Shechtman, and I think we talked to some other

18   practitioners about it as well.  I can't remember who.

19   Q.  Ultimately you decided not to proceed that way?

20   A.  The decision -- I don't remember exactly who took the lead

21   on this, but the decision at the end of the day was not to do

22   it.

23   Q.  That was notwithstanding that you believed that the judge

24   was cognitively impaired?

25   A.  Again, I'm not a medical professional.  But, our experience

1    of her on the handful of occasions when we were before the

2    judge, our review of the transcripts, our discussions with

3    others, including the assistants on the case, suggested to us

4    that was a possibility.

5    Q.  So the assistants on the case also thought that the judge

6    might be cognitively impaired?

7           MR. BHATIA:  Objection, your Honor.

8    A.  I can't say what they thought.

9           THE COURT:  Counsel.  There was an objection.  Basis?

10          MR. BHATIA:  He can't testify as to someone else's

11   state of mind, your Honor.

12          THE COURT:  What did they tell you, if anything?

13          THE WITNESS:  I don't remember the specifics.  I

14   remember we had conversations about it.  Other than I remember

15   either one of the two assistants, either Jessica Masella or Ben

16   Naftalis, who was handling the case at the time, suggesting

17   that we -- that is to say suggesting that Paul Shechtman and I,

18   make an appointment to speak with Joon Kim, who was at that

19   time in the leadership at the Southern District U.S. attorney's

20   office, and them indicating, in sum and substance, that he or

21   others in the leadership were aware that she, you know, had

22   been ill, and that there were -- there were issues.

23   Q.  In fact, would it be fair to say that even at the

24   sentencing, there were certain incidents that occurred that

25   reinforced your thought that she might have some kind of

1   cognitive impairment?  Am I right?

2   A.  Yes, that's correct.

3   Q.  You put in your own -- in the declaration that we've

4   offered into evidence here, a discussion between you and the

5   Court and Mr. Walsh in which the Court was very firm about the

6   instruction that she had given Mr. Walsh at the time of his

7   plea with respect to the important right he would be giving up

8   if he were to waive his right to appeal.  And you did not

9   correct her, correct?

10  A.  Yes, it's exactly as I said in my affidavit.  Which I think

11  verbatim quotes the transcript of the hearing.

12  Q.  And in fact, you knew, because you were there, that Judge

13  Cedarbaum had not in fact given Mr. Walsh those warnings,

14  because she hadn't taken the plea; am I right?

15  A.  Correct.

16  Q.  And in fact, Magistrate Judge Fox, who did take the plea,

17  did not tell Mr. Walsh that he was giving up his right to

18  appeal absolutely as long as he got a sentence below 20 years

19  of 20 years or less, correct?

20  A.  I think that's right.  He did not use the categorical

21  language.

22  Q.  You did not correct him either?

23  A.  That is correct.

24  Q.  Just to revisit one issue, if I may.  And I won't belabor

25  it.  But in your declaration did you also say that in

1   connection with communications with Mr. Sickler that you, you

2   or someone at your firm repeated to him or informed him that

3   the firm's hope was that the sentence would be in the single

4   digits?

5   A.  That sounds right.

6   Q.  And did you also share that hope with Mr. Walsh?

7   A.  Yes.

8           MS. KELLMAN:  Your Honor, I believe we offered the

9   declaration earlier today and I think it's in evidence.  But

10  I'd just like to show it to the witness.

11          THE COURT:  Yes, ma'am.

12  Q.  Showing the witness his declaration of Michael Tremonte

13  which is in evidence as Exhibit 2.

14          Do you recognize that document and your signature on

15  the last page?

16  A.  I do.

17  Q.  Thank you.  Now, you've characterized the end of the

18  judicial -- the sentencing proceeding that day as not complete,

19  correct?

20  A.  That was my understanding.

21  Q.  And that was, to some extent, as a result of Judge

22  Cedarbaum saying, well, let me know if your client wants his

23  plea back or words to that effect, correct?

24  A.  What happened at the end of that proceeding left it very

25  unclear where the matter stood.  And I think, just back to your

1   earlier question, the whole sort of final five minutes of the

2   transcript to my mind are further indication that Judge

3   Cedarbaum was encountering some difficulties in fully

4   appreciating what was happening at the proceeding.

