KC1VTEMC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                              19 CR 696 (PAE)

ARI TEMAN,

               Defendant.                 REMOTE TELECONFERENCE

------------------------------x

                                          New York, N.Y.
                                          December 1, 2020
                                          10:37 a.m.


Before:

                    HON. PAUL A. ENGELMAYER,

                                          District Judge


                         APPEARANCES


AUDREY STRAUSS,
     Acting United States Attorney for the
     Southern District of New York
KEDAR S. BHATIA
JACOB GUTWILLIG
     Assistant United States Attorneys

JOSEPH A. DIRUZZO, III
JUSTIN GELFAND
JUSTINE A. HARRIS
NOAM K. BIALE
     Attorneys for Defendant


ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD

KC1VTEMC

|  |  |
|---|---|
| 1 | (Remote teleconference) |
| 2 | THE COURT:  I'm calling the case of *United States v.* |
| 3 | *Teman*, 19 CR 696. |
| 4 | Let me just begin by taking the roll. |
| 5 | Who do I have for the government? |
| 6 | MR. BHATIA:  Your Honor, Kedar Bhatia, for the United |
| 7 | States.  I'll be speaking today.  And I'm joined on the line by |
| 8 | Jacob Gutwillig, Assistant U.S. Attorney; as well as the case |
| 9 | agent, Detective Daniel Alessandrino. |
| 10 | THE COURT:  All right.  Very good. |
| 11 | Mr. Bhatia, for whatever reason, your voice is |
| 12 | projecting as faint.  So I will ask you, when you speak, to |
| 13 | speak up.  Thank you. |
| 14 | Who do I have for the defense? |
| 15 | MR. BIALE:  Good morning, your Honor. |
| 16 | This is Noam Biale, on behalf of Ari Teman. |
| 17 | Mr. Teman and I are present on the video link.  And on |
| 18 | the phone we have my colleague Justine Harris; and we also have |
| 19 | trial counsel, Justin Gelfand and Joseph DiRuzzo, also joining |
| 20 | us by phone. |
| 21 | THE COURT:  Very good.  All right.  Good morning to |
| 22 | all of you. |
| 23 | And Mr. Teman, just to confirm for the record that you |
| 24 | are present on the video and can hear and see what's being |
| 25 | said; you can hear and see us all. |

KC1VTEMC

1          THE DEFENDANT:  I believe so, your Honor.

2          THE COURT:  Well, I just need to make sure.

3          THE DEFENDANT:  I hear you.  I don't know if I'm not

4     hearing somebody else.  But right now everybody who has spoken

5     I've heard.

6          THE COURT:  Very good.  All right.  Terrific.

7          And is our court reporter there?

8          THE COURT REPORTER:  Yes, your Honor.  Good morning.

9          THE COURT:  All right.  Good morning.

10          I'm going to ask everyone to speak up.  For whatever

11     reason, Skype today is giving me a low volume for just about

12     everybody, even though I've got the volume on max.  It's

13     considerably less loud than the court hearing we had just a few

14     minutes ago in another matter, who knows why.

15          All right.  Let me begin just by welcoming back trial

16     counsel, Mr. Gelfand, Mr. DiRuzzo and Mr. Bhatia; and welcoming

17     to the case new counsel, Mr. Biale and Mr. Harris and, of

18     course, welcoming you, Mr. Teman.

19          There have been lots and lots of filings on the docket

20     of this case since trial, but I'm acutely mindful that our last

21     conference in this case was on the last day of trial, on

22     January 29th.  And boy does that feel like a lifetime ago, with

23     the intervening public health crisis.

24          Counsel and Mr. Teman, I just want to say I hope you

25     and your families and those close to you have been able to stay

KC1VTEMC

1  safe and healthy during these extraordinary eight last months

2  since the pandemic hit.  And with another wave upon us, you

3  have my wishes as well for continuing good health and safety

4  for you and yours.

5      I also want to welcome anyone who's auditing this by

6  telephone.  I'm glad at this time, when remote hearings are

7  requested for good and sound reasons and health and safety, as

8  Mr. Teman has done so here, that the public is able to attend

9  our conferences telephonically.

10     Unfortunately, it's not possible for members of the

11 public to watch by video.  Experience has shown that the

12 platforms used for video access grow more unstable with a

13 larger number of video participants, even those who just are

14 watching on the video and not themselves appearing.

15     My fellow judges and I regrettably have had a number

16 of conferences by video which got scuttled or interrupted by

17 technology problems.  And so our IT staff has advised us not to

18 overload the number of video attendees.

19     I do need to remind everyone listening that you are

20 not permitted to record these proceedings.  In an in-person

21 courtroom, that goes without saying, because spectators are not

22 permitted to bring recording devices into court.  But in a

23 remote proceeding, it's necessary for me to say that, so I just

24 did.  The court reporter is transcribing these proceedings; and

25 so if anyone would like a copy of the transcript to reconstruct

KC1VTEMC

1    what was said here, you're at liberty to order it.

2              All right.  We are here today for the sentencing

3    hearing in the case of *United States v. Ari Teman*, or at least

4    to begin the sentencing process in Mr. Teman's case.  I say

5    that because for reasons that I will be taking up with counsel

6    shortly, I have determined that I don't believe it will be

7    possible to complete that process today; instead, I think we

8    will only be able to cover but so much ground.

9              By sheer coincidence, about two minutes before I

10   jumped on this call, my chambers got an email from Mr. Biale

11   reaching the same outcome, I think, for a different reason,

12   having to do with a recent flurry of communications relating to

13   forfeiture.

14             Mr. Biale, I'm with you.  I have no intention of

15   reaching that issue today.  Indeed, I have a homework

16   assignment for counsel to reflect on involving that very issue.

17   So what I propose to do is take care of a number of

18   preliminaries, including one very important one which is going

19   to occupy counsel, and we will adjourn short of making any

20   decisions in the case.

21             MR. BIALE:  Understood, your Honor.

22             THE COURT:  All right.  Very good.

23             So before we turn to the substance of the hearing,

24   which, again, I don't think we're going to get to, there are a

25   number of preliminary matters I need to take up, so please bear

KC1VTEMC

1    with me.

2              The first involves the remote nature of this

3    proceeding.

4              We're in the midst of the COVID-19 pandemic.  I'm

5    conducting this proceeding pursuant to the authority granted by

6    Section 15002 of the CARES Act, and the standing orders issued

7    by our chief judge pursuant to that act.

8              I'm participating in this conference from the

9    courthouse in my chambers.  Counsel and Mr. Teman are

10   participating remotely.  Mr. Teman and lead counsel for each

11   side are participating by videoconference.  The remaining

12   counsel are participating by telephone.

13             I will ask everybody to please let me know immediately

14   if you are having any difficulty hearing the speaker, whether

15   it's me or an attorney or the defendant when they are speaking;

16   and as to the video participants, whether you are having any

17   difficulty seeing the other video participants.

18             I will, even in the truncated nature of this

19   proceeding, be calling on multiple people during the course of

20   this proceeding.  When I do call on you, I will try to do so

21   clearly by name.  If I haven't done so for some reason or you

22   otherwise have occasion to speak, including to let us know that

23   you can't hear or see something adequately, please identify

24   yourself by name for clarity of the record.

25             And please don't interrupt each other or me during

KC1VTEMC

1   this conference.  If we interrupt each other, it becomes

2   difficult for the court reporter to create an accurate

3   transcript of these proceedings.  I will give counsel obviously

4   a full opportunity, item-by-item or issue-by-issue, to be

5   heard.

6          All right.  I've been advised that the defendant,

7   Mr. Teman, cannot participate in person in the usual way today,

8   that is, by his being physically present in the courtroom,

9   without incremental risk to himself.  And that is as a result

10  of the COVID pandemic which is surging right now, including in

11  New York state, where we are; and Florida, where Mr. Teman

12  resides, and where I understand he is participating from

13  remotely.

14         Counsel in their submissions have put medical

15  information before the Court indicating that Mr. Teman has

16  heightened vulnerability to COVID-19 on account of a

17  respiratory history.  It is also not knowable when the COVID

18  pandemic will ease up, but there is good reason to doubt that

19  it will significantly abate in the next month or two.

20         Defense counsel, Mr. Biale, do you agree that for the

21  Court to conduct this proceeding in person at this time,

22  requiring Mr. Teman to travel to New York would present

23  heightened risks to his health?