5          I imagine that when she was at the top of her game,

6   she probably would have said, no, you can't withdraw your plea,

7   there's no ground for that.  No, you can't make additional

8   arguments, there's no ground for that.

9          But, we were succeeding in, as I said earlier,

10  throwing a wrench in the works.  And my understanding at the

11  end of the proceeding was that it was open.  It's an

12  understanding that I shared with the assistant, and he agreed.

13  Q.  Now, so, it's your understanding -- it's your

14  characterization then, if I'm understanding you, that Judge

15  Cedarbaum's behavior had the last few minutes of the sentencing

16  proceeding supported your idea that she might be cognitively

17  impaired?

18  A.  My intuition.  Again, I'm not a medical professional.

19  Q.  But among the words that were spoken as the sentencing

20  proceeding was winding down were among two that I'd like to

21  inquire of you.  One is whether or not the judge said does your

22  client want to withdraw his plea.  Did she ask that question?

23  A.  Did Judge Cedarbaum ask that question?

24  Q.  Yes.

25  A.  I believe so.

 1   Q.  Do you want to see the transcript?  Will you take my
 2   representation?
 3   A.  I take your word.  I think that's what happened, yes.
 4   Q.  Would it be fair to say that you were taken aback by the
 5   sentence?
 6   A.  Yes, indeed.
 7   Q.  Would it be fair to say that your being taken aback
 8   bordered on being stunned?
 9   A.  Yeah, but again, the same distinction I drew earlier.
10   There's the sentence, and there's the circumstances of the
11   sentence being handed down by the judge.  Like I said before,
12   we knew that there was a 20-year cap.  That it was
13   theoretically possible that the Court could go there.  But as
14   you know from our sentencing submission, those are good
15   arguments, those are very, very strong arguments.  There were
16   lots of excellent reasons why Mr. Walsh should not be sentenced
17   to the statutory maximum.
18           This case was highly unusual, both in terms of the
19   economics.  As we argued in our sentencing submission,
20   99 percent of the principal amount involved in the fraud by the
21   time of sentencing had been returned to the institutional
22   investors.
23           There were also extraordinary circumstances in terms
24   of Mr. Walsh's personal history and characteristics.  The
25   so-called 3553(a) factors.  He had had an extraordinary career.

1    He was a very good and decent human being, a supportive and

2    loving father, and a pillar of the community.

3        So, given everything that we said, which we meant,

4    right, in my view, shouldn't have been 20 years.  But again,

5    reasonable people can debate that.

6        What was stunning to me was that the judge reached

7    that conclusion without, in my subjective view, fully

8    appreciating and making the fine judgments that are necessary

9    to render a sentence in a case like this.  And that belief was

10   further supported when I read the Second Circuit's opinion

11   sending back Mr. Greenwood's sentencing.  At that sentencing

12   proceeding, there were also irregularities, including the judge

13   remarking on devastating losses to individuals.  As the circuit

14   pointed out, no one was devastated and there were no

15   individuals.

16       The totality of the circumstances, our sentencing,

17   Greenwood's sentencing, the last conference that we had in

18   Judge Cedarbaum's chambers.  We waited several hours in the

19   anteroom, and when we finally got there, it, it -- the judge --

20   I mean, I don't mean to be indelicate.  The judge's conduct

21   suggested to us, I think to everyone, that she didn't fully

22   appreciate what was happening.

23       So that's what was stunning to me, and I was trying to

24   stop the show.  Because, although I had never encountered

25   circumstances like this before, in my head I'm thinking is

1  there something we can do to change this.

2  Q.  When you said there was a conference in chambers, when was

3  that?

4  A.  I don't remember.  I think it was the last status

5  conference we had or the one before.

6  Q.  Before sentencing or before plea?

7  A.  No, I'm sorry.  It was before the plea.  I don't remember

8  when.  I know that it's one of the conferences where we

9  discussed the problems with discovery.  And that didn't happen

10  only once.

11  Q.  So, you're saying that back as early as November or

12  October, November or December or January of 2013 and '14, that

13  there was a conference in chambers at which you left thinking

14  that the judge was suffering from some kind of cognitive

15  impairment?