24         MR. BIALE:  Yes, your Honor, I do.

25         THE COURT:  Government counsel, do you agree that that

KC1VTEMC

```
1    is so?

2              MR. BHATIA:  Yes.

3              THE COURT:  All right.

4              I find that conducting this proceeding in person is

5    not now -- that is to say in court the usual way, is not

6    reasonably available.  I do find that videoconferencing in the

7    manner that we are proceeding now, and teleconferencing for the

8    nonlead counsel participants, is reasonably available; and I

9    find that the defendant is able to participate in this

10   proceeding by videoconferencing means.

11             I have received a written waiver of right to be

12   present in court proceedings.  It was filed on Sunday.  It has

13   been docketed at docket 173.  I want to confirm with you,

14   Mr. Biale, that the defendant was advised of his right to

15   appear in person at this proceeding, that he understood those

16   rights, and that he voluntarily gave up those rights.

17             MR. BIALE:  Yes, your Honor.  We fully discussed that

18   matter with Mr. Teman.  And he's voluntarily giving up his

19   right to be present in person at the proceeding.

20             THE COURT:  Okay.

21             And just to make sure that I can make a legally

22   adequate finding, Mr. Biale, briefly describe how you came to

23   provide the document to Mr. Teman, and the circumstances under

24   which you discussed his rights with him.

25             MR. BIALE:  Sure, your Honor.
```

KC1VTEMC

1          So the discussion has been an ongoing one based on

2     both Mr. Teman's strong interest in having this case conclude

3     efficiently and soon, based on the amount of time that he has

4     been on home detention.  At the same time we've discussed with

5     Mr. Teman his countervailing concern about his health and what

6     it would mean for him to travel from Florida to New York.

7          Based on all of those considerations, Mr. Teman

8     expressed to us that he felt it was not safe for him to travel

9     and he would prefer to participate in sentencing remotely.

10          As a result, we made an application to the Court to do

11     that.  As your Honor knows, there was some back and forth

12     between the defense and the government about that issue.  The

13     Court ultimately granted our request to proceed remotely.  We

14     sent a copy of the Court's order to Mr. Teman, along with the

15     waiver of rights; and explained that in order to proceed

16     remotely, he would need to sign the waiver of rights, and one

17     of us as his counsel would do so, and that we would file it on

18     the docket.  He returned a signed copy of it to us, I signed

19     it, and then filed it.

20          THE COURT:  All right.  Thank you.

21          That's very comprehensive and helpful.

22          And that leads me to my next question, which is the

23     handwriting alongside both signatures leaves something to be

24     desired.

25          Mr. Biale, is that Mr. Teman's signature on the

KC1VTEMC

1   document?

2           MR. BIALE:  Yes, your Honor.

3           THE COURT:  And is it yours?

4           MR. BIALE:  It's an electronic signature that I pasted

5   onto the document.

6           THE COURT:  All right.  Very good.

7           Mr. Teman, is that indeed your signature on the

8   document?

9           THE DEFENDANT:  Yes, your Honor, that is my signature.

10          THE COURT:  I suffer from handwriting deficiencies as

11  well.

12          Okay.  Mr. Teman, did you hear what Mr. Biale just

13  said to me about the process by which you were informed of your

14  right to have the sentence proceed in person?

15          THE DEFENDANT:  Yes, I did, your Honor.

16          THE COURT:  And you did indeed sign a document giving

17  up your right to be present in person?

18          THE DEFENDANT:  Yes, I did, your Honor.

19          THE COURT:  Do you understand that you have a right to

20  have this hearing proceed in person, meaning you and the

21  lawyers and me, government, we'd all be in person in my

22  courtroom?

23          THE DEFENDANT:  Yes, I do, your Honor.

24          THE COURT:  And do you understand that the public

25  health emergency created by this pandemic has heightened the

KC1VTEMC

1    risks associated with travel and court appearance; and

2    particularly for persons traveling out of state, you might be

3    subject to heightened risks, as well as quarantines and the

4    need for testing and a variety of other inconveniences were

5    this to occur in person?

6            THE DEFENDANT:  Yes, your Honor.  And multiple doctors

7    of mine have made that clear.  I think we've --

8            THE COURT:  Have you fully discussed these issues and

9    your rights with Mr. Biale and your other lawyers?

10           THE DEFENDANT:  Yes, your Honor.

11           THE COURT:  Okay.

12           Do you understand that if we proceed, as we are about

13   to, by videoconferencing, you and your counsel would still be

14   able to fully participate in this proceeding; you'd both be

15   able to fully address the Court.  In the event there came a

16   need for a breakout where you and your counsel -- without being

17   overheard by anybody else -- could speak privately, we could

18   make the technology work, even if it means hitting the pause

19   button and logging back on; but we'd be able to find a way for

20   you to confer privately with your lawyer or lawyers.

21           Do you understand that?

22           THE DEFENDANT:  Yes.  Thank you, your Honor.

23           THE COURT:  And just to be clear, do you wish to give

24   up your right to be sentenced in person with your lawyer by

25   your side?

KC1VTEMC

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  All right.  I find a knowing and voluntary

3    waiver of Mr. Teman's rights to be present in person for this

4    sentencing.

5          Finally, as to this issue, for us to proceed today,

6    even if it means just undertaking some of the sentencing

7    process, I'm required to make a finding that this proceeding

8    can't be delayed without harm to the interests of justice.

9          Defense counsel, in your letter of November 20th,

10   docketed at docket 167, you told me that Mr. Teman's mental

11   health would be benefited by moving the case forward.  You

12   wrote:  "while the Court in its November 19, 2020 order invited

13   a request to adjourn sentencing, Mr. Teman's countervailing

14   mental health concerns compel us to request that sentencing

15   proceed on the current schedule.  We plan to provide the Court

16   with additional material regarding Mr. Teman's mental health

17   early next week.  But it suffices to say for now that the

18   ongoing pendency of the case has significantly exacerbated

19   ongoing struggles to such a degree that we believe it is

20   important for Mr. Teman not to delay resolution of this matter

21   further."

22         Purely in the interest of a clear record, Mr. Biale,

23   can you just elaborate a little bit.

24         MR. BIALE:  Yes, your Honor.

25         So we've had extensive discussions with Mr. Teman

KC1VTEMC

1   since Ms. Harris and I joined the case.  And before that, his

2   trial counsel had extensive discussions with him.

3          As your Honor knows, Mr. Teman has been on home

4   detention since the trial verdict in January.  He has

5   essentially been solitary for that time, because his partner

6   had to leave the country.  So he is alone there.  He has his

7   dog who provides a great deal of comfort.

8          But the isolation that we are all experiencing due to

9   the COVID pandemic, for Mr. Teman has been significantly

10  harder.  The various mental health issues that have been raised

11  before the Court -- both in the sealed submissions with trial

12  counsels' sentencing submission that was submitted in July, as

13  well as the letter from Mr. Teman's parents, which we submitted

14  last week in connection with our request for remote

15  sentencing -- I think speak to the particular difficulties that

16  Mr. Teman has with coping with the ongoing uncertainty

17  regarding this case.

18         I can speak just personally based on my conversations

19  with him that I have seen him struggle to a degree that is

20  quite profound and sets him apart from most of the clients I

21  have.  No doubt, having a sentencing hanging over their heads

22  is a difficult process.  For Mr. Teman it's really been

23  harrowing.  And I don't think that it serves his interests or

24  the public interest to delay further.

25         Now, I stand by all that, in spite of the discussion

KC1VTEMC

1    that we're going to have in a moment about a brief adjournment.

2    But I think that all of that stands as a reason to proceed with

3    sentencing as soon as practicable, and to do so remotely given

4    that we cannot convene in person safely.

5        THE COURT:  And I take it, Mr. Biale, that extends to

6    accomplishing what little we can here before an adjournment.

7        MR. BIALE:  Yes, your Honor.

8        THE COURT:  All right.  Very good.

9        Look, I'm fully persuaded by that.  Let me just

10   confirm that the government is too.

11       MR. BHATIA:  Yes, your Honor.

12       I mean, I think we take a different view,

13   respectfully; but if your Honor were to make the CARES Act

14   findings, I think you --

15       THE COURT:  All right.  Look, I make the finding --

16   Mr. Biale, thank you.  That was a very persuasive and clear

17   articulation.

18       I find that the sentencing proceeding cannot be

19   further delayed without harm to the interests of justice.  I

20   fully accept counsel's proffer -- which is supported, among

21   other things, by the letter from Mr. Teman's parents -- that

22   Mr. Teman is struggling with the pendency of this matter, and

23   he would like to put this case behind him.  I credit that.  I

24   credit that forward progress will be good for his state of

25   mind.  I hope that commencing the sentencing process today,

KC1VTEMC

1    even if we can't finish it or won't be able to finish it, will

2    give you, Mr. Teman, some additional peace of mind that at

3    least we are moving forward.