16  A.  I think it was -- I don't remember the exact timing.  It

17  was more than just conjecture at that point in the sense that

18  we had heard that Judge Cedarbaum had suffered a stroke.  I

19  believe that conference was after she had suffered the stroke,

20  and we had heard she was on the mend, that she was doing better

21  in the months leading up to sentencing.  So I think that's what

22  the sequence was.

23  Q.  And the conference where you walked out thinking she was

24  impaired was before the stroke or after the stroke?

25  A.  I believe it was after.

1    Q.  Was it before the plea?

2    A.  I don't know for sure.  And I believe it was before the

3    plea.

4    Q.  Before the plea.

5    A.  Yes.

6    Q.  Thinking that the judge might be cognitively impaired, is

7    that what caused you to begin to do research with respect to

8    the judicial disability act?

9    A.  After the sentencing, yes.

10   Q.  Well, you said that you began to suspect cognitive

11   impairment before the plea.

12   A.  Yeah, but we didn't --

13   Q.  You went forward with the plea?

14   A.  We went forward with the plea.

15   Q.  You went forward with the sentencing?

16   A.  Correct.

17   Q.  It wasn't until you couldn't fathom the 20-year sentence

18   that you began to think, maybe we should look at the cognitive

19   impairment issue?

20   A.  Correct.  Remember, the word around the courthouse was

21   that, you know, the plea was taken before a magistrate, our

22   understanding was that was in part because Judge Cedarbaum was

23   recovering.  So I don't think we saw her between that status

24   conference and the sentencing hearing.  And so we started -- to

25   your question -- we started the research in the hours following

1    the sentencing hearing, as I recall it.

2    Q.  In fact, at sentencing, Judge Cedarbaum on a number of

3    occasions referred to the fact that she had in fact taken the

4    plea when in fact she had not taken the plea.  She had

5    delegated it to the magistrate, correct?

6    A.  I believe that's right.

7    Q.  You did not correct her?

8    A.  No, she corrected herself eventually.

9    Q.  Eventually.  During that proceeding, during the sentencing

10   proceeding -- just say that the judge corrected herself, would

11   it be fair to say that her correction was triggered by the

12   United States attorney helping to refresh her recollection that

13   in fact she had not given the defendant any instructions with

14   respect to the appellate waiver, because she had referred the

15   plea to the magistrate?

16   A.  That sounds right.

17   Q.  Would it be accurate to say also that after this 20-year

18   sentence was announced, that one of the suggestions that you

19   made to the Court was that she impose a sentence of 20 years

20   plus one day, correct?

21   A.  Yes.

22   Q.  And you knew that to be an illegal sentence, correct?

23   A.  Correct.

24   Q.  And even Judge Cedarbaum knew that to be an illegal

25   sentence, correct?

1    A.  Correct.

2    Q.  But you were doing what you could to figure out a way to

3    salvage Mr. Walsh's right to appeal, correct?

4    A.  Just throwing a wrench in the works, yes, one of several.

5    Q.  We started on this several times and I hope we can get

6    through it this time.  There came a time when, among the things

7    that were being discussed after the sentencing proceeding, was

8    whether or not Mr. Walsh wanted to withdraw his plea.  Correct?

9    A.  Correct, yes.

10    Q.  And did you have conversations with Mr. Walsh about that?

11    A.  I don't remember if I had conversations directly with

12    Mr. Walsh about that.

13    Q.  Did you have conversations with Mr. Shechtman about it?

14    A.  I did.  In fact Mr. Shechtman -- so we had a series of

15    conversations, and then Mr. Shechtman drafted a letter to the

16    Court indicating that we were going to withdraw the plea.  I

17    called or e-mailed him or both and said I am not so sure about

18    that.  We discussed it.  And his view prevailed.

19    Q.  That --

20    A.  And then we filed the letter.

21    Q.  You filed a letter informing the Court that --

22    A.  -- Mr. Walsh --

23    Q.  -- would not be seeking to withdraw his plea.

24    A.  Correct.

25    Q.  That letter was filed on November 4, 2014, correct?

1    A.   It sounds right.

2              MS. KELLMAN:   May I approach, your Honor?

3              THE COURT:   Yes, ma'am.

4              MS. KELLMAN:   Showing the witness what's previously

5    been received in evidence as Exhibit 8.