4            All right.  The next preliminary matter I need to take

5    up involves new Federal Rule of Criminal Procedure 5(f).

6            As counsel are aware, in late October, the President

7    signed the Due Process Protections Act.  It put Rule 5(f) in

8    place.  It requires the Court at the initial scheduled

9    conference in a criminal case to advise the prosecution of its

10   obligations under *Brady v. Maryland* and its progeny, and to

11   issue a written order to the same effect.

12           Like most other judges in this district, I've taken

13   the view that the best practice is to treat Rule 5(f) to apply

14   to existing cases and not merely new ones.  So I've docketed

15   the written Rule 5(f) order in all my pending criminal cases,

16   including this one.  I did so in this case on October 30th.

17   The order is docketed at docket 153.

18           And now I'm going to make the companion oral

19   notification that's also required by Rule 5(f).

20           And, Mr. Bhatia, fair warning, at the end of this I'm

21   going to ask you whether the government understands its *Brady*

22   obligations and whether it has complied with them.

23           All right.  Here it goes.

24           Pursuant to Federal Rule of Criminal Procedure 5(f), I

25   remind the government of its obligation under *Brady v. Maryland*

KC1VTEMC

and its progeny to disclose to the defense all information,
whether admissible or not, that is "favorable to" the
defendant, "material either to guilt or to punishment," and
known to the government.

The government must make good-faith efforts to
disclose such information to the defense as soon as reasonably
possible after its existence becomes known to the government.
The government must also disclose information that can be used
to impeach the trial testimony of a government witness, and
must do so sufficiently in advance of trial in order for the
defendant to make effective use of it at trial.

I remind you that these obligations are continuing
ones, and that they apply to information whether or not you
credit it.

I further remind you that for these purposes, "the
government" includes any federal, state, and local law
enforcement officers and other officials who have participated
in the investigation and prosecution of the charged offenses;
and that you have an obligation to seek from these sources all
information subject to disclosure.

And finally, I caution the government that if it fails
to comply with this order, any number of consequences may
follow:

One, I may order production of the information and
specify the terms and conditions of such production.

KC1VTEMC

1          Two, I may grant a continuance.

2          Three, I may impose evidentiary sanctions.

3          Four, I may impose sanctions on any responsible lawyer

4    for the government.

5          Five, I may dismiss charges before trial or vacate a

6    conviction after trial or a guilty plea.

7          Or six, I may enter any other order that is just under

8    the circumstances.

9          Government, do you understand these obligations and

10   will you confirm that you have fulfilled and will fulfill them?

11         MR. BHATIA:  Yes, I understand our obligations.  And

12   we have fulfilled and will fulfill our obligations.

13         THE COURT:  All right.  Very good.

14         All right.  The next preliminary matter that I need to

15   take up involves a disclosure I need to make that is occasioned

16   by the appearance of Mr. Biale as new counsel for Mr. Teman.

17   And the disclosure is that I am acquainted with Mr. Biale.

18         Mr. Biale's wife, Margaret Graham, worked for a summer

19   at the law firm at which I used to work, and we worked together

20   closely on a criminal appeal.  Ms. Graham and I have kept in

21   touch over the years, and we have had lunch or coffee several

22   times since she joined the U.S. Attorney's Office for the

23   Southern District of New York.

24         Through Ms. Graham I have gotten to know Mr. Biale.  I

25   recall spending an hour or so alone in my chambers with

KC1VTEMC

1    Mr. Biale several years ago discussing his professional options

2    before he joined the Sher Tremonte firm.  I have also

3    personally appointed Mr. Biale and the Sher Tremonte firm to

4    represent a *pro se* plaintiff in a case before me in which the

5    plaintiff sued his lawyer from an earlier matter for allegedly

6    misappropriating a $100,000 retainer.  Mr. Biale did an

7    absolutely superb job in that case.  I think very highly of

8    Mr. Biale, and regard myself as something of a mentor of his

9    and also as a friend.

10          In the interest of full disclosure, I must also put on

11    the record the sad fact that I attended shiva at Mr. Biale's

12    apartment in Brooklyn in the summer of 2019.  And most

13    recently, about six weeks ago, on October 10th, I was a

14    recipient of a group email that Mr. Biale sent to friends and

15    family announcing the joyous news of the arrival of a new son,

16    Abraham Ewing Graham Biale; and for which, Mr. Biale, a huge

17    *mazel tov* to you and Ms. Graham from the Court.

18          All that said, I have absolutely no doubt that

19    notwithstanding that I am acquainted with Mr. Biale in the

20    various ways that I have reviewed, these will not in any way,

21    shape, or form compromise my ability to preside over this case

22    dispassionately and neutrally and with fairness to all.

23    Nevertheless, I did need to make this disclosure, as I do in

24    all cases where I've had a friendship with counsel.

25          Mr. Biale, did you disclose to the government the sum

KC1VTEMC

1   and substance of the facts that I've just reviewed?

2         MR. BIALE:  Your Honor, in candor, I did not.  But I

3   appreciate that your Honor has now put that on the record, and

4   I appreciate what you said.

5         THE COURT:  All right.

6         Mr. Bhatia, regardless, you are now on notice of the

7   information that I have just reported to you.  I trust that the

8   government does not have any issue with regard to the Court's

9   continuing to preside over this case.

10         MR. BHATIA:  No issue whatsoever.

11         THE COURT:  All right.

12         And Mr. Biale, just in the interest of full

13   disclosure, did you disclose to your client the fact that you

14   and I are acquainted in the ways that I've just reviewed?

15         MR. BIALE:  Yes, your Honor.

16         THE COURT:  All right.

17         And did Mr. Teman have any concerns about your

18   representing him in light of all of that?

19         MR. BIALE:  He did not.

20         THE COURT:  All right.

21         And Mr. Teman, is that correct?

22         THE DEFENDANT:  That's correct, your Honor.

23         THE COURT:  Prior to this hearing, had you been made

24   aware of the facts that I have just reviewed with Mr. Biale?

25         THE DEFENDANT:  Except that he's owed a *mazel tov*, he

KC1VTEMC

1    was rather candid and helpful to me by sharing his struggles as

2    encouraging and very helpful in a dark moment for me.

3            THE COURT:  I'm not surprised to hear that.  I'm glad

4    to hear that.

5            All right.  And it goes without saying, but you are

6    comfortable proceeding then with Mr. Biale as one of your

7    counsel?

8            THE DEFENDANT:  Yes, your Honor.

9            THE COURT:  All right.

10            That leads me then to a related issue, and this is

11    going to -- this is the principal reason that I was going to be

12    unable for us to proceed today.

13            And this issue also involves Mr. Biale, but it

14    implicates the case of *United States v. Curcio*.  And I

15    apologize in advance for the need to pursue these matters, but

16    circuit law requires that the Court be attentive to facts that

17    raise even potential conflicts.

18            Mr. Biale, for the record, am I correct that your

19    wife, Ms. Graham, is today employed as an Assistant United

20    States Attorney by the U.S. Attorney's Office for the Southern

21    District of New York, which is prosecuting your client,

22    Mr. Teman, in this case?

23            MR. BIALE:  That's correct, your Honor.

24            THE COURT:  All right.  And am I correct that

25    Ms. Graham has been an employee of the U.S. Attorney's Office

KC1VTEMC

| | |
|---|---|
| 1 | at all times since Mr. Teman was indicted in September 2019? |
| 2 | MR. BIALE:  Yes. |
| 3 | THE COURT:  All right. |
| 4 | Mr. Biale, I need to confirm for the record that |
| 5 | before -- |
| 6 | UNIDENTIFIED SPEAKER:  Your Honor, I just want to make |
| 7 | very clear -- |
| 8 | THE COURT REPORTER:  I'm sorry.  Who is speaking?  Who |
| 9 | is speaking?  Who is speaking?  Hello?  I'm sorry, who is |
| 10 | speaking?  Your Honor?  This is the court reporter.  Hello? |
| 11 | THE DEPUTY CLERK:  Judge, it's A.J.  I think Martha is |
| 12 | trying to get your attention. |
| 13 | THE COURT:  Hold on.  Somebody is interrupting. |
| 14 | THE COURT REPORTER:  I'm sorry.  I'm not getting any |
| 15 | of this.  I don't know who was speaking. |
| 16 | (Indiscernible crosstalk) |
| 17 | THE COURT:  But right now, whoever was cutting in, |
| 18 | please be respectful of the ongoing conversation. |
| 19 | THE DEPUTY CLERK:  Judge, it's A.J. |
| 20 | Martha is unable to hear what you folks are hearing. |
| 21 | Martha is trying to cut in.  She is unable to hear you folks. |
| 22 | THE COURT:  Martha, are you able to hear me right now? |
| 23 | THE COURT REPORTER:  I'm able to hear you.  What I |
| 24 | didn't know is who was speaking, which attorney, when he |
| 25 | started speaking.  I did not get any of that. |