6              THE COURT:   Thank you.

7    A.   That is correct.

8    Q.   This is the letter that you filed with Judge Cedarbaum

9    informing her that the defendant would not be moving to

10   withdraw his guilty plea?

11   A.   That is correct.

12   Q.   Did you show this, share this letter with Mr. Walsh before

13   you filed it?

14   A.   I don't recall.

15   Q.   Would it surprise you that the first time Mr. Walsh learned

16   about this was in an e-mail from you on November 5, 2014?   The

17   day after it was filed?

18   A.   Yeah, it would be surprising to me that Mr. Shechtman

19   didn't discuss it with Mr. Walsh.

20   Q.   When you say Mr. Shechtman, it's your letter, right?

21   A.   As I mentioned earlier, Mr. Shechtman drafted that letter

22   and sent me the draft.   We had a debate about it, and his view

23   prevailed.

24   Q.   And you wrote the letter?

25   A.   No, he wrote the letter.

1  Q.  You signed the letter and it's on your letterhead?

2  A.  That's correct.

3  Q.  You did not show it to your client before you filed it?

4  A.  As I said, I don't recall.

5  Q.  Let me show you some e-mails.

6  A.  So it starts here --

7  Q.  Do you recognize the e-mails?  Do you recognize those

8  e-mails?

9  A.  I don't remember them, but they're mine.

10  Q.  That's your e-mail address, correct?

11  A.  Yes, that's right.

12        MS. KELLMAN:  I offer what is a part of the record in

13  any event as Walsh exhibits, in the Walsh exhibits, it's page

14  72 of the Walsh exhibits, from the 2255 position.

15        THE COURT:  Thank you.  I guess counsel is offering

16  it.

17        MR. BHATIA:  I believe it's already in evidence as

18  Defense Exhibit 9.

19        THE COURT:  Thank you.

20  Q.  I want to read from it if I may.  On November 4, did you

21  write and say:  We ran it by Sarah and assumed she was sharing

22  it with you?

23  A.  That is what the e-mail says, yes.

24  Q.  Well, is there anybody else who writes e-mails and signs

25  your name?

```
 1   A.  No, no.

 2   Q.  And did you then forward on November 5 the actual letter to

 3   Mr. Walsh with a notation this letter as filed is attached?

 4   A.  Yes, after he said okay.

 5   Q.  After he said okay to see it?

 6   A.  He just said okay in the letter.  I don't remember this

 7   exchange.  But yes, it appears to have happened.

 8   Q.  When you say he said okay, it wasn't an okay to the

 9   substance, because you'd already filed the letter.

10   A.  It just says okay.

11   Q.  I'm asking you, could he have been saying okay to something

12   you had already filed or okay, please, send me the letter?

13   A.  It could be either way, I don't know what he intended.

14   Q.  But you did not show him this letter before you filed it,

15   correct?

16   A.  As I said twice, I don't remember.

17   Q.  Well, doesn't this e-mail refresh your recollection?

18   A.  It suggested that --

19   Q.  That you gave it to Sarah and not my client?

20   A.  Yeah, it suggests that I didn't.  I don't remember.

21   Q.  Reading the e-mails from your e-mail account doesn't

22   refresh your recollection?

23   A.  Does not refresh my recollection.  No.

24          MS. KELLMAN:  Your Honor, I'm not sure if I offered

25   the letter to Judge Cedarbaum in which Mr. Tremonte informs her
```

1    that they will not be moving to withdraw his guilty plea.  It's

2    dated November 4, it is document 1-1, and it's page 69 of the

3    petition.  But I'd offer it as a hearing exhibit.

4          MR. BHATIA:  Your Honor, I believe that's in evidence

5    already as a Defense Exhibit 8.

6          THE COURT:  Thank you.

7    Q.  I think you said earlier that when you heard the 20-year

8    sentence, that you found it quite jarring to say the least,

9    correct, or unexpected?

10   A.  That's not what I said.

11   Q.  Did you expect the 20-year sentence?

12   A.  I've now been over this twice.  We hoped for a lower

13   sentence.  We hoped for a sentence in the single digits.