KC1VTEMC

|    |    |
|----|----|
| 1  | THE COURT:  Okay.  Thank you. |
| 2  | We'll back up a moment. |
| 3  | Martha, I put several questions to Mr. Biale about his |
| 4  | wife's employment at the U.S. Attorney's Office, to which he |
| 5  | answered yes.  Did you catch that, Martha? |
| 6  | THE COURT REPORTER:  Yes, your Honor.  It's when the |
| 7  | attorneys -- |
| 8  | THE COURT:  Mr. Teman interjected.  And I think the |
| 9  | challenge there -- no fault here, I think Mr. Teman did not put |
| 10 | his name to his remarks, and that's probably, Martha, why you |
| 11 | didn't know who was speaking.  That was Mr. Teman. |
| 12 | Were you able to capture the words that were said? |
| 13 | THE COURT REPORTER:  No, because I was busy trying to |
| 14 | interrupt to see who was speaking. |
| 15 | THE COURT:  Okay.  So, Mr. Teman, just so we can |
| 16 | reprise that, after I said what I said to Mr. Biale and he |
| 17 | confirmed the facts about his wife's employment, what did you |
| 18 | say? |
| 19 | THE DEFENDANT:  I spoke up to clarify that I did not |
| 20 | know anything about Mr. Biale's wife and her profession or |
| 21 | anything, other than the loss of a child that he had shared. |
| 22 | THE COURT:  Okay.  That is my recollection of what |
| 23 | Mr. Teman just said. |
| 24 | And then in response to that, I said, in substance |
| 25 | Thank you, Mr. Teman.  That is exactly why I'm undertaking this |

KC1VTEMC

1    necessary conversation.

2         Thank you, Martha.  I apologize.  I didn't realize it

3    was you who was cutting in.

4         And A.J., I apologize to you.  I thought that was

5    somebody else.

6         All right.  So, Mr. Biale, let me just pursue that

7    with you.  Before you took on this representation, was

8    Mr. Teman notified by you of the fact that your wife is

9    presently employed by the office that is prosecuting Mr. Teman,

10   and that she has been employed there during the entire course

11   of this prosecution?

12        MR. BIALE:  Your Honor, I apologize.  I don't recall

13   having a conversation about that with Mr. Teman.  And it sounds

14   like I did not.  Perhaps what makes sense is for -- I think

15   where your Honor is headed, that we should break and have a

16   discussion with Mr. Teman about this.

17        THE COURT:  Well, we're going to do a little more than

18   that.  But, yes, you and I are on the same page.

19        But, look, to be very blunt -- and this is something

20   that -- this is obviously pivotally important.  Mr. Biale's

21   wife status as an employee of the United States Attorney's

22   Office for the Southern District of New York -- Mr. Teman's

23   adversary in this case -- presents a potential conflict.

24        It is, in my judgment, based on my knowledge of the

25   case law, I believe it to be a completely waivable conflict.  I

KC1VTEMC

have seen, in fact, at least one instance in which a defendant,
following careful *Curcio* proceedings, resulting in questioning
under oath of the defendant by the Court, knowingly waived the
conflict presented by one of his lawyers being married to an
AUSA in the office that is prosecuting him.

Nevertheless, the Second Circuit, as I think all
counsel on the call are aware, has insisted on rigorous
compliance, with a series of steps and procedures that a
district court must use to establish that a defendant wishes to
waive his right to conflict-free counsel.

In particular, *Curcio* requires that the Court:

One, advise the defendant of the dangers arising from
the particular conflict.

Two, determine through questions that are likely to be
answered in narrative form whether the defendant understands
those risks and freely chooses to run them.

And three, give the defendant time to digest and
contemplate the risks, after encouraging him or her to seek
advice from independent counsel.

And I'm citing the case of *United States v. Curcio*,
680 F.2d 881, 888-890 (2d Cir. 1982).

The purpose of those careful procedures is to protect
the defendant and his constitutional right to be free from
conflict-free counsel; and to protect the integrity of the
court proceedings.

KC1VTEMC

1          Absent a properly conducted *Curcio* proceeding

2    resulting in a knowing waiver by Mr. Teman of the potential

3    conflict here -- and it needs to be a waiver that I find

4    knowing and intelligent -- we simply cannot proceed further

5    with Mr. Biale representing Mr. Teman.

6          I confess that I did not spot this issue that defense

7    counsel is married to a prosecutor at the office that is

8    prosecuting Mr. Teman until yesterday, after having extensively

9    prepared for the sentencing.  And I spotted it only as I was in

10   the process of writing up my own narrative about how I know

11   Mr. Biale; and suddenly it dawned on me that I know him through

12   his wife, and his wife -- whom I melt through a private law

13   firm -- now happens to be working at the Southern District U.S.

14   Attorney's Office.  And perhaps counsel may have overlooked

15   this, too.

16         Let me ask you, Mr. Bhatia, were you aware that

17   Mr. Biale is married to one of your colleagues?

18         MR. BHATIA:  Yes, I was.

19         THE COURT:  Is there a reason you didn't alert me to

20   the potential conflict?

21         MR. BHATIA:  I apologize, your Honor.  I wasn't aware

22   this is one of the situations that triggers a *Curcio* hearing;

23   although now that you mention it, we are happy to proceed and

24   conduct one.

25         THE COURT:  Mr. Biale, are you also of the view that

KC1VTEMC

1    you didn't think this might be a potential conflict, or it just

2    didn't -- just sort of blipped on it and didn't think about it?

3              MR. BIALE:  So, your Honor, I will say that -- so

4    Mr. Teman retained Ms. Harris in the summer.  And I was brought

5    into the case a little bit later to assist her.  I've obviously

6    been working closely with her.  I am not saying that to suggest

7    that it was her responsibility to disclose it, but I was not

8    part of the initial conversations.

9              I certainly understand that this is something that,

10   had we discussed it before, we wouldn't be addressing it for

11   the first time with your Honor now.

12             I will say to your Honor that I do not -- I have not

13   had a situation like this before where a court has conducted a

14   *Curcio* hearing based on the fact that I'm married to an AUSA in

15   the Southern District of New York.  It may be a best practice.

16   And, you know, I certainly will consider that going forward.

17             I think what I would propose -- and I don't want to --

18             THE COURT:  Sorry.  I'm not looking for a proposal,

19   because I've got a proposal.

20             I'm trying to understand how it can be that both

21   counsel in this case who knew that you, Mr. Biale, are married

22   to somebody who works for the office that is prosecuting

23   Mr. Teman and trying to put him in prison, didn't think to

24   raise -- in the case of Mr. Biale with Mr. Teman, in the case

25   of either of you -- with the Court the potential conflict.

KC1VTEMC

1          I will tell you, based on my knowledge of the case

2     law, that while this is a waivable conflict, it's unthinkable

3     that this is not something that merits a *Curcio* hearing.

4     People raise *Curcio* hearings for me when an associate in a

5     defense law firm is applying to the U.S. Attorney's Office for

6     employment.  This is way closer than that.

7          Look, in any event, lecture notwithstanding, here's

8     the point:  This is exactly the sort of conflict that needs to

9     be addressed at the threshold before we move forward.  Under

10    Second Circuit law, before a criminal defendant can waive such

11    a conflict so as to allow the case to move forward, there has

12    to be the carefully handled set of proceedings that *Curcio*

13    dictates.

14         Ordinarily, counsel bring this to my attention by

15    letter beforehand; they alert me to the fact of the potential

16    conflict.  And that can expedite the *Curcio* proceeding by

17    enabling the Court at the next conference to have the first of

18    the required two *Curcio* hearings, the first of which the Court

19    alerts the defendant to the potential dangers presented by the

20    conflict; at the second in which the defendant, after getting

21    the opportunity to consult with independent counsel, is

22    questioned by the Court to establish his awareness of the

23    problem or the conflict and his willingness to proceed.

24         So here's what I propose:  I would be inviting error

25    to proceed forward here making any substantive determinations

KC1VTEMC

1    in the case with a potential conflict left unresolved.