14   Q.  Would it be fair to say then that when you heard a 20-year

15   sentence, that jarred you?

16   A.  The imposition of the 20-year sentence was jarring, yes.

17   Q.  During the course of the time that -- withdrawn.

18         MS. KELLMAN:  Your Honor, does the Court like to take

19   a break?  I may be finished but I just want to go through my

20   notes.  Anyway, if I can't that's fine.

21         THE COURT:  If you want to take a break, I'll do it.

22   But if you want to, you can stand there for three minutes.

23         MS. KELLMAN:  That's fine, Judge.

24         THE COURT:  Thank you.

25         (Pause)

```
 1                MS. KELLMAN:  Very briefly if I may, Judge.

 2                THE COURT:  Yes, ma'am.

 3    Q.  Mr. Tremonte, will you take my representation that you had

 4    a meeting with the United States attorney's office on March 3,

 5    2014?

 6    A.  I will.

 7    Q.  At that meeting, do you recall that meeting being about the

 8    possibility of a plea, the beginning of a discussion of a

 9    guilty plea?

10    A.  I don't recall the meeting, but it sounds right.

11    Q.  Do you recall, without worrying about the date, do you

12    recall having a meeting with the government in which you

13    represented to the government that you believed Mr. Walsh's

14    case to be a triable case?

15    A.  I'm sure I said multiple times words to that effect to the

16    government, yes.

17    Q.  Would you agree that you also said to the government that,

18    while they have a good circumstantial case, that it was not

19    without its weaknesses?

20    A.  I'm sure I said that multiple times as well.

21    Q.  Did you tell them that Mr. Walsh was not involved in the

22    day-to-day operations of the business?

23    A.  Definitely told him that.

24    Q.  Did you tell them that your client was in denial?

25    A.  It wouldn't surprise me if I did say that.
```

```
 1              MS. KELLMAN:  I have nothing further, Judge.

 2              THE COURT:  Thank you.  Redirect, counsel?

 3              MR. BHATIA:  No redirect, your Honor.

 4              THE COURT:  Thank you.  You may step down, sir.  Thank

 5    you.

 6              THE WITNESS:  Thank you, your Honor.

 7              (Witness excused)

 8              THE COURT:  Any further witnesses for the government?

 9              MR. BHATIA:  None from the government.

10              THE COURT:  Any further witnesses for the petitioner?

11              MS. KELLMAN:  No, your Honor.

12              THE COURT:  Thank you.  Is there anything else you

13    want to do on the record or do you want to go off the record

14    and discuss what we're going to do next?

15              MR. BHATIA:  We can go off the record.

16              MS. KELLMAN:  I have nothing else for the record.

17              (Adjourned)

18

19

20

21

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                           Page

 3   STEPHEN WALSH

 4   Direct By Ms. Kellman  . . . . . . . . . . . . 4

 5   Cross By Mr. Bhatia  . . . . . . . . . . . .74

 6   Redirect By Ms. Kellman  . . . . . . . . . 107

 7   Recross By Mr. Bhatia  . . . . . . . . . . 113

 8   MICHAEL TREMONTE

 9   Direct By Mr. Bhatia . . . . . . . . . . . 116

10   Cross By Ms. Kellman . . . . . . . . . . . 147

11                     GOVERNMENT EXHIBITS

12   Exhibit No.                             Received

13    1022    . . . . . . . . . . . . . . . . .78

14    1013    . . . . . . . . . . . . . . . . .89

15    1019    . . . . . . . . . . . . . . . . 115

16                     DEFENDANT EXHIBITS

17   Exhibit No.                             Received

18    4    . . . . . . . . . . . . . . . . . .29

19    1, 2, and 3  . . . . . . . . . . . . . .29

20    5    . . . . . . . . . . . . . . . . . .43

21    6    . . . . . . . . . . . . . . . . . .46

22    8    . . . . . . . . . . . . . . . . . .50

23    9    . . . . . . . . . . . . . . . . . .54

24    10   . . . . . . . . . . . . . . . . . .60

25    11   . . . . . . . . . . . . . . . . . .63
```

12          . . . . . . . . . . . . . . . . . .72