2          What I want to have happen is as follows:  I want
3    defense counsel first to review the issue carefully with
4    Mr. Teman.  And Mr. Teman's look of shock was obvious to me,
5    even from 1,000 miles away on video, when he learned that one
6    of his lawyers works -- is a colleague of Mr. Bhatia's.

7          Insofar as this conflict implicates the representation
8    by the firm of Sher Tremonte, I would urge that Mr. Gelfand and
9    Mr. DiRuzzo perhaps take the lead in inviting those
10   discussions, insofar as they are not subject to any such
11   conflict.

12          I then expect defense counsel to reach out to the
13   government.  And, government, I expect that you will consult
14   with the appeals unit in the U.S. Attorney's Office to make
15   sure that any submission that the Court receives on this point
16   in substance has been approved by the appeals unit, insofar as
17   it appears that trial counsel missed the *Curcio* issue, too.

18          Two weeks from today, December 15, I would like to
19   receive a joint letter from the parties.  It should notify the
20   Court whether Mr. Teman, after careful consideration, wishes to
21   proceed with Sher Tremonte on his team.  The letter should also
22   set out the parties' views -- supported by case law -- whether
23   the conflict here is waivable.  I am virtually certain that it
24   is waivable; but in the interest of due care, I would benefit
25   from case authority.

KC1VTEMC

1    Assuming that counsel agree that the conflict is

2    waivable, and that Mr. Teman does agree to waive it and to

3    proceed with Sher Tremonte, the letter should set out counsels'

4    proposed procedure, consistent with *Curcio*, for obtaining the

5    appropriate knowing and voluntary waiver.  As I said, *Curcio*

6    typically envisions a two-hearing procedure.  I would welcome

7    counsel setting out for me in writing the particular questions

8    that counsel propose that the Court put to Mr. Teman at each

9    hearing.

10    I hope and expect that counsel -- the government and

11    defense -- will be able to agree on the proposed procedure in

12    question.  We each have an equal interest here in the integrity

13    of this aspect of the proceeding.  If not, I still want a joint

14    letter; it should just set out the parties' various agreement

15    and disagreement.

16    The two weeks, in my estimation, should be enough time

17    to give Mr. Teman -- in consultation with counsel -- to digest

18    this news flash, and to reach a thoughtful and informed

19    conclusion as to whether to proceed with Sher Tremonte on his

20    team.  It should also give counsel enough time thereafter to

21    meet and confer and make a joint proposal to the Court,

22    consistent with *Curcio*.  However, needless to say, if counsel

23    on either side -- particularly the defense, but either side --

24    needs more time than two weeks to consider and work through

25    these important issues, obviously I'll accommodate that.  Just

KC1VTEMC

1    submit a letter seeking such an extension.

2         Upon receiving counsel's letter, if indeed Mr. Teman

3    wishes to waive his right to conflict-free counsel, I will

4    schedule a *Curcio* hearing.  Mr. Teman, I see –– I think I see

5    the long face.  I understand your frustration and surprise.

6    Let me just finish.

7         Please understand, I'm protecting your rights, as well

8    as everyone's right to the integrity of the proceeding.  And I

9    hope you appreciate that while I haven't always ruled for you,

10   I have tried throughout this proceeding to be attentive to your

11   rights.  You'll recall the dismissal of a count due to speedy

12   trial issues and the probing questions I put to the government

13   that resulted in their unilateral dismissal of Counts Five and

14   Six.  This is of the same nature.

15        There is an issue here that adversely affected your

16   rights.  I want to spot it, and I want to give time to make

17   sure your interests are protected, your rights here at stake.

18   Because you have a constitutional right to conflict-free

19   representation.  With limited –– one moment, sir.

20        With limited exceptions, a defendant can waive that

21   right; but under the law, the waiver has to be obtained

22   pursuant to a careful set of procedures that enables the Court

23   to assure itself that the waiver was knowing and intelligent,

24   and received after a period of deliberation.  When a conflict

25   surfaces, it is important that the Court and counsel turn

KC1VTEMC

1    square corners.

2         Mr. Teman, I wasn't intending to call on you at this

3    point, but just simply to explain myself because I regret this.

4    But if there's something you need to say, I'll let you do so.

5         But let me just say this:  I know your lawyers will be

6    tensing up each time you offer to say something to the Court

7    unguided by them.  So please, think carefully before you speak,

8    because your lawyers assuredly would want to confer with you

9    before you do so.

10        THE DEFENDANT:  Your Honor, I appreciate that, and

11   I'll keep it limited.

12        I don't mean to flatter, but it's impressive that you

13   can see facial expressions in such a small -- I have a very

14   small box here on the screen.

15        I'm concerned about an even larger issue, which is,

16   without going into the details that your Honor is undoubtedly

17   aware -- and a lot of paper has been exchanged electronically

18   back and forth, the questions -- the core questions we have

19   raised about this trial in two words would be prosecutorial

20   misconduct.

21        And I have just learned that the attorneys

22   representing me are literally married to the prosecution.  I

23   think that raises a much larger question about the entire case

24   and privileged communications and strategy and advice I've

25   gotten throughout this trial.

KC1VTEMC

```
1        I want to be candid that I am intending to seek
2   additional outside -- and I don't know how I'm going to afford
3   it; I've put all my money and taken loans to pay full
4   restitution.  And I want to note, your Honor, I showed up today
5   virtually with all the money to pay, coming here to beg you for
6   mercy to put an end to this.  And now I'm learning that -- and
7   your Honor is aware that we've had very esteemed controversial
8   attorneys like Professor Dershowitz helping us, you may not be
9   aware that Professor Lessig from Harvard Law School has also
10  stepped in to help.  Ron Coleman has stepped in to help.  Molly
11  McCann, who was just counsel for General Flynn, has stepped in.
12       I've had very helpful feedback.  And now I'm learning
13  that I basically might have had -- even inadvertently, and I
14  believe Mr. Biale is a very good man -- slips of the tongue
15  when you -- you know, I discuss my work with my girlfriend.
16  And it's surprising, given this case, she's still my
17  girlfriend, given the topic.
18       But I think there's a much bigger concern here, which
19  is we will never, never be able to know what I gave that was
20  privileged to my counsel that was just funneled to people we've
21  accused over and over of cheating.  And not only have we
22  accused them of cheating, Professor Dershowitz has accused them
23  of cheating, Ron Coleman has accused them of cheating, Molly
24  McCann has accused them of cheating.  They've been accused of
25  cheating.  The Southern District of New York has been accused
```

KC1VTEMC

1    of burying evidence in *U.S. v. Najad*, *U.S. v. Ahuja*.  You can

2    go up and down the halls of the Southern District of New York

3    and they will talk about these attorneys -- one of whom he's

4    married to -- emailing each other about "burying evidence."

5    Professor Outlaw from Vanderbilt and from Howard University

6    wrote a letter to Judge Nathan, who in full -- I want to have

7    full --

8              (Court reporter disconnected from call)

9              THE COURT REPORTER:  I'm sorry, your Honor?  Your

10   Honor, I was thrown off the call.  I just called back.  I'm

11   sorry.  The last thing I have --

12             THE COURT:  Who is that, the court reporter?

13             THE COURT REPORTER:  Yes.

14             THE COURT:  How long ago did you drop off the call?

15             THE COURT REPORTER:  The last thing I have was the

16   defendant was saying:  Professor Outlaw from Vanderbilt and

17   from Howard University wrote a letter to Judge Nathan, who

18   fully wanted to have --

19             THE COURT:  One moment.

20             Mr. Teman, because if something is said without the

21   court reporter, it's as if it didn't happen.

22             THE DEFENDANT:  I can repeat it.

23             THE COURT:  One moment.  Please don't interrupt, just

24   for the court reporter's benefit, that's all.

25             I will invite you to pick up where you referred to

KC1VTEMC

1    those people.

2            But before you do, I get the gist of what you're

3    saying.  I'm happy for you to complete the thought.

4            There will be time enough to take this up.  So

5    complete the thought as you wish.

6            (Indiscernible crosstalk)

7            THE COURT:  Sorry, sir.  Please.

8            This is not a day in which I'm resolving anything.

9    I'm simply putting in place a procedure for communication

10   within the defense team, between the defense and the

11   government, and ultimately to the Court.  I am deciding nothing

12   except setting a procedure.

13           So I will ask you, Mr. Teman, understand that this is

14   not a moment for advocacy.  I'm happy to hear what you have to

15   say.  But at the end of all this, all I'm going to be doing is

16   putting in place a process.

17           Go ahead, Mr. Teman.

18           THE DEFENDANT:  Your Honor, I appreciate that.  I will

19   be concise.  And I invite the court reporter to shout out if

20   anything is unclear.

21           She mentioned that I left off on Professor Outlaw --

22   which is a fantastic name for a professor writing about

23   criminal trials -- who wrote to Judge -- I'd like to note for

24   the record the judge cracked up.  But anyway -- I am the

25   comedian sometimes.

KC1VTEMC

1    But this is a very serious topic, which is that

2    Professor Outlaw of Howard University and Vanderbilt, wrote to

3    Judge Nathan and said that quite a sizable percentage of the

4    Southern District of New York -- I believe the count was

5    something like 14 members of the staff, multiple supervisors,

6    and that's just in one trial, *U.S. v. Najad*.  And then there's

7    another trial before Judge Failla, *U.S. v. Ahuja*.  And there's

8    also, I believe, a case before Judge Hellerstein where S.D.N.Y.

9    coincidentally dumped six terabytes of data right before trial.

10    And I'll point out that what hasn't been brought up,

11    but last night, 4 p.m., 9 p.m., somewhere between there,

12    Southern District of New York disclosed that Bank of America

13    and they had information pertaining to a $14,000 transaction or

14    money that was held, effectively a personal guarantee if the

15    transaction they allege was illegal.  And they go, Oh, we just

16    got this information November 30th.

17    Sentencing was supposed to be September 29th.  And

18    your Honor can correct me, but I think it was also supposed to

19    be sometime in June.  And this trial was in January, and the

20    arrest was in July.

21    I'm going to sum this up very clearly in bullet

22    points, which is, I agree, your Honor, I believe a statement

23    you made once in trial is you tried to be a source of truth and

24    light.  I don't think anybody can look at the behaviors of the

25    Southern District of New York in this case and across, and the

KC1VTEMC

1    fact that they were married to my defense counsel and failed to

2    disclose that, combined with all of the facts relating to

3    magically late and -- excuse me, late disclosure is actually

4    not accurate, because I think your Honor will agree, sentencing

5    was supposed to happen half a year ago.  And magically, they

6    discovered a $14,000 drawdown, effectively changing the case,

7    effectively now it's not going -- it went to the bank, and I

8    said, I'm going to take this money.

9            They said, Well, you're not entitled to this money.

10           Basically, the whole case changes to, I went to the

11    bank and said I believe we're contractually obligated, I'm

12    putting that right here on the document; I'm chatting with you

13    for an hour.  And in addition to that, I understand that if I'm

14    wrong or, in the government's view, I'm dishonest, I personally

15    stand to lose $14,000.

16           I've got -- and I'm not waiving privilege here --

17    tremendous pushback on strategy and ideas.  And if I knew that

18    my defense counsel was married to the opposing team, I wouldn't

19    have hired them.

20           And right now, I think what can be clear -- and

21    everybody from the outside can admit -- and I'm going to end on

22    this, I don't think any defendant should have to learn this now

23    at this stage and believe that all the post-trial motions and

24    God knows what else Southern District of New York hasn't yet

25    disclosed and refused to disclose to us.

KC1VTEMC

1    Mr. Biale implicitly admitted that they haven't

2    disclose all information.  Mr. Biale, I believe, was on his

3    second trial in this case.  He's a young man.  He didn't choose

4    to lie to your Honor's face over and over as he did.  He was

5    coached by a supervisor at the Southern District of New York.

6    And now you're asking me to be tried because someone was

7    married.

8    I am sure when we come back, we're going to be asking

9    for at least a different venue.  Thank you, your Honor.

10    THE COURT:  All right.

11    Look, thank you, Mr. Teman.  You covered a lot of

12    ground there, and I don't propose to address everything you

13    covered.  My focus here is this case, not other matters.

14    You said a moment ago that your counsel -- I think you

15    used the plural -- were married to an AUSA.  To be clear, I am

16    unaware that Mr. DiRuzzo or Mr. Gelfand, your trial counsel, or

17    Ms. Harris, your other post-trial counsel, have any such

18    relationship with anyone at the Southern District of New York.

19    The potential conflict issues that I flagged, as I

20    understand it, is limited to Mr. Biale.  You're at liberty to

21    examine with the other lawyers whether their spouses or

22    partners are employees of the Southern District, but my guess

23    is the answer will prove no.

24    And so while I appreciate what you have said, the

25    issue that I raised is a tight and narrow one that involves

KC1VTEMC

1    Mr. Biale's ability -- and, therefore, that of his law firm --

2    to represent you without a knowing and intelligent waiver.  It

3    does not in any way, shape, or form potentially implicate

4    anything that occurred in this matter before Mr. Biale joined

5    the defense team.

6          I will be, a little later on, raising with counsel

7    some questions I have about the forfeiture and restitution

8    filings that I received in the last few hours.  I hadn't

9    thought about whether the issue had been that the government

10   had had them all along and just produced them, so much as just

11   the rudeness of their coming in in the last 24 hours, which is

12   necessitating everybody recognizing the need for an

13   adjournment.  I hadn't thought of that as any form of a late

14   disclosure issue.  I'm happy for counsel to confer about that

15   and to receive a submission on that point.

16         But for now, the issue that I flagged is simply

17   presented by the fact that since the Sher Tremonte firm has

18   been part of the case -- or at least since Mr. Biale has been

19   part of the team -- there is this *Curcio* issue that arises.

20   And so for that reason, I need to hit the pause button on all

21   this to run that to ground.

22         In the fullness of time, Mr. Teman, you should speak

23   with, in particular, your independent lawyers, Mr. Gelfand and

24   Mr. DiRuzzo, who I also esteem very --

25         THE DEPUTY CLERK:  Your Honor, I apologize.  I don't

KC1VTEMC

1    know if anybody else -- you've frozen completely.

2              I'm going to reach out to Judge Engelmayer very

3    quickly.  Hold on one moment.

4              (Pause)

5              THE COURT:  All right.

6              Just simply, yes or no, Mr. Teman, can you hear me?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Mr. Bhatia, can you hear me?

9              MR. BHATIA:  Yes.

10             THE COURT:  Mr. Biale, can you hear me?

11             MR. BIALE:  Yes, your Honor.

12             THE COURT:  Court reporter, can you hear me?

13             THE COURT REPORTER:  Yes, your Honor.

14             THE COURT:  Okay.

15             And court reporter, did you lose any -- did you at any

16   point lose the audio or were you able to hear everything?

17             THE COURT REPORTER:  I heard you up until you froze.

18             THE COURT:  Okay.  I don't know when that was.  What

19   was the last thing that you recorded my saying?

20             THE COURT REPORTER:  Let me just look at it.  Hold on

21   one minute please.

22             THE COURT:  Keep your voice up.  I'm having difficulty

23   hearing you from a volume perspective.

24             THE COURT REPORTER:  Okay.  I'm just looking at it.

25             "In the fullness of time, Mr. Teman, you should speak

KC1VTEMC

1   with your independent lawyers, Mr. Gelfand and Mr. DiRuzzo, who

2   I also esteem very," and that was it.

3        THE COURT:  Very highly.

4        I have no doubt that they have your best interests at

5   heart and are independent of the potential conflict I

6   identified.  You should speak with them about your best

7   interests, whether to use one of the other lawyers who is

8   assisting you, whether to waive the conflict and go with the

9   Sher Tremonte firm, or do something else.  And I don't weigh in

10  on that, I just am trying to police the conflict process here

11  to make sure that your right to conflict-free counsel is

12  respected.

13       I do though need to say this, which is that your very

14  estimable trial counsel, who are unaffected by any conflict,

15  have thoroughly raised the issues that you had flagged under

16  *Brady v. Maryland* in this case.  And as the lengthy post-trial

17  decision that I rendered reflects, I found those claims of

18  misconduct to be meritless.

19       I do not preclude your exploring with your counsel the

20  thesis -- if you think it worth exploring -- that some

21  sentencing materials on account of the relationship here were

22  shared in some way from Mr. Biale to Ms. Graham to Mr. Bhatia,

23  I have zero reason to think that that happened, but you're at

24  liberty to make inquiry about that through independent counsel,

25  but this call is not the time to do that.

KC1VTEMC

1          Mr. Teman, hold on.

2          This is also not a time for speech-making.

3          I am here to protect your rights.  And your right

4    principally involves at this point going offline, speaking with

5    your independent lawyers, and deciding how you want to proceed

6    as to representation.  And I will be happy to hear from the

7    counsel who emerge ultimately from that process if there's some

8    new issue presented by the Sher Tremonte firm's role in the

9    case that needs to be explored.

10         But, once again, I just want to emphasize, just to

11    lend some reality to this, that that firm has been post-trial

12    counsel only.  There's no reason I have to think that the jury

13    trial that resulted in a conviction on all counts was in some

14    way compromised by the fact that Ms. Biale happens to be --

15    Mr. Biale happens to represent -- married to Ms. Graham.

16         In any event, the point is that I've now put in place

17    a procedure.  Counsel are to write me a joint letter in 14

18    days.  In the event the determination is not to seek to waive

19    the conflict -- and that's your right -- let me know how

20    counsel propose jointly to proceed.

21         And, Mr. Teman, it may be that for financial reasons

22    or just due diligence reasons or needing to take a deep breath,

23    you need more time.  I'll be happy to give that to you.  As

24    you're going to hear in a few moments, I think there are very

25    good reasons sounding in public health and safety why you might

KC1VTEMC

1    want to slow this process down.  We'll see.

2              But the bottom line is this is between you and your

3    counsel.  I do not want anymore speeches made.  It only runs

4    the risk that something you would say would be something that

5    your eventual counsel will regret that you said.

6              Okay.  So having taken care, then, of the *Curcio*

7    issue, I want to give counsel a heads-up that once we resolve

8    that representation issue -- whether it turns out to be a

9    *Curcio* waiver or a substitution of counsel or a reversion just

10   to using estimable trial counsel, however it works out -- I am

11   likely to commission letter submissions from counsel on two

12   areas relating to sentencing.  And I'm going to set a schedule

13   for all this once the dust settles on the representation

14   issues.  Affirmatively, I do not want any submissions from

15   anybody on these issues until the representation issue is

16   settled.

17             The first involves forfeiture and restitution.

18             For reasons that are completely puzzling to me, at the

19   very last minute yesterday, as Mr. Teman said, after sentencing

20   had been scheduled and rescheduled and pending for months, I

21   received a flurry of three letters, initiated by one from the

22   government, debating forfeiture and restitution.  And then less

23   than an hour before sentencing, I received a chart with some

24   data, I gather, from the bank victim in this case.

25             Needless to say, given the last-minute nature of the

KC1VTEMC

submissions, I have not had a full opportunity to study the
issue.  And in subject of best practices, this is not the way
to go, government, to start teeing that stuff up the day before
sentencing.

At this point I am simply uncertain as to the legal
and factual bases for an award of forfeiture here, on top of an
award of restitution.  I just haven't looked into it or
explored it; and the rather threadbare letters I've gotten
don't give me enough to go on.

It's also frankly unclear to me from the letters
whether the government is, in fact, seeking separate awards of
forfeiture and restitution, how they relate to each other, if
there is a legal basis for compounding both here, and
whether -- if the government is seeking both, whether the Court
has the legal authority or the discretion to decline to order
the forfeiture on the grounds that on the circumstances here
it's essentially a replica of restitution.

I'm still formulating the full range of (inaudible) on
which I will eventually need guidance from counsel.  But I
expect that once the *Curcio* or representation issue is done, I
will commission letter briefing on this issue that was
belatedly exposed to me in the last 24 hours.  And I will
certainly insist that the briefing be complete materially in
advance of the eventual sentencing date.

All right.  The second area in which I'm likely to

KC1VTEMC

1   solicit presentencing briefing involves whether Mr. Teman is

2   going to qualify for bail pending appeal.  And the reason is

3   that it may be important to the Court in determining the just

4   and reasonable sentence to know whether Mr. Teman is likely to

5   serve some of the prison sentence during a time when prison

6   conditions are more restrictive than usual as a result of the

7   pandemic, or whether any such sentence would first begin to be

8   served after the appellate process has run its course and when,

9   God willing, the pandemic has also hopefully run its course.

10          As counsel may be aware, I believe that the pandemic

11  is an important factor that a just court must take account of

12  at sentencing, just as it must in evaluating relevant in the

13  last number of months petitions for compassionate release.  As

14  counsel are probably aware, I personally granted a large number

15  of compassionate release applications during the pandemic.  In

16  imposing sentences during the pandemic, I have imposed sentence

17  in a number of cases in which the defendant had been in custody

18  since the pandemic walloped New York beginning in mid March.

19          As you are all aware, the conditions in federal

20  prisons have been uncommonly hard during the pandemic.  At the

21  MCC and the MDC, the local jails, where in-custody defendants

22  awaiting sentence in this district are typically held, such

23  conditions have been particularly onerous and, on several

24  occasions, have resulted in lengthy lockdowns.  To prevent the

25  spread of COVID, there have been restrictions on inmate

KC1VTEMC

movement, and on visits from family and counsel.  There have
also been restrictions to aimed at safeguarding health in
various FCIs, federal correction institutions, in which
defendants are generally designated after sentencing.

I have repeatedly taken those harsh conditions into
account in imposing sentence.  I have repeatedly said in
sentences over the last eight months that time spent in custody
during the lockdown conditions necessitated by a pandemic is
necessarily harder time than Congress or anyone ever envisioned
or intended prison time to be.

And so in deciding on the just sentence, I have taken
the view the defendants who have endured custody in such
circumstances are entitled -- all else equal -- to lower
overall sentences than would otherwise be the case.  In other
words, in calculating the sentence, I have informally given
defendants credit for more than one day for each day spent in
custody.  And the same logic applies to a defendant whose term
of prison custody has not yet begun, but is likely to begin
while the pandemic is still ongoing.

So it will be an important data point for me, in
calculating the just and reasonable sentence, to factor in
whether Mr. Teman does or does not satisfy the requirements for
bail pending appeal.  If he does satisfy those standards, given
the typical life cycle of a criminal appeal in the Second
Circuit, his prison term is less likely to be spent during

KC1VTEMC

1  pandemic lockdown conditions than if he does not satisfy those

2  standards.

3       For obvious reasons, I do not want to receive any such

4  submissions from counsel until the representation issue has

5  been squarely resolved.  But I'm giving all of you -- including

6  potentially counsel yet to be retained -- a heads-up that once

7  the representation issue is resolved, I am likely to set a

8  schedule for such submissions.  And I will, in the order that I

9  issue, likely try to put a sharp point on any particular issues

10  that would be of assistance to me for counsel to address.

11       And I want to ask defense counsel -- I'm here

12  addressing myself not just to the present defense counsel, but

13  to anyone who may later join Team Teman of the following one

14  issue that is important and relates to sentencing.  And again,

15  Mr. Teman, I'm looking out for you.

16       The issue is whether it makes sense and it is in

17  Mr. Teman's best interest to hold sentencing soon after the

18  conflict issue, the representation issue, is resolved, or

19  whether it makes better sense to put sentencing off, and here's

20  why:

21       I am acutely aware that the COVID pandemic is

22  currently at a peak.  I'm aware that Mr. Teman has heightened

23  exposure to COVID, given his history of respiratory issues.

24       Before sentencing takes place, the standards governing

25  Mr. Teman's release are set by Title 18, United States Code,

KC1VTEMC

1    Section 3143(a).  And I found that Mr. Teman meets those

2    standards, which allows him to stay at home where he and

3    probably the rest of the country are likely most safe during

4    COVID.

5            Once sentencing occurs, however, for Mr. Teman to

6    remain at liberty -- barring the time spent between sentencing

7    and surrender date -- all that will require him to satisfy a

8    different statute, Title 18, United States Code, Section

9    3143(b).  And that statute, the bail pending appeal statute,

10   requires Mr. Teman to identify substantial questions on appeal

11   that would likely lead to reversal or a new trial as that

12   standard has been articulated by the Second Circuit in the

13   foundational case of *United States v. Randell*, 761 F.2d 122,

14   (2d Cir. 1981).

15           I am not prejudging that question.  I will be eager to

16   hear what counsel have to say about that.  But, in the interest

17   of candor, I will say that I am familiar with the issues in

18   this case.  I resolved the extensive post-trial motions

19   litigated by Mr. Gelfand and Mr. DiRuzzo.  And I denied all

20   those motions in a 27-page decision I issued on June 5th

21   docketed at docket 138.

22           Based on the issues that have been put to me so far,

23   at present, I'm not seeing a question or legal issue that rises

24   to the *Randell* standard.  Again, I could be wrong.  I'm happy

25   to be briefed.  But I'm quite well familiar with the issues

KC1VTEMC

1    (inaudible) --

2              THE COURT REPORTER:  I'm sorry.  I'm sorry, your

3    Honor?  Your Honor?  Okay.

4              THE COURT:  -- Section 3145(c) of Title 18, which

5    permits release where "exceptional reasons exist," which this

6    Court has cited in allowing the pretrial release of various

7    prisoners during COVID, alas, does not eliminate the

8    requirement that a defendant who is between sentencing and

9    appeal establish the existence of a substantial question under

10   3143(b).

11             So I would ask the defense, present and future, to

12   consider thoughtfully whether it really is in Mr. Teman's best

13   interest to proceed to sentencing now.  The pandemic right now

14   is surging across the country.  It may continue to surge for

15   some time.  I am open to putting off the sentencing date, and

16   hopefully this dreadful public health situation will begin to

17   abate before long.

18             And during the period between before sentencing, that

19   requires -- that, rather, enables Mr. Teman to remain out of

20   custody, provided only that he continues to comply with the

21   existing conditions of release that have been set, which he has

22   shown an inability to comply with.

23             A number of my colleagues have handled this very

24   situation in this very way, by adjourning the sentencing dates

25   of defendants who are currently released on conditions of bail.

KC1VTEMC

1    I'm willing to do that here.  I'm open to an adjournment.

2            So I ask defense counsel to reflect, in consultation

3    with Mr. Teman, and take that up with Mr. Teman.  And after the

4    completion of the representation determination, if you will, I

5    expect to issue an order confirming that, after thoughtful

6    consultation between defendant and counsel, I would like to

7    understand what Mr. Teman's judgment is as to whether to

8    proceed or seek an adjournment until hopefully that the

9    pandemic is in (inaudible).

10           So with that, I have nothing further for now.  But

11   those are important issues that I want counsel to consider.

12           With that, I'm going to go around the horn to see if

13   there's anything else that needs to be addressed.  But if there

14   is nothing else, I will expect a joint submission on December

15   15th, whether relating to the *Curcio* issue or, if that is

16   mooted, whether as to the next step in progress in the case.

17           Mr. Teman, I'm mindful that if you wind up in the hunt

18   for new counsel, two weeks may not be enough.  Rest easy.  I'm

19   not forcing your hand here.  If you need the time, you'll get

20   it.

21           With that, let me just go around the horn, beginning

22   with you, Mr. Biale.  I Appreciate that all of this appears to

23   have come as a surprise to you, notwithstanding my comment

24   earlier that it ought to have been flagged for me earlier.

25   Knowing you well, as I do, I have 100 percent confidence in

KC1VTEMC

1   your integrity and have no doubt -- despite what was said by

2   Mr. Teman -- of your good faith, independence, integrity, and

3   commitment to him.  Nevertheless, the nature of conflicts is

4   that potential conflicts need to be run through this process.

5           Is there anything else you want to put on the record

6   or say at this point?

7           MR. BIALE:  Understood, your Honor.

8           Not at this time.  Thank you.

9           THE COURT:  Mr. Bhatia, anything from you?

10          MR. BHATIA:  Obviously we'll take all the comments

11  from today into account and speak with counsel, whoever that

12  may be.

13          One thing to flag for your Honor is there was some

14  question about adequate notice for forfeiture.  To the extent

15  sentencing is now adjourned, we may want to give that notice

16  sooner rather than later.  The issue is a notice one.

17          So I'm just flagging for the Court and for the defense

18  that we may do that; but it's not with the intention of

19  catching anyone in a period of transition.  But if the question

20  is notice, we hope to give that -- make sure that everyone is

21  on notice now.

22          THE COURT:  Mr. Bhatia, I've already directed that.

23  Essentially, I said that once we've sorted out the

24  representation issue, one of the areas in which I need

25  considerably more input from both sides -- but in the first

KC1VTEMC

1    instance, the government -- involves restitution and

2    forfeiture.  It follows that on the schedule I set, you will

3    have your opportunity to say your piece, and Mr. Teman's

4    counsel will have their opportunity to.

5            And all those will be submitted with finality

6    sufficiently in advance of sentencing so that each side isn't

7    dealing with movable parts here, and they know what the sum and

8    substance of the submissions are, and I, in turn, will be able

9    to get the answer right.

10            But it's no way to promote accuracy and

11    decision-making to dump stuff on a court in the way that

12    happened in the last 24 hours.  And so this time, by court

13    order, I will insist that everything be submitted meaningfully

14    enough in advance so that I can do my job right.

15            MR. BHATIA:  Obviously we will comply with the Court's

16    schedule.  I wasn't sure if the Court wanted us to write extra

17    notice under 32.2, sort of, as soon as possible.  We'll stick

18    with the schedule that you've laid out.

19            THE COURT:  All right.

20            I thought I was crystal clear.  I do not want any

21    substantive submissions in the case until the representation

22    issue is sorted out.  It's a lot easier to sort this out and to

23    not compound any issue if you are communicating or sending

24    stuff to Mr. Biale while he is subject to an as yet unwaived

25    conflict.  So I would much sooner just hit the power save

KC1VTEMC

1    button on anything of substance until the representation game

2    of musical chairs has come to a close.  Okay?

3              MR. BHATIA:  That makes perfect sense.  Thank you.

4              THE COURT:  All right.

5         Mr. Teman, I strongly discourage you from saying

6    anything further; nonetheless, this concerns you.  If there's

7    something you feel must be said, mindful that your counsel are

8    no doubt channeling me in saying, Don't say it, I give you the

9    floor.

10             THE DEFENDANT:  Your Honor, thank you.

11        I want to just put on the record that I retained

12   Justine Harris.  I didn't know -- know them.  But I retained

13   Sher Tremonte specifically to deal with the topic of *Brady*

14   violations and other related S.D.N.Y. cheating as I've

15   addressed, having nothing to do with sentencing.  In fact, they

16   have made clear that they just volunteered out of the goodness

17   of their heart to show up to sentencing.

18        And what a surprise party it has been.

19        Second, I can't speak to technicalities and

20   legalities, but this idea that now S.D.N.Y. gets additional

21   time to correct an error of disclosure, I'll note that their

22   disclosure where they say they got information from Bank of

23   America, said they got it December 30th of 2020.  So we're

24   still on Skype, but they have time travel.

25        It just seems like every single time in this case

KC1VTEMC

1   S.D.N.Y. messes up and then they cheat to get it in anyway,

2   witnesses have fled the country, etc.  I just want to note that

3   for the record.

4        I very much expect to show up with new counsel.  And I

5   don't know of the technical means of doing this, but I very

6   much expect to ask for some sort of outside independent

7   hearing, whether it's an ablit (ph) court.  You have a personal

8   relationship with this guy.  He does a major significant thing.

9   And, your Honor, it may be all accidental, you know?  Like

10  hiring the wrong person at a company who leaks information to a

11  competitor, that might be all accidental, but it's still a spy

12  on the team.  And this is shocking.

13       So that's all I'm going to say.  Thank you.

14       THE COURT:  All right.  Look, Mr. Teman, we have a

15  process for the resolution of claims.  It's called litigation

16  before the district court.  If either party is dissatisfied

17  with the resolution that I reach, we have a process called

18  appeal.  That's what we will do here.

19       You are at liberty to pursue with counsel or successor

20  counsel any grievances you have.  Counsel, binded by their

21  obligations not to bring privilege claims before the Court, are

22  at liberty to pursue claims.  And if you have a good-faith

23  basis to think that this is other than appears to the Court,

24  which is simply a failure to raise with the Court the issue of

25  a marital relationship, and if you really believe that there's

a basis for believing that you have a spy in your kip, you're at liberty to pursue that through independent counsel, they are empowered to make motions before me, and we'll litigate that in the proper way. I can't foresee the means by which any such issue will be litigated until something is before me.

But there's a process for that. I hope, if nothing else is clear to you, I hope it's obvious from you today that I am trying to protect your rights in this process, and I will continue to do so, including in the context of any claim you, through counsel, should choose to raise.

With that, I look forward to hearing from everybody in two weeks. I want to wish everybody continued good health for you and your families.

And Mr. Teman, I regret that, you know, the challenge of being a criminal defendant at this time has been compounded by the challenge of being, you know, cooped up in a worldwide pandemic with all the concerns that must be on your mind. So you're in my thoughts.

In any event, we stand adjourned.

I look forward to a joint submission two weeks from now. In case I haven't made it clear enough though, no substantive submissions until we've sorted out the counsel issue. I will issue a bottom-line, one or two-sentence order reflecting the bottom-line outcome here.

We stand adjourned. Thank you. (Adjourned